UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALBANY MED HEALTH SYSTEM, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>HEALTH RESOURCES AND SERVICES<br>ADMINISTRATION, et al.,<br><br>    Defendants. | Civil Action No. 23-3252 (APM) |

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

    I.    Statutory Background ........................................................................................... 3

    II.    340B Office of Pharmacy Affairs Information System ("OPAIS") Registration... 4

    III.    Apart From Declared Public Health Emergencies, HRSA Has Used Medicare Cost Report Verification Since 1994. ...................................................................... 6

    IV.    HRSA Ends Registration Flexibilities After the COVID-19 Public Health Emergency to Promote Program Transparency and Integrity. ................................ 8

LEGAL STANDARDS ....................................................................................................... 12

ARGUMENT ...................................................................................................................... 13

    I.    Plaintiffs' Notice-and-Comment Claim Fails Because Medicare Cost Report Verification Is a Procedural Rule. ......................................................................... 15

    II.    Congress Gave HHS the Authority to Establish Medicare Cost Report Verification. ......................................................................................................... 20

    III.    Plaintiffs' Statutory-Interpretation Arguments Are Misplaced. .......................... 21

    IV.    HRSA's Resumption of Medicare Cost Report Verification Was Not Arbitrary and Capricious. ................................................................................................... 24

        A.    Plaintiffs' Invocation of Lost Savings Does Not Make the Notice Arbitrary and Capricious. ......................................................................... 26

        B.    Plaintiffs' Claim that HRSA Has Diverged from CMS Practice Does Not Make the Notice Arbitrary and Capricious. ............................................... 27

        C.    The 2023 Notice Is Adequately Reasoned. ............................................... 30

    V.    Even if Medicare Cost Report Verification is a Legislative Rule, It Was Issued 30 Years Ago Pursuant to Notice and Comment, And Any Challenge Is Far Too Late. ..................................................................................................................... 36

    VI.    Relief, if Any, Should Be Properly Limited. ....................................................... 42

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott Labs. v. Young,*
 920 F.2d 984 (D.C. Cir. 1990) ............................................................................ 23
*AFL-CIO v. NLRB,*
 57 F.4th 1023 (D.C. Cir. 2023) ...................................................................... passim
*Akron Gen. Med. Ctr. v. Azar,*
 836 F. App'x 13 (D.C. Cir. 2021) ................................................................ 21, 24
*Alliance for Hippocratic Med. v. FDA,*
 78 F.4th 210 (5th Cir. 2023) ........................................................................ 32, 37
*Am. Hosp. Ass'n v. Bowen,*
 834 F.2d 1037 (D.C. Cir. 1987) .......................................................................... 17
*Califano v. Yamasaki,*
 442 U. S. 682 (1979) ............................................................................................ 42
*City of Brookings Mun. Tel. Co. v. FCC,*
 822 F.2d 1153 (D.C. Cir. 1987) .......................................................................... 35
*Clean Air Council v. Pruitt,*
 862 F.3d 1 (D.C. Cir. 2017) ................................................................................ 38
*Cnty. of Los Angeles v. Shalala,*
 192 F.3d 1005 (D.C. Cir. 1999) .......................................................................... 28
*CTS Corp. v. Waldburger,*
 573 U.S. 1 (2014) ................................................................................... 23, 27, 30
*Dist. Hosp. Partners, L.P. v. Burwell,*
 786 F.3d 46, (D.C. Cir. 2015) ...................................................................... 25, 40
*Envtl. Def. Fund v. Costle,*
 657 F.2d 275 (D.C. Cir. 1981) ............................................................................ 13
*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ..................................................................................... 13, 35
*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021) ............................................................................... 12, 13, 29
*Gill v. Whitford,*
 138 S. Ct. 1916 (2018) ........................................................................................ 42
*Gomez v. Trump,*
 485 F. Supp. 3d 145 (D.D.C. 2020) .................................................................... 42
*Grossmont Hosp. Corp. v. Burwell,*
 797 F.3d 1079 (D.C. Cir. 2015) .......................................................................... 22
*Heckler v. Chaney,*
 470 U.S. 821 (1985) ............................................................................... 32, 36, 41
*Impro Prods. v. Block,*
 722 F.2d 845 (D.C. Cir. 1983) ...................................................................... 36, 37
*Indus. and Fin. Mkts. Ass'n v. CFTC,*
 67 F. Supp. 3d 373 (D.D.C. 2014) ...................................................................... 42

*ITServe Alliance v. Cissna*,
    443 F. Supp. 3d 14 (D.D.C. 2020) ............................................................... 38
*James V. Hurson Assocs., Inc. v. Glickman*,
    229 F.3d 277 (D.C. Cir. 2000) ............................................................... 16, 17
*JEM Broad. Co., Inc. v. F.C.C.*
    22 F.3d 320 (D.C. Cir. 1994) ....................................................................... 19
*Kessler v. F.C.C.*,
    326 F.2d 673 (D.C. Cir. 1963) ............................................................... 19, 22
*Lamoille Valley R.R. Co. v. ICC*,
    711 F.2d 295 (D.C. Cir. 1983) ..................................................................... 17
*Lomak Petroleum, Inc. v. FERC*,
    206 F.3d 1193 (D.C. Cir. 2000) ................................................................... 12
*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ....................................................................................... 42
*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 41, 42
*Maggard v. O'Connell*,
    671 F.2d 568 (D.C. Cir. 1982) ..................................................................... 25
*Make The Road N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ..................................................................... 36
*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..................................................................................... 29
*Mathews v. Eldridge*,
    424 U.S 319 (1976) ...................................................................................... 13
*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ....................................................... 36, 37, 38
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 34
*Nat'l Biodiesel Bd. v. EPA*,
    843 F.3d 1010 (D.C. Cir. 2016) ................................................................... 37
*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ................................................................... 42
*Ogletree v. Cleveland State Univ.*,
    2022 WL 17826730 (N.D. Ohio Dec. 20, 2022) ......................................... 42
*Phoenix Herpetological Soc'y, Inc. v. U.S. Fish and Wildlife Serv.*,
    2020 WL 3035037 (June 5, 2020) ................................................................ 13
*Planned Parenthood of Metro. Washington, D.C., Inc. v. Horner*,
    1988 WL 126240 (D.D.C. Nov. 15, 1988) ................................................... 22
*Pub. Cit. v. Dep't of State*,
    276 F.3d 634 (D.C. Cir. 2002) ..................................................................... 19
*Public Serv. Comm'n of Utah v. Wycoff*,
    344 U.S. 237 (1952) ..................................................................................... 43
*Ranger v. FCC*,
    294 F.2d 240 (D.C. Cir. 1961) ..................................................................... 19
*Sadeghzadeh v. USCIS*,
    322 F. Supp. 3d 12 (D.D.C. 2018) ......................................................... 12, 17

*Sanofi-Aventis U.S., LLC v. HHS*,
   570 F. Supp. 3d 129 (D.N.J. 2021) ............................................................ 23, 39, 40
*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ...................................................................................... 22
*Sierra Club v. EPA*,
   551 F.3d 1019 (D.C. Cir. 2008) .................................................................... 37
*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) ...................................................................................... 42
*United States ex rel. Complin v. N.C. Baptist Hosp.*,
   2016 WL 7471311 (M.D.N.C. Dec. 28, 2016) ............................................. 34
*United States v. Calhoon*,
   97 F.3d 518 (11th Cir. 1996) ........................................................................ 34
*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ...................................................................................... 20
*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................................................... 42
*United Student Aid Funds v. Devos*,
   237 F. Supp. 3d 1 (D.D.C. 2017) .................................................................. 40
*Vernal Enterps., Inc. v. FCC*,
   355 F.3d 650 (D.C. Cir. 2004) ...................................................................... 41
*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ...................................................................................... 20
*WWHT, Inc. v. FCC*,
   656 F.2d 807 (D.C. Cir. 1981) ................................................................ 25, 26

Statutes

28 U.S.C. § 2201(a) ................................................................................................ 42
28 U.S.C. § 2401(a) ................................................................................................ 36
42 U.S.C. § 256b ...................................................................................................... 3
42 U.S.C. § 256b(a)(4) ..................................................................................... passim
42 U.S.C. § 256b(a)(5)(B) ................................................................................ 39, 43
42 U.S.C. § 256b(a)(9) ................................................................... 2, 14, 19, 20
42 U.S.C. § 256b(d) .......................................................................................... 24, 25
42 U.S.C. § 256b(d)(2) ............................................................................................ 34

Regulations

42 C.F.R. § 413.65 ........................................................................................... passim
42 C.F.R. § 413.65(b)(1) ......................................................................................... 28
42 C.F.R. § 413.65(k) .............................................................................................. 35
42 C.F.R. §§ 405.1801(b) .......................................................................................... 5

Other Authorities

59 Fed. Reg. 29,300 ................................................................................................ 16
61 Fed. Reg. 55,156 ................................................................................................ 35

65 Fed. Reg. 18,434 ................................................................................................................. 27

## INTRODUCTION

For a hospital to register an off-site clinic in the 340B Drug Pricing Program ("340B Program" or "Program")—which is a discount drug purchasing program for certain safety-net healthcare providers—the Health Resources and Services Administration ("HRSA") requires the hospital to submit certain information, including information from its most recently-filed Medicare Cost Report. HRSA has taken this approach since 1994, and for good reason. The registration process, including use of the hospital's Medicare Cost Report, helps verify that the off-site clinic is eligible to participate in the 340B Program as an integral part of the parent hospital. It allows other stakeholders in the Program to identify which sites may access 340B discount pricing. It is a necessity for basic Program operability, administrability, transparency, and integrity. It is also expressly mandated by the 340B statute, which instructs the agency to notify Program stakeholders of the identities of participating hospital sites and to develop a registration system that verifies the hospitals' information.

In recognition of the unprecedented exigencies presented by the COVID-19 pandemic, HRSA extended certain flexibilities to 340B hospitals in service of patient care. The pandemic forced hospitals to rapidly reorganize their operations, sometimes shifting services to new locations for patient safety. HRSA recognized that it could take time for a new site to appear on the hospital's Medicare Cost Report and be registered with the Program, so it relaxed its normal practice of requiring hospitals to register the sites before they accessed 340B pricing. Rather, the sites could use 340B drugs for their patients immediately and register later when practicable.

When the COVID-19 public health emergency came to an end in May 2023, so did HRSA's relaxation of its longstanding registration requirements. When hospitals professed confusion, HRSA issued a Federal Register notice in October 2023 to remind hospitals of these longstanding requirements and provide them a grace period to come into compliance.

No good deed goes unpunished. Plaintiffs now seek to use HRSA's emergency response as a springboard to challenge 340B registration requirements. They assert that Medicare Cost Report verification is unlawful under the Administrative Procedure Act ("APA"). But their APA claims rest on a fundamental misunderstanding of the nature and role of HRSA's use of Medicare Cost Report verification for 340B registrations.

The Medicare Cost Report approach, as an aspect of the 340B registration process, is quintessentially a procedural rule. It is not an added substantive criterion for Program eligibility. It is a procedural mechanism to determine whether an off-site clinic can derive eligibility from its 340B-eligible parent hospital. Obviously, the 340B Program could not function without some sort of mechanism to identify and verify the eligible participants—just as such mechanisms are necessary for a multitude of government programs that provide benefits to defined recipients.

As a procedural rule, the Medicare Cost Report approach is not subject to the APA's notice-and-comment requirements. The 340B statute grants HRSA the authority to maintain such a registration process; Plaintiffs simply ignore the relevant provisions at 42 U.S.C. § 256b(a)(9) and (d)(2). Plaintiffs' statutory-interpretation analysis of the phrases "covered entity" or "patient of the entity" also misses the mark, as this is not a dispute about the substantive eligibility of covered-entity sites or whether they can provide 340B drugs to their patients. This is a dispute about the procedure for registering 340B covered entities—registration that the statute expressly mandates.

That leaves Plaintiffs' arbitrary-and-capricious claim. Plaintiffs cannot carry their heavy burden here. Medicare Cost Report verification, which has been in place since 1994, is needed for Program administrability, transparency, and integrity. HRSA explained as much in its 2023 notice reiterating the rule and HRSA's rationale is amply supported by the administrative record.

Even if HRSA's approach were viewed as a legislative rule, Plaintiffs' opportunistic challenge would fail. The 1994 notice that established the rule was preceded by public notice and comment. And nothing HRSA did or said during the pandemic would have repealed it. Thus, Plaintiffs' pre-enforcement challenge to a 30-year-old policy would be untimely.

For these reasons, Plaintiffs are not entitled to any relief and summary judgment should be granted to Defendants.

## BACKGROUND

### I.    Statutory Background

Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, establishes a discount drug purchasing program for certain safety-net healthcare providers. The statute defines the "covered entities" eligible to participate in the 340B Program. 42 U.S.C. § 256b(a)(4). Among them are certain types of hospitals. *Id.* (a)(4)(L)-(O). The Program is administered by HRSA under authority delegated by the Secretary of Health and Human Services (the "Secretary"). The day-to-day operations of the Program are managed by a component of HRSA called the Office of Pharmacy Affairs ("OPA").

The statute imposes certain requirements on both covered entities and the Secretary. Covered entities must not (among other obligations) "resell or otherwise transfer" 340B drugs "to a person who is not a patient of the entity." *Id.* (a)(5)(B). This is known as the prohibition on diversion. Covered entities also "shall not request payment" under Medicaid for a drug subject to 340B discount pricing if that drug would also be subject to a Medicaid rebate. *Id.* (a)(5)(A)(i). This is known as the prohibition on duplicate discounts.

Meanwhile, the Secretary must establish a "a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering,

purchasing, and delivery of covered outpatient drugs under this section." *Id.* (d)(2)(B)(iv). *See also id.* (a)(9) ("[t]he Secretary shall notify manufacturers of covered outpatient drugs . . . of the identities of covered entities"). Relatedly, the statute charges the Secretary with "[t]he development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of [the Department] relating to [section 340B]" and "[t]he development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website . . . ." *Id.* (d)(2)(B)(i), (ii). Subsection (a)(9) has been part of the statute since its passage in 1992. Subsection (d)(2) was added by 2010 amendments.

## II.   340B Office of Pharmacy Affairs Information System Registration

To facilitate 340B Program operations and in accordance with these statutory instructions, HRSA has maintained a database for the registration of covered entity sites since the inception of the 340B Program. *See* A.R.[1] at 15 (1994 notice explaining that a site cannot access 340B pricing until it is included on the Program's "master list"). That database, in its updated form, is known as the 340B Office of Pharmacy Affairs Information System (the "System" or "OPAIS"). A.R. at 34-39.

There are thousands of hospitals participating in the 340B Program, and over 30,000 associated outpatient facilities. Both because of the statutory instructions identified above, and as a matter of basic operational necessity, HRSA must track which healthcare provider sites are participating in the 340B Program. It needs to know so that it can carry out Program auditing. It

---

[1]   Citations to "A.R." mean the certified administrative record produced in this case. The Bates identifier and leading zeroes have been omitted to reduce clutter.

needs to let manufacturers and wholesalers know who may access 340B discount pricing. It needs to let State Medicaid agencies know for their rebate programs.

This lawsuit deals with the mechanics of how a 340B covered-entity hospital registers an off-site clinic ("child site") on the System. HRSA's registration process in its current form has been in place since 2012, and except for declared public health emergencies related to the COVID-19 pandemic or disasters, HRSA has enforced the requirement that hospitals must register child sites in the System before those sites may utilize 340B discount pricing. A.R. at 34-35. Registration proceeds in two steps. First, the parent hospital submits registration information to HRSA during a two-week window that occurs at the start of every calendar quarter. *Id*. Next, HRSA evaluates the information and lists the child site on the System at the start of the following quarter. *Id*. at 37. That is, if a hospital submits paperwork for a child site during the January registration window, and the paperwork is approved, the site will be registered effective April 1.

Part of the paperwork that a hospital must submit for child-site registration draws on information from the hospital's Medicare Cost Report. *Id.* at 48, 135. That is an annual form that a hospital submits to its Medicare Administrative Contractor laying out information such as utilization data and cost center charges. *See* CMS.gov, "Cost Reports"; 42 C.F.R. §§ 405.1801(b), 413.20(b), 413.24(f).  If a child site is not listed on the hospital's Medicare Cost Report, it cannot be registered in the System. A.R. at 48.

This is an objective and administrable approach that provides documentation that the child site—which may be a legally distinct and separately located healthcare provider—is integrated with the parent hospital to be part of the "covered entity" that is statutorily eligible for 340B pricing. Here is the reasoning. The 340B statute draws on Medicare definitions to define hospital-type covered entities. *See* 42 U.S.C. § 256b(a)(4)(L)-(O) (cross-referencing sections 1820 and

1886 of the Social Security Act); A.R. at 14 (1994 notice explaining that "section 1886 addresses Medicare payment for hospital inpatient services"). The Centers for Medicare and Medicaid Services ("CMS"), which administers Medicare, has promulgated regulations for when it will treat healthcare facilities, including off-campus, remote, and satellite locations, as "provider-based" to a "main provider," such that the main provider can bill Medicare for services rendered by the provider-based facility. *See* 42 C.F.R. § 413.65. The regulations on their face are geared towards establishing—for Medicare's purposes—that a potential provider-based facility is adequately integrated with the potential main provider. *See id.* (d), (e) (requirements for provider-based status for all facilities, and additional requirements for "off-campus" facilities).

"Financial integration" is a criterion for provider-based status. *See id*. (d)(3). If a child site is not reflected in a hospital's Medicare Cost Report or supporting documentation, that raises a substantial concern that it is not provider-based. And separately, it raises a substantial question for HRSA as to whether it should be considered part of a 340B-eligible covered-entity hospital.

## III.   Apart From Declared Public Health Emergencies, HRSA Has Used Medicare Cost Report Verification Since 1994.

HRSA has used the Medicare Cost Report approach since 1994. ECF No. 8-1 ("Pl. MSJ") at 1. That year, in a final notice preceded by public notice and comment, HRSA explained that 340B hospitals "offer outpatient services in off-site or satellite outpatient facilities," and that proper interpretation of the term "hospital" in § 256b(a)(4)'s delineation of covered entities would allow for use of 340B drugs at such facilities if they are "an integral component of the" hospital. A.R. at 14. To ensure that a particular facility is indeed an "integral component" of the hospital, and not "properly viewed as an independent, free-standing facility," HRSA stated that it would look at the hospital's Medicare Cost Report, because "[o]nly outpatient facilities which are an integral component of the [hospital] will be included on" it. *Id.* Looking to the Medicare Cost

Report formed an "independent and objective basis" for "fair and easy administration" of the 340B Program. *Id.*

Thus, HRSA has used such verification to vet hospital child sites' participation in the 340B Program for almost 30 years. No one ever sued to challenge HRSA's approach, even though Plaintiffs allege it supposedly created "an enormous practical problem" for 340B hospitals right from the start. Compl. ¶¶ 11, 15; Pl. MSJ at 1. Indeed, no commenter raised this purported "problem" as a concern in 1994. *See* A.R. at 13-15.

In mid-2020, recognizing the exigencies presented by the COVID-19 pandemic, HRSA waived the requirement that a hospital had to register a child site in the System before the child site could access 340B pricing. *Id.* at 53-55. This waiver was "implemented in recognition of the need for hospitals to quickly respond to the rapidly evolving conditions of the COVID-19 pandemic" by, for example, shifting services to off-site locations. *Id.* at 71. HRSA issued the waiver with the expectation that "off-site, outpatient facilities" would eventually "be listed as reimbursable on a future Medicare Cost Report," *id.*, thus affirming that the facility was integrated with the parent hospital and not an independent provider. *See also id.* at 55 (2020 FAQ describing flexibility for hospitals that cannot "*yet*" register a child site) (emphasis added); *id.* at 76; *id.* at 105 (June 2020 email from stakeholder recognizing the "expectation that before using 340B drugs, the site is operating in a manner that ultimately will lead to it appearing on the next filed cost report") (emphasis omitted). Then, the covered entity could register the site in the System. *See id.* at 55.

With the end of the COVID-19 public health emergency in May 2023, HRSA ended its waiver of child-site registration requirements, including the waiver of Medicare Cost Report verification, and resumed its original policy. *Id.* at 61-62, 70-71, 135. Thus, hospitals' purported

child sites can no longer access 340B pricing immediately; rather, they must first register in the System (and as a precursor step, be listed on the parent hospital's Medicare Cost Report).

## IV.    HRSA Ends Registration Flexibilities After the COVID-19 Public Health Emergency to Promote Program Transparency and Integrity.

During the COVID-19 pandemic—a period which drew the Department of Health and Human Services ("Department") and HRSA's attention and resources to a host of urgent and complicated problems unrelated to the 340B Program—HRSA officials preliminarily assessed that it might not be necessary to require Medicare Cost Report verification, even after the pandemic. If hospitals were appropriately accessing 340B discount pricing at off-site clinics, HRSA expected that they would eventually appear on the hospital's Medicare Cost Report and be registered on the System without issue. And so, during the height of the pandemic, HRSA informally communicated to stakeholders that the waiver of Medicare Cost Report verification would last beyond the public health emergency—while also simultaneously saying the opposite. *See* A.R. at 94 (June 8, 2020 email to trade periodical); *but see also id.* at 90 (June 3, 2020 email to same periodical stating, "HRSA has not changed its policy in that we continue to only register hospital outpatient facilities on [the System] that are listed as reimbursable on the hospital's Medicare cost report. The 1994 guidance you mention is still in place."); *id.* at 104 (June 16, 2020 email to healthcare lawyer stating "[t]his is not a change in policy" but rather HRSA posted the registration-waiver FAQ "in light of the COVID-19 pandemic in an effort to highlight some of the 340B practices that are available to covered entities during this challenging time"). With respect to the informal statement(s) that the waiver would remain past the end of the pandemic, there was the implicit but obvious caveat that the waiver was contingent on 340B hospitals not abusing it.

Experience did not bear out HRSA's expectation of how 340B hospitals would act. During fiscal year 2023 audits (which began October 2022), HRSA found that more than one-third of the

audited hospitals had failed to register their child sites in the System despite (i) reporting that the unregistered sites would be listed on a future Medicare Cost Report, and (ii) having had time since the audits to register the sites. *Id.* at 21; *see also id.* ("HRSA has found that despite these representations, those covered entities did not attempt to bring those sites into compliance with HRSA requirements."); *id.* at 302-11 (April 2023 compliance analysis).

HRSA's inquiries to hospitals also revealed that the waiver had allowed the proliferation of possibly non-compliant sites accessing 340B pricing. Due to reports from stakeholders and the media regarding hospitals' potential abuse of the 340B Program, HRSA sought information from 60 hospitals in early 2023. *Id.* at 21; *see also id.* at 296-301 (sample letters to hospitals). The hospitals were chosen for their high number of registered child sites; their high volume of 340B purchases; or past findings of 340B Program noncompliance. *Id.* at 21. HRSA found that nearly half of the hospitals were utilizing 340B drugs at sites not listed on their most recent Medicare Cost Report; moreover, even listed sites sometimes had no reported costs or charges. *Id.*; *id.* at 466 (summary analysis); *see also id.* at 313-465, 467-471 (supporting information for summary analysis). In such circumstances, "HRSA cannot verify whether use of 340B drugs at those sites" "is warranted," *id.* at 21, because HRSA did not know whether those purported child sites were adequately integrated with a 340B-eligible hospital.

Thus, as the Department prepared to transition out of the COVID-19 public health emergency, HRSA was faced with a problem: the waiver had given rise to a situation where hospitals were using 340B discount drugs at off-site facilities without HRSA having any indication that those facilities were actually integrated with a statutorily eligible covered entity. *See id.* at 21 ("HRSA is unable to verify the eligibility of 340B Program participants when off-site, outpatient facilities are permitted to participate prior to their inclusion on the most recently filed Medicare

Cost Report."). Without using Medicare Cost Report verification as part of the System registration during the public health emergency, HRSA had been solely reliant on after-the-fact audits to confirm that a covered-entity hospital was appropriately accessing 340B pricing for an off-site clinic that was a true child site.[2]

Meanwhile, in 2023, the exigencies that had justified the waiver no longer existed. *See id.* at 20 ("[T]he circumstances [no longer require] significant unplanned activities or changes by hospital covered entities to accommodate these exigencies or adjust operations without planning for additional requirements to conduct business."). It was no longer necessary to sacrifice program integrity so that hospitals could "expeditiously adjust their operations and locations for providing care off-site while maintaining immediate access to the 340B Program resources." *Id.*; *see also id.* at 21 ("[A]udits of covered entities suggest that the waiver is widely used by covered entities though it is no longer necessary to meet the unique challenges due to the [pandemic].").

Beyond assuring the basic eligibility of covered-entity sites, HRSA's registration process served other policy objectives, too, and those objectives were definitively undermined by the waiver. In 2022, the 340B Program accounted for more than $53.7 billion worth of drug purchases; it touches a multitude of stakeholders, so transparency and administrability are of paramount importance. When "facilities participate without first being registered and listed in [the System], as occurred under the waiver, it can create confusion and make efforts to audit or determine compliance difficult because HRSA, states, and drug manufacturers do not have uniform and comprehensive visibility into which sites are eligible to purchase 340B drugs." *Id.* at 21. After all, the System "is a centralized resource not just for HRSA, but also for manufacturers and states,

---

[2]    HRSA can only audit a fraction of covered entities in the Program. HRSA conducts about 200 audits a year; there are currently nearly 3,000 hospitals in the Program (not to mention other covered entities) and over 33,000 associated outpatient facilities.

who use it to plan operations (such as distribution) that may adjust depending on the number of facilities in a given location." *Id.* And by impeding HRSA's ability to audit covered-entity hospitals, the temporary registration waiver increased the risk of diversion by creating situations where 340B drugs "would be dispensed to individuals for whom HRSA is unable to verify their patient eligibility status." *Id.*

Furthermore, registration is critical to effectuating the 340B statute's prohibition on duplicate discounting—a situation in which "a manufacturer provides both a Medicaid rebate and a 340B discount on the same drug." *Id.* That is because HRSA's mechanism for tracking the intersection of Medicaid and 340B utilization, known as the "Medicaid Exclusion File," can only accommodate covered-entity sites that were registered and listed in the System. *Id.* "Therefore, manufacturers and states would not know which sites use 340B for their Medicaid patients, as the [Medicaid Exclusion File] is used by them to decrease the likelihood of duplicate discounts." *Id.*

In short, it was necessary to end the registration waiver to serve the "original policy goals" that had "for decades" led HRSA to "requir[e] certain criteria for off-site, outpatient facility registration on an ongoing basis." *Id.* at 20. It was also consistent with the statute and responsible, common-sense Program administration, both of which call for identifying and verifying the healthcare providers that participate in a $50 billion drug purchasing program. In May 2023, HRSA began informing stakeholders that the temporary waiver of Medicare Cost Report verification (like its waiver of child-site registration as a whole) would come to an end when the public health emergency came to an end. *See, e.g.*, *id.* at 126-37. In October 2023, HRSA published a notice in the Federal Register "remind[ing] stakeholders" of Medicare Cost Report verification and outlining its "approach to enforcement of 340B registration requirements." *Id.* at 19-22, 70-72. Because "some covered entities believed the waiver would continue indefinitely and would not be

tied to the end of the" public health emergency, HRSA issued the notice to give hospitals a grace period to come into compliance with HRSA's "longstanding registration requirements." *Id.* at 21. A hospital would not be subject to enforcement action if it registered its child sites during the January 2024 registration window, or else notified HRSA by January 25, 2024 (ninety days after the notice) that it would register an operational child site not yet on its Medicare Cost Report. *Id.* at 21-22. While HRSA allowed hospitals this grace period from enforcement, it did "not believe that any undue burden would be caused by reverting back to its original program guidelines, which have been in place since 1994." *Id.* at 22. In the wake of the end of the registration flexibilities and the October 2023 notice, HRSA has seen a marked uptick in the number of child sites being registered on the System.[3]

## LEGAL STANDARDS

In APA cases, summary judgment serves as "the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Sadeghzadeh v. U.S. Citizenship & Immigr. Servs.*, 322 F. Supp. 3d 12, 17 (D.D.C. 2018) (citation omitted). The typical Rule 56 standard "does not apply because of the limited role of a court in reviewing the administrative record." *Id.* (citation omitted). "[T]he district judge sits as an appellate tribunal, and the entire case on review is a question of law." *Id.* (cleaned up). The party challenging final agency action bears the burden of demonstrating a violation of the APA. *Lomak Petrol. Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000).

---

[3]    For example, the number of hospital child-site registrations in the first quarter of 2024 doubled those in the first quarter of 2023. This supports HRSA's concern that hospitals were using the waiver to access 340B pricing at sites that eluded basic Program transparency and integrity measures. Information about the number and timing of hospital child-site registrations is publicly available on the System (https://340bopais.hrsa.gov/home).

For Plaintiffs' arbitrary-and-capricious claim, judicial review is "deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Sadeghzadeh*, 322 F. Supp. 3d at 17 (subsection 706(2)(A) reflects "a narrow standard of review as courts defer to the agency's expertise") (quotes omitted); *Phoenix Herpetological Soc'y, Inc. v. Fish & Wildlife Serv.*, Civ. A. No. 17-2584 (APM), 2020 WL 3035037, at *4 (D.D.C. June 5, 2020) (describing standard as one that is "highly deferential" and "presumes the agency's action to be valid") (citing *Env't Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)). The APA's arbitrary-and-capricious standard requires only that "agency action be reasonable and reasonably explained." *Prometheus Radio*, 592 U.S. at 423. A court "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotes omitted).

## ARGUMENT

Plaintiffs assert that HRSA's return to enforcement of Medicare Cost Report verification is unlawful because it: (i) was done without notice-and-comment rulemaking; (ii) exceeds HRSA's statutory authority; (iii) is contrary to the 340B statute; and (iv) is arbitrary and capricious. Plaintiffs' claims fail because they are predicated on a fundamental misunderstanding of the nature and role of such verification in HRSA's administration of the 340B Program. It is not a substantive restriction on covered entities' participation in the Program; rather, it is a means of identifying and verifying which sites are eligible to access 340B discount pricing. Translated to APA terms, HRSA's reliance on the Medicare Cost Report is a procedural, not legislative, rule.

Defendants agree with Plaintiffs that an off-site clinic that is integral to a covered-entity hospital is eligible to participate in the 340B Program. But without verification and registration, HRSA (and key participants in the Program, such as drug manufacturers and wholesalers) will not

know that a given outpatient facility is integral to, and thus part of, a 340B covered-entity hospital. All sorts of government-backed programs where someone is getting a benefit require persons to register and verify their eligibility. Inherent in such processes is the possibility of delay, burden, and mistakes. *Cf. Mathews v. Eldridge*, 424 U.S 319, 340-48 (1976). The 340B Program is no different: the statute requires HRSA to identify and verify participating covered entity sites. *See* 42 U.S.C. § 256b(a)(9), (d)(2) (requiring a "single, universal, and standardized" system for the "identification" and "verif[ication]" of "each covered entity site"). To do so, HRSA asks for certain information, including information from the parent hospital's latest filed Medicare Cost Report. This is a common-sense necessity for basic program administrability and integrity. For example, without System registration, drug manufacturers would have little transparency into who is receiving the 340B discounted drugs and wholesalers would not know which sites they can distribute 340B discounted drugs to. And with unknown sites receiving the covered outpatient drugs, there is a heightened risk of such drugs being subject to both the 340B discount and a Medicaid rebate. As HRSA's experience during the pandemic shows, hospitals may prefer to operate with limited transparency into where they are using 340B drugs. But that is not a responsible way to administer the Program. Nor is Plaintiffs' position sound under the statute.

The fact that one aspect of the registration process, Medicare Cost Report verification, may impose certain burdens on Plaintiffs does not change its procedural nature. And the statute expressly directs the Department to set up an identification and verification system for covered entity sites, so clearly the particulars of such a system are within the Congress's delegation of authority to the agency. For similar reasons, HRSA's approach is consistent with the statute; Plaintiffs' inapposite statutory-interpretation argument does not show otherwise. Nor does the purported burden to hospitals or any of Plaintiffs' other arguments render arbitrary and capricious

the reinstatement of HRSA's longstanding approach, as is adequately supported by the administrative record.

Even if HRSA's use of Medicare Cost Report verification were a legislative rule (it is not), Plaintiffs' challenge still fails. HRSA established its approach in a final notice, issued after public notice and comment, that was promulgated in 1994. That means that (i) HRSA satisfied APA's notice-and-comment requirements; and (ii) the limitations period for Plaintiffs' pre-enforcement APA challenge expired in 2000.

HRSA's temporary waiver of such verification during the pandemic could not change the analysis: there was no notice-and-comment rulemaking to rescind the 1994 final notice, which would be required if (as Plaintiffs contend) it sets out a legislative rule. Thus, Plaintiffs' contention that Medicare Cost Report verification is a legislative rule is fundamentally inconsistent with their contention that HRSA's actions and statements in 2020 created a new "permanent policy." Pl. MSJ at 1, 13, 35. Nor can Plaintiffs' theory of a new permanent policy—as opposed to temporary nonenforcement of a procedural rule—be squared Plaintiffs' own recognition that the waiver was occasioned by the COVID-19 public health emergency. Finally, their theory contradicts HRSA's clear and consistent formal statements about the temporary status of the registration waiver and the continuing vitality of the 1994 policy. Thus, even if the Court finds that the Medicare Cost Report approach is a legislative rule, Defendants are entitled to summary judgment.

## I.     Plaintiffs' Notice-and-Comment Claim Fails Because Medicare Cost Report Verification Is a Procedural Rule.

Medicare Cost Report verification is a procedural rule not subject to the APA's notice-and-comment requirements. Such verification does not change the substantive eligibility criteria for covered-entity participation in the Program. Rather, the child site's eligibility is derived from the eligibility of its parent hospital, and Medicare Cost Report verification is one step in the procedure

by which a parent hospital informs the agency (and other stakeholders such as manufacturers and wholesalers) that a given site will participate in the Program based on derived eligibility.

The APA excepts "rules of agency organization, procedure, or practice" from its notice-and-comment requirements. *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quoting 5 U.S.C. § 553(b)(A)). The purpose of the "procedural exception" is "to ensure that agencies retain latitude in organizing their internal operations." *Id.* "The critical feature of a rule that satisfies the so-called procedural exception is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Id.* (alterations omitted). And "an otherwise-procedural rule does not become a substantive one . . . simply because it imposes a burden on regulated parties." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

HRSA's use of Medicare Cost Report verification fits comfortably within the APA's procedural exception. It does not "encode[] a substantive value judgement," *AFL-CIO*, 57 F.4th at 1034, because—as Plaintiffs recognize—HRSA already made the "substantive value judgment" that child sites are properly included within the hospital as a covered entity. *See* Pl. MSJ at 23. The Medicare Cost Report rule simply addresses the paperwork that is needed to assure HRSA that a child site should be registered in the System, i.e., it addresses the "manner in which regulated parties" present "their viewpoints" that a child site is integrated with the parent hospital. *AFL-CIO*, 57 F.4th at 1035 (alteration omitted). Rather than rely on full-blown, ex post audits to assess whether a child site is integrated with a parent hospital, HRSA uses this ex ante registration guardrail to "improv[e] the efficient and effective operations of the agency." *Id.* (alteration omitted). Indeed, the proposed notice preceding the 1994 guidance described the use of Medicare Cost Report verification as part of the "procedures" for determining whether to include a 340B

hospital's off-site clinic in the Program. *Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Inclusion of Outpatient Hospital Facilities*, 59 Fed. Reg. 29,300 (June 6, 1994).

Plaintiffs agree that procedural rules are not subject to notice-and-comment requirements, Pl. MSJ at 17, but then cursorily argue that Medicare Cost Report verification is "plainly substantive" because it is a "requirement" that changes "when a covered entity could permissibly use 340B drugs at child sites . . . ," *id.* at 18-19. This argument skips the relevant analysis.[4] Procedural rules are no less procedural just because they are mandatory or alter the "timetable for regulated entities to assert substantive rights." *AFL-CIO*, 57 F.4th at 1046 (quoting *Lamoille Valley R.R. Co. v. Interstate Com. Comm'n*, 711 F.2d 295, 328 (D.C. Cir. 1983)) (cleaned up). Were it otherwise—if procedural rules could never be mandatory—the procedural exception would be meaningless.

The D.C. Circuit's decision in *AFL-CIO* is instructive. The Court analyzed whether a 2019 NLRB rule was procedural or substantive. In addressing the rule's requirement that certain union-election disputes be resolved pre-election, the Court rejected the argument that the requirement was "outside the APA's procedural exception" because it "builds in a source of unjustified delay." 57 F.4th at 1044. The Court noted that the 2019 provision "mark[ed] a return to the pre-2014 approach." *Id.* The same reasoning applies here. The claim that (in Plaintiffs' view) HRSA's approach creates "unjustified delay" does not make it non-procedural, particularly because HRSA's actions in 2023 were merely a return to the status quo that existed prior to the pandemic.

---

[4]    Plaintiffs' argument for why Medicare Cost Report verification is not an interpretive rule, Pl. MSJ at 19-20, is similarly irrelevant. As explained above, the agency has already interpreted the term "hospital" to include child sites. As explained below (*infra* at 21-22), HRSA's use of such verification does not purport to interpret the statutory terms that Plaintiffs focus on. Plaintiffs concede as much. Pl. MSJ at 19 ("But nothing in the Notice purports to interpret anything.").

Any incidental burden on the hospital's "substantive" right to access 340B pricing for their child sites does not alter the procedural nature of the Medicare Cost Report rule. *See James V. Hurson*, 229 F.3d at 281 ("But even if the [agency's] elimination of face-to-face did impose a substantial burden on food processors, that burden would not convert the rule into a substantive one that triggers the APA's notice-and-comment requirement.") (emphasis omitted); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (the focus is not on "whether a given procedure has a substantial impact on parties" but rather "whether the agency action also encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior," because "even unambiguously procedural measures affect parties to some degree").[5]

In any event, part of the delay in child-site access to 340B pricing, which Plaintiffs attribute solely Medicare Cost Report verification, actually comes from aspects of the registration process that Plaintiffs do not challenge: the quarterly System registration window for covered-entity submissions and next-quarter effectiveness. *See supra* at 5. Further, Plaintiffs' purported delay period includes the full five-month period after the close of the fiscal year that CMS allows for hospitals to file their reports, *see* Pl. MSJ at 10, but HRSA does not stop hospitals from filing them earlier. The maximum theoretical delay attributable to HRSA's use of Medicare Cost Report verification is as little as twelve months, and such a delay only happens in the unlikely event that a hospital opens the off-site clinic right at the start of its new fiscal year. On similar reasoning, it

---

[5]    To be sure, the *AFL-CIO* court stated that a rule may fall outside the procedural exception if it "imposes substantive burdens," "trenches on substantial private rights or interests," or "otherwise alters the rights or interests of parties." 57 F.4th at 1034-35. But that language should not be read too broadly, because the panel did not overrule D.C. Circuit and Supreme Court precedent describing the contours of the APA's substantive versus procedural dichotomy as the distinction between regulating "secondary rather than primary conduct." *See id.* at 1052 (Rao, J., concurring in part). HRSA's approach does not regulate "primary" conduct (340B hospitals are allowed to access 340B pricing for their child sites) but rather "secondary" conduct (340B hospitals must provide certain information to register a child site in an agency database).

is also possible that HRSA's approach causes much less delay between the opening of a child site and 340B registration—for example, if a hospital opens its clinic late in its fiscal year. Plaintiffs admit that hospitals can plan child-site openings to minimize any burden that may come from the 340B Program registration process. *See* Gelejian Decl. (ECF No. 8-4) at ¶¶ 6, 11.

This Circuit's precedent confirms that Medicare Cost Report verification is a procedural rule, notwithstanding any purported burden to the hospitals. In *Bowen*, the Court held that a Department transmittal that "set forth an enforcement plan for [the Department's] agents in monitoring the quality of and necessity for various operations" was procedural even though the transmittal "burden[ed] hospitals by (1) making it more likely that their transgressions from Medicare's standards will not go unnoticed and (2) imposing on them the incidental inconveniences of complying with an enforcement scheme." *Id.* at 1050-51. So, too, here: HRSA's "enforcement plan" is to verify child sites' access to the 340B Program by relying on the parent hospital's Medicare Cost Report. Thus, as in *Bowen*, HRSA's approach is a "classic procedural rule[]." *Id.* at 1050 (emphasis omitted). In another regulatory context, this Circuit has held that rules with the "harsh[]" effect of "cost[ing] appellants a radio broadcast license," did not lose their procedural character. *Pub. Cit. v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (describing *Ranger v. FCC*, 294 F.2d 240 (D.C. Cir. 1961)); *see also JEM Broad. Co., Inc. v. F.C.C.*, 22 F.3d 320, 322, 327 (D.C. Cir. 1994) (upshot of FCC's procedural rule was that appellant would fall behind hundreds, if not thousands, of applicants for a limited number of channel licenses); *Kessler v. FCC*, 326 F.2d 673 (D.C. Cir. 1963) (rule freezing applications for 18 months was a procedural rule not subject to notice-and-comment rulemaking).

If a rule is procedural even where it effectively blocks a party from accessing the benefit of a regulatory regime, it follows that mere delay in access to 340B pricing to permit HRSA to

verify Program eligibility does not transform a procedural rule into a substantive one. The Medicare Cost Report approach encodes no substantive value judgment, and instead is a procedural rule exempt from the APA's notice-and-comment requirements.

## II.     Congress Gave the Department the Authority to Establish Medicare Cost Report Verification.

Once Medicare Cost Report verification is properly understood as a procedural rule tied to the 340B Program registration process, it is easy to see that Congress has expressly delegated authority to the agency to establish it. Subsection (a)(9) of the 340B statute directs the Secretary to "notify manufacturers of covered outpatient drugs and single State [Medicaid] agencies of the identities of covered entities[.]" 42 U.S.C. § 256b(a)(9). The statute tasks the Secretary with the "development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the [Department] relating to" Section 340B, *id.* (d)(2)(B)(i); the "development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on [that] website," *id.* (d)(2)(B)(ii); and the "establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under" Section 340B, *id.* (d)(2)(B)(iv).

The Medicare Cost Report approach is an integral part of the registration "system" by which HRSA (as delegate of the Secretary) "verif[ies]" and "identifie[s]" 340B covered entity sites consistent with the statutory command to do so. Thus, it is within HRSA's authority under the statute. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 543 (1978) ("[A]dministrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."); *cf. United*

*States v. Mead Corp.*, 533 U.S. 218, 227, 229 (2001) (When Congress explicitly gives an agency "responsibility to implement a particular provision," "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and "agencies charged with applying a statute necessarily make all sorts of" "choices.") (quote omitted).

Plaintiffs' argument overlooks the relevant statutory provisions. Plaintiffs' failure to engage with those provisions is even more puzzling given that HRSA's 2023 Federal Register notice specifically identified them. A.R. at 19-20. Amicus—but not Plaintiffs—argues that the HRSA's approach is not supported by 42 U.S.C. § 256b(a)(9) or (d)(2), despite recognizing that "these provisions require HRSA to identify 340B covered entities for manufacturers and state Medicaid agencies and to verify the accuracy of the information regarding covered entities." ECF No. 19 at 5. That is exactly what the System registration process, including the step of Medicare Cost Report verification, does.

## III. Plaintiffs' Statutory-Interpretation Arguments Are Misplaced.

Plaintiffs argue that the Medicare Cost Report approach is contrary to law because it is an improper construction of the statutory term "hospital" and the statutory phrase "patient of the entity." Pl. MSJ at 22-25. Plaintiffs are attempting to manufacture a statutory-interpretation dispute where there is none, perhaps because they are trying to avoid narrow arbitrary-and-capricious review. The parties agree that an off-site clinic that is integrated with the parent hospital is statutorily eligible for 340B pricing, and the clinic can benefit from the Program by providing 340B drugs to eligible patients. Plaintiffs' framing of the issue is wrong, and as a result, they spend several pages of their brief addressing a straw man.

The key question is, how does HRSA know that the facts out in the world match the parties' shared construction of the statute? Plaintiffs briefly stumble across this realization: the rule is about "HRSA's preferred evidence of [the] relationship" between a parent hospital and a purported child

site. Pl. MSJ at 23 (emphasis in the original); *see also id.* at 19 (the 2023 Federal Register notice does not "purport[] to interpret anything"); *id.* at 10 ("HRSA's reliance on Medicare cost reports as the . . . evidence of" an integrated relationship).

Once the dispute is properly framed, it becomes clear that such verification is not contrary to law. When a program is set up to provide certain benefits to a defined set of eligible individuals or entities, there is inherently the risk of error or delay: someone may be entitled to the benefits, but the administering agency does not immediately *know* they are (because, after all, agencies are not omniscient). Government healthcare programs require all manner of evidence and adherence to submission procedures for reimbursement of provider claims, *see, e.g.*, *Akron Gen. Med. Ctr. v. Azar*, 836 F. App'x 13 (D.C. Cir. 2021); *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079 (D.C. Cir. 2015); agencies like the Departments of Veterans Affairs and Education require applications and evidence before providing veterans benefits or student loans.

Agencies necessarily must create procedures to establish eligibility, and having such requirements does not equate to a substantive revision of the eligibility criteria. That is true as a matter of common sense and as a matter of precedent. For example, in *Kessler*, the D.C. Circuit "agree[d]" with the FCC's explanation that a total "freeze" on applications for radio broadcast licenses did not constitute "the establishment of new allocation standards." 326 F.2d at 673. *See also Planned Parenthood of Metro. Wash., D.C., Inc. v. Horner*, Civ. A. No. 88-1751, 1988 WL 126240, at *3 (D.D.C. Nov. 15, 1988) (in addressing charities' ability to participate in the Combined Federal Campaign, distinguishing between statutory provisions that "concern the *procedural* mechanisms" versus "the *substantive* criteria" that are applied to "determine eligibility" (emphases in original)); *cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406-08 (2010) (in addressing the Rules Enabling Act, distinguishing rules that

"altered [substantive] rights" from those that "regulated only the process for enforcing those rights").

Plaintiffs' statutory-interpretation argument that Medicare Cost Report verification unlawfully restricts covered entities' ability to participate in the 340B Program, Pl. MSJ at 22-25, proves too much. Under Plaintiffs' logic, any requirement, at all, that parent hospitals register in the 340B Program is unlawful. According to Plaintiffs, a healthcare provider is immediately entitled to 340B discount pricing because it satisfies the criteria of § 256b(a)(4) simply by virtue of its existence and operation within the statutory parameters of eligibility. Yet, under the statute, it cannot access 340B discount pricing until it registers with HRSA. *See* 42 U.S.C. §§ 256b(a)(9), (d)(2). The basic logic of Plaintiffs' contrary-to-law argument nullifies those statutory provisions.

Nor is HRSA's approach contrary to Congressional purpose. *Contra* Pl. MSJ at 27-29. The 340B statute expressly tasks the Secretary with verifying information related to covered entity sites. *See* 42 U.S.C. § 256b(d)(2)(B)(ii), (iv). That plain instruction suffices to show Congress's intent. *Abbott Labs. v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990) ("Of course, the language of the statute itself is always the best indication of congressional intent."). Taking a broader view, the need for verification necessarily follows from the recognition that the 340B Program balances the often-opposed interests of drug manufacturers (who provide the discounts) and covered entities (who benefit from them). Plaintiffs' position that access to 340B pricing should be automatic and self-fulfilling for any site they want would invite hospitals (and other entities) to access these valuable discounts based merely on say-so—vitiating Congress's careful delineation of eligible covered entities, 42 U.S.C. § 256b(a)(4), based on criteria are not always self-evident, *see e.g., id.* at § 256b(a)(4)(L)(ii) (calling for specific minimum "disproportionate share adjustment percentage"). Put bluntly, drug manufacturers are already not eager to give the mandated discounts

in situations where HRSA believes they are required to do so, *see, e.g.*, *Sanofi-Aventis U.S., LLC v. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129 (D.N.J. 2021), *aff'd in part and rev'd in part*, 58 F.4th 696 (3d Cir. 2023); it is not hard to imagine how manufacturers would react to a situation where there were reduced checks on 340B hospitals' ability to claim discount pricing for loosely affiliated off-site clinics.

Defendants agree with Plaintiffs that the overarching goal of the 340B Program is to allow safety-net providers to "stretch scarce Federal resources," Pl. MSJ at 28, but Plaintiffs' over-simplified presentation of Congressional purpose ignores the axiom that "no legislation pursues its goals at all costs." *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014). In short, the HRSA's approach bolsters program integrity, and program integrity is indisputably part of Congress's purpose here. *See, e.g.*, 42 U.S.C. § 256b(d) (entitled "Improvements in program integrity," and including paragraph on "Covered entity compliance").

## IV.    HRSA's Resumption of Medicare Cost Report Verification Was Not Arbitrary and Capricious.

As this Court well knows, judicial review under the APA's arbitrary-and-capricious standard is deferential. *See supra* at 12-13. Even Plaintiffs admit that the agency has a "low hurdle here." Pl. MSJ at 35. Nevertheless, Plaintiffs argue that HRSA's 2023 notice is arbitrary and capricious because (i) HRSA failed to consider the burdens on covered-entity hospitals, *id.* at 29-33; (ii) HRSA's practice diverges from that of CMS, *id.* at 33-35; and (iii) the 2023 notice is otherwise inadequately reasoned, *id*. at 35-40. None of Plaintiffs' arguments withstand scrutiny.

To start, Plaintiffs' arguments largely ignore the relevant context and history of the Medicare Cost Report approach. To recap: If a child site truly is integrated with a parent hospital, it will eventually be on the parent hospital's report; HRSA has relied on this approach since 1994. *Supra* at 4-6. Plaintiffs do not appear to dispute these points, Pl. MSJ at 9-10, 30-31, and most (if

not all) of Plaintiffs participated in the 340B Program prior to the pandemic and abided by the 1994 regime. HRSA temporarily suspended its normal System registration process, including Medicare Cost Report verification, to account for the COVID-19 public health emergency, with the expectation that 340B hospital child sites would eventually be registered. *Supra* at 7. The administrative record reflects that did not happen—even though the public health emergency lasted three years—suggesting that hospitals may have been abusing the waiver and raising the possibility that off-site clinics were accessing 340B pricing even though they were not integrated with 340B-eligible covered entities. *Supra* at 8-10, 12, n.3. Without the Medicare Cost Report approach, HRSA would not be able to determine whether ineligible sites are improperly accessing 340B pricing unless it happened to audit the relevant hospital, if ever. As such, in the interest of program integrity, in May 2023, HRSA ended the waiver and resumed its system of ex ante verification. And in October 2023, HRSA published a Federal Register notice that provided hospitals with a grace period to come into compliance. *Supra* at 11-12.

HRSA's experience with the temporary waiver of Medicare Cost Report verification during the pandemic shows that HRSA's approach is eminently reasonable and necessary for efficient operation of the 340B Program. Moreover, this background underscores that such verification did not spring anew in the 2023 Federal Register notice. Again, it has been in place—without prior legal challenge—since 1994. The function of the 2023 notice, contrary to the thrust of Plaintiffs' brief, was merely to formalize the end of the waiver, "remind" stakeholders of HRSA's longstanding registration requirements, and provide covered entities with a grace period to return to compliance before HRSA took enforcement action.

The adequacy of an agency's explanation for its actions is necessarily context-specific: "the concept of arbitrary and capricious review defies generalized application and must be

contextually tailored." *Dist. Hosp. Partners, L.P. v. Burwell,* 786 F.3d 46, (D.C. Cir. 2015) (quoting *Maggard v. O'Connell*, 671 F.2d 568, 571 (D.C. Cir. 1982)); *see also id.* ("[T]he parameters of the arbitrary and capricious standard of review will vary with the context of the case.") (quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981)). Plaintiffs' arbitrary-and-capricious claim targets the 2023 notice, Pl. MSJ at 29, but many of its arguments elide the distinction between that notice and HRSA's original 1994 decision. Viewed in proper context, the 2023 notice easily passes muster.

### A. Plaintiffs' Invocation of Lost Savings Does Not Make the Notice Arbitrary and Capricious.

Plaintiffs complain that HRSA's action was arbitrary and capricious because it failed to "consider the substantial lost savings for covered entities that would result from its action." Pl. MSJ at 30. But that has been a purported problem since 1994. *See id.* Plaintiffs are raising arguments that are targeted at policy choices made 30 years ago, not arguments about the enforcement grace period created by the 2023 notice. If the 1994 rule actually created a significant problem of "lost savings," one would expect that the comments submitted to the agency in 1994 would have mentioned it. They did not. *See* A.R. at 13-15.

In any event, Plaintiffs are wrong that HRSA "pretended" that "the negative impacts of its policy" did "not exist" in the 2023 notice. Pl. MSJ at 30. Plaintiffs' own brief demonstrates that HRSA was weighing the burdens of the policy against its benefits. When HRSA stated that by "May 11, 2023, hospitals should have been able to register offsite, outpatient facilities on" the System, it specifically was not "disregarding that hospitals cannot [register sites] until 5-17 months after a facility opens." *Id*. Rather, HRSA was pointing out that hospitals had years to register purported child sites and had not done so. Moreover, as explained above (*supra* at 18), Plaintiffs overstate the burden that comes from the Medicare Cost Report approach itself, as opposed to

other sources of delay that are not being challenged here. As between a burden that was not supported by the record (i.e., hospitals had adequate time to register sites) and an unquestionable policy benefit (ensuring only eligible sites participate in the 340B Program), HRSA reasonably chose the latter.[6] Indeed, since the October 2023 notice was issued, there has been a rush of child site registrations. *See supra* at 12, n.3. And as explained above (*supra* at 22-24), HRSA's program-integrity efforts are not contrary to the statutory text or Congressional purpose. *Contra* Pl. MSJ at 32-33.

### B.     Plaintiffs' Claim that HRSA Has Diverged from CMS Practice Does Not Make the Notice Arbitrary and Capricious.

Next, Plaintiffs complain that HRSA's practice is no longer consistent with CMS practice because CMS practice changed in or around 2002. *See* Pl. MSJ at 34. Even if Plaintiffs' account were true, this purported inconsistency has been around for 20 years, making Plaintiffs current challenge conspicuously late.

In any event, Plaintiffs are wrong that any inconsistency between Medicare reimbursement and access to 340B pricing arose in 2000 (when Medicare established the provider-based rule, *see* Pl. MSJ at 9-10) or 2002 (when Medicare removed the requirement for an affirmative pre-determination of provider-based status, *see id.* at 10). In fact, any discrepancy between the two regimes (Medicare reimbursement for hospital child sites on the one hand, discount drugs for hospital child sites on the other) has existed since HRSA's original 1994 decision. Plaintiffs assert that, as things stood in 1994, "CMS had established criteria to determine whether the equivalent of a parent-child site relationship existed for Medicare purposes; locations that satisfied those

---

[6]     Amicus attempts to downplay HRSA's concern with duplicate discounts, but it does not cite any evidence to support its assertions. ECF No. 19 at 6, 11-12. The risk of duplicate discounts was only one facet of HRSA's decision to return to Medicare Cost Report verification, and amicus does not dispute that the problem exists to some degree.

criteria could be listed on a hospital's Medicare cost report and, after listing, receive reimbursement for their costs and expenses." Compl. at ¶ 12. What Plaintiffs omit is that, once the child-site location was listed on the Medicare Cost Report, it received retrospective reimbursement. *See generally* Dep't Off. of Inspector Gen., *Medicare Hospital Prospective Payment System* (Aug. 2001) at 1-2 (describing use of cost reports in retrospective reimbursement and shift to prospective payment system for hospital inpatient services in mid-1980s); Dep't Off. of Inspector Gen., *Review of HCFA's Development of Medicare's Prospective Payment System for Hospital Outpatient Department Services* (Nov. 1998) at 2-3 (describing shift to prospective payment system for outpatient services in the mid- to late-1990s); 65 Fed. Reg. 18,434, 18,436 (Apr. 7, 2000) (introductory background of rule implementing prospective payment system for hospital outpatient services). Cost-based reimbursement was just how Medicare operated before it shifted to a mainly prospective model. *See generally Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999).

Thus, in the Medicare world, child sites have always received reimbursement back to the time they became operational. And in the 340B Program, they have received access to 340B pricing only after listing on a Medicare Cost Report and registration with HRSA. Plaintiffs' historical comparison of the effects of HRSA's child-site guidance versus Medicare reimbursement practices is mistaken.

Even were HRSA's approach not in lockstep with Medicare provider-based determinations, that does not render it arbitrary and capricious. The System registration and Medicare provider-based determinations are materially distinct. A holistic reading of CMS's provider-based regulations supports HRSA's logic when it comes to the unique circumstances of the 340B Program. At the outset, the regulations emphasize that "[a] facility or organization is not

entitled to be treated as provider-based simply because it or the main provider believe it is provider-based." 42 C.F.R. § 413.65(b)(1). While a main provider can submit an attestation and paperwork to receive a determination of provider-based status, *see id.* § 413.65(b)(3), they do not have to. Instead, they can bill Medicare as if the facility is provider-based, on pain of possible recoupments if it is later determined that the facility is not, in fact, provider-based. *Id.* § 413.65(j).

These regulations reflect CMS's policy choice that ex post enforcement is sufficient for Medicare program integrity, but they do not reflect an assertion that a facility will be provider-based simply because the main provider believes it so. Put another way, to the extent that Plaintiffs suggest that CMS treats a facility as provider based as soon as it opens, that is not precisely true. *Contra* Pl. MSJ at 9. Rather, CMS tells hospitals to proceed at their own peril and simply defers any definitive determination to subsequent audits.

HRSA's choice to police child-site eligibility on the front end, as part of System registration, is not arbitrary and capricious and makes sense in the unique context of the 340B Program. It should go without saying that HRSA's administration of the 340B Program can, does, and will differ from CMS's administration of Medicare. HRSA's policy choice clears the low bar of "reasonable," *Prometheus Radio*, 592 U.S. at 423, especially as the agency has "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Mass. v. EPA*, 549 U.S. 497, 527 (2007).

Plaintiffs' argument that HRSA has engaged in an "unexplained" "departure from past practice," *see* Pl. MSJ at 35, reads too much into the 1994 guidance. Precise consistency with Medicare practice was not a "principal policy goal[]" for its own sake, *contra id.*; rather, HRSA was borrowing concepts from Medicare to the extent it made sense for the different context of the 340B Program. Indeed, precise consistency between Medicare and the 340B Program would not

have made sense as a statutory matter. The 1994 guidance noted that the 340B statute cross-referenced section 1886(d)(1)(B) of the Social Security Act, which dealt exclusively with hospital *inpatient* reimbursement. A.R. at 14. "However, section 340B deals exclusively with outpatient drugs." *Id.* The differences between HRSA's administration of the 340B Program and CMS's administration of Medicare do not establish that the 2023 notice is a change in agency position, *contra* Pl. MSJ at 35, and are not a basis to find HRSA's use of Medicare Cost Report verification arbitrary and capricious.

## C.   The 2023 Notice Is Adequately Reasoned.

Plaintiffs make a series of miscellaneous arguments that the 2023 notice is otherwise inadequately reasoned. None work.

At the outset, Plaintiffs overstate the reliance interests at play. *See* Pl. MSJ at 35-36. It is not a "reliance interest" that the relevant hospitals would make more money if HRSA's policy were different. Instead, the reliance interests (if any) must derive from ambiguity about whether the registration waiver was permanent. Therefore, any reliance interests that are cognizable here would have arisen between mid-2020, when there were isolated statements that the waiver may be permanent, and May 2023, when HRSA told stakeholders that the waiver would end with the public health emergency. *See* A.R. at, *e.g.*, 94, 126. Outside of that limited window, Plaintiffs have been living with Medicare Cost Report verification since 1994 without filing a lawsuit to challenge it. And pursuant to the 2023 Federal Register notice, any purported child sites that were opened prior to October 27, 2023, enjoy immediate and unbroken access to 340B pricing, as long as the parent hospital signals an intent to list the site on a future Medicare Cost Report. *See id.* at 21-22.

Plaintiffs' assertion that covered entities invested substantial resources during this limited window—in the midst of a pandemic—into "evaluating, preparing, opening, and operating []new facilities" or irrevocably "incorporated" the waiver "into their financial plans going forward," Pl.

MSJ at 36, strains credulity and is largely devoid of evidence.[7] And Plaintiffs' quote from the 2023 notice is badly out-of-context: looking at the next three sentences in the notice, HRSA's point was that a substantial number of hospitals were using the waiver improperly. *See* A.R. at 21.

Plaintiffs are wrong that HRSA did not adequately consider whatever reliance interests may have arisen during the public health emergency due to informal public statements reported by a media outlet that were not properly caveated. That is why the statements are in the administrative record. *See* A.R. at, *e.g.*, 94. The purported "confusion" among stakeholders was the main purpose of the October 2023 notice, which established a 90-day grace period to return to compliance with the 1994 regime. Indeed, the decision to end the waiver was communicated to stakeholders several months earlier, in May 2023. *See id.* at, *e.g.*, 126-35. Thus, Plaintiffs had a 9-month period (from May 2023 to January 2024) to make their operations consistent with a 30-year-old agency practice. In sum, Plaintiffs' invocation of "serious reliance interests," Pl. MSJ at 35-36, rings hollow.

Taking Plaintiffs' specific arguments in turn, each fails. First, Plaintiffs claim that "HRSA failed to substantiate that its [registration waiver] had led to any meaningful program non-compliance." Pl. MSJ at 36. That claim is refuted by the 2023 notice itself and the administrative record. As explained above (*supra* at 8-10), HRSA found that hospitals were not listing purported child sites on their Medicare Cost Reports and registering them in the System despite having time

---

[7]     Plaintiffs include declarations for only a few health systems or hospitals. Only one (the Albert Decl., ECF No. 8-2) includes concrete specifics, and even it (i) recognizes that the 2023 notice largely mitigated the harm that Plaintiff Albany Med faced, *id.* ¶¶ 9-13; and (ii) suggests that Albany Med would have opened most if not all the referenced clinics regardless of HRSA's policy. That Plaintiffs come forward with at most one health system—from among 40-plus hospitals and health systems that are named plaintiffs—speaks volumes about the Plaintiffs' assertion of purported reliance interests. *Contra* Pl. MSJ at 35-36. Amicus's narrative, ECF No. 19 at 15-17, is similarly devoid of cites to evidence and fails to account for the fact that HRSA told hospitals back in May 2023 that it would resume Medicare Cost Report verification.

to do so, which highlighted the risk of ineligible sites accessing 340B pricing.[8] This concern has been validated by the large number of registrations that have occurred since the end of the public health emergency. *See supra* at 12, n.3.

Taking a broader view, Medicare Cost Report verification is an objective and administrable approach to child-site registration, and such registration fosters transparency in the 340B Program. It is common sense that if several unidentified covered-entity sites are using 340B discount drugs, increased diversion and duplicate discounting are likely downstream consequences. Plaintiffs' argument boils down to the notion that HRSA should have waited for more evidence of program abuses or relied on other, after-the-fact enforcement mechanisms. *See* Pl. MSJ at 36-37. Not surprisingly, Plaintiffs cite no precedent holding that an agency action arbitrary and capricious on such grounds, and it contravenes the principle that agencies have wide discretion in allocating enforcement resources. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.").

Second, Plaintiffs argue that the Medicare Cost Report approach (or, more specifically, the 2023 notice) is internally inconsistent because it requires verification of certain facilities' 340B eligibility, whereas those facilities are already eligible in some sort of abstract, self-fulfilling sense. Thus—according to Plaintiffs' reasoning—HRSA's policy is an unlawful "restriction not

---

[8]    Amicus argues that HRSA's "own inconsistent stance" on registration prior to 2014 shows that it does not serve "compliance and integrity policy goals." ECF No. 19 at 9-10. Plaintiffs did not make this argument, but in any event, the cited FAQs do not show a "change [in] policy," as opposed to clarification of the specific application of longstanding policy to evolving circumstances. Even on its own terms, amicus's point is illogical: if HRSA "expanded" Medicare Cost Report verification over the years, that would underscore that HRSA viewed it as important to program integrity.

contained in the 340B statute." Pl. MSJ at 38. For the reasons explained above (*supra* at 21-23), this argument cannot be squared with the statute, precedent, or common sense.

Third, Plaintiffs argue that there are alternative methods of verification. Pl. MSJ at 39-40. This argument is inapposite to the question at hand. The Court must determine whether it was arbitrary and capricious for HRSA to reinstate the Medicare Cost Report approach at the end of the public health emergency, not whether the approach was arbitrary and capricious when it was instituted 30 years ago. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 243-44 (5th Cir. 2023), *cert granted*, 2023 WL 8605746 (Dec. 13, 2023) (relying on D.C. Circuit precedent to determine that original approval of mifepristone was not at issue in a challenge to a later agency action that lifted restrictions on mifepristone's use). Put another way, Plaintiffs' argument about other methods of verification may have been appropriate for a challenge to the 1994 notice, but it is mismatched to their challenge to the 2023 notice. Indeed, Plaintiffs' cited cases about an agency's consideration of alternatives point to concerns that were voiced to the agency at the time of the relevant decision. Pl. MSJ at 38, 40. Here, the time for that voicing was in 1994. Plaintiffs are essentially asking the Court to overturn an agency decision based on their ability to posit alternatives to a policy that was implemented 30 years ago.

Focusing on the reinstatement of Medicare Cost Report verification in 2023, plainly HRSA's action was not arbitrary and capricious. The record shows that 340B hospitals were widely non-compliant with HRSA's policy throughout the public health emergency, even though they had time to list purported child sites on their Medicare Cost Reports and HRSA had made clear that it expected hospitals would come into compliance as soon as practicable. This finding calls into question Plaintiffs' protests that HRSA's approach leads to unjustified delays in access to 340B pricing, and that such delays are the true motivation for their challenge. Even when 340B

hospitals had the opportunity to list purported child sites on their Medicare Cost Reports, they did not. Thus, HRSA was appropriately concerned that hospitals may have been using the registration waiver to access 340B pricing for off-site clinics that were not truly integrated with the parent covered entity. This easily establishes a "rational connection between the facts found and the choice made." Pl. MSJ at 36 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Plaintiffs' arguments about alternative verification methods again present a distorted picture of the Medicare regime. First, they say HRSA should rely on the bills that a hospital submits to Medicare. Pl. MSJ at 39. To be sure, a hospital can submit bills to Medicare as if an off-site clinic is provider-based as soon as the clinic opens. But as explained above, that only reflects the hospital's determination that it is willing to risk future recoupments. It does not reflect a determination that the off-site clinic is provider-based. Despite Plaintiffs' suggestion that the Department of Justice would prosecute a hospital for healthcare fraud based on its submission of bills that improperly hold out an off-site clinic as provider-based, *see* Pl. MSJ at 39, counsel has not been able to identify a single case where that happened.[9] And practically speaking, a covered entity's bill(s) to Medicare—possibly a single bill, under Plaintiffs' argument—is a far less robust information source than a hospital's filed Medicare Cost Report. HRSA can and does look to specific information in the report to verify a child site's derived 340B Program eligibility; moreover, HRSA can independently cross-validate the information submitted as part of the System registration with data from CMS's Healthcare Cost Report Information System (or "HCRIS"). *See* A.R. at 48. Here is Plaintiffs' argument plainly stated: let us give the agency a UB-04 right after

---

[9]     There are, however, fraud cases related to inaccurate Medicare Cost Reports. *See, e.g.*, *United States v. Calhoon*, 97 F.3d 518 (11th Cir. 1996); *United States ex rel. Complin v. N.C. Baptist Hosp.*, 2016 WL 7471311 (M.D.N.C. Dec. 28, 2016).

the child site opens, *see* Pl. MSJ at 39; ECF No. 19 at 12, which will show that we asked Medicare for reimbursement at a particular site, instead of information from our filed Medicare Cost Reports, which serves as an annual compendium of (among other things) a hospital's financial operations. To state the argument refutes it, especially because the statute tasks the agency with maintaining a "single, universal, [] standardized" system to actually "verify the accuracy" of hospital sites' claim to 340B pricing. 42 U.S.C. § 256b(d)(2).

Plaintiffs next point to the provider-based attestations that hospitals are "allow[ed]" to submit. Pl. MSJ at 39-40. Plaintiffs cite no evidence for the proposition that "these provider attestations are typically submitted to CMS close in time to when a facility opens," *id.* at 40, so it is unclear whether this proposal would actually address Plaintiffs' concerns. In any event, those attestations are optional; HRSA understands that the attestation process is not consistently used. *See* Dep't Off. of Inspector Gen., *CMS is Taking Steps to Improve Oversight of Provider-Based Facilities, But Vulnerabilities Remain* (June 2016) at 10-11. And the attestation process may have its own shortcomings. *See id.* at 14-15. HRSA's reliance on those attestations would, at the least, be in tension with the fact that they are voluntary under 42 C.F.R. § 413.65. (And it would likely lead to yet another challenge from hospitals that HRSA is imposing unwarranted restrictions on Program participation.) Finally, a complete attestation does not definitively establish provider-based status, it just provides protection from recoupments for a set period. *See* 42 C.F.R. § 413.65(k); *Oversight of Provider-Based Facilities* at 6-7.

Agencies need only consider "responsible" or "significant and viable" alternatives, not "every alternative device and thought conceivable[.]" *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987). And the ultimate touchstone of arbitrary-and-capricious review is whether an agency's "path" to a decision "may reasonably be discerned." *Fox Television*,

556 U.S. at 513-14. HRSA acted "reasonably" when it chose—in 2023, based on its experience during the pandemic—to reaffirm a choice it had previously made—back in 1994—to require information from a hospital's Medicare Cost Report to register an off-site clinic.

**V.    Even if Medicare Cost Report Verification is a Legislative Rule, It Was Issued 30 Years Ago Pursuant to Notice and Comment, And Any Challenge Is Far Too Late.**

Even if Medicare Cost Report verification is viewed as a legislative rule, Plaintiffs' challenge must fail. When HRSA first promulgated this approach in a 1994 Federal Register notice, it did so after a period of public notice and comment. *See* A.R. at 13-15.[10] In a world where such verification is viewed as a legislative rule, nothing HRSA did in 2020 could plausibly be viewed as a rescission of that rule. The 2023 Federal Register notice simply confirms HRSA's longstanding position from 1994, and the agency has complied with the APA's notice-and-comment requirements. When an agency issuance "remind[s] parties of [an] existing" rule that was issued after notice and comment, the reminder need not be preceded by more notice and comment. *See Mendoza v. Perez*, 754 F.3d 1002, 1024 n.16 (D.C. Cir. 2014). That is what the 2023 notice does. A.R. at 19 ("HRSA is issuing this Notice to . . . remind stakeholders of the registration requirements[.]").

Plaintiffs wholly fail to account for the 1994 notice-and-comment period. Ultimately, the point of the APA's notice-and-comment requirements is to give the public a chance to be heard on agency policy. *See, e.g.*, *Make The Road N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). That happened here, in 1994. Plaintiffs offer no reason for why a new notice-and-comment period would be necessary: indeed, they emphasize that the burdensome delay they complain of has *always* been a feature of HRSA's approach. Pl. MSJ at 9-10. Plaintiffs might have argued that the

---

[10]    HRSA did so even though it believed such an approach was not legally required. *See* 61 Fed. Reg. 55,156 (Oct. 24, 1996).

purported "seismic change" in the Medicare Cost Report "landscape," Pl. MSJ at 34, provided a new context that behooves renewed public comment. But Plaintiffs did not make this argument. In any event, as explained above (*supra* at 27-28), Plaintiffs are wrong that any practical divergence between the 340B Program and Medicare practice is a new phenomenon. In the absence of any argument as to why the 1994 comment period was insufficient, Plaintiffs' notice-and-comment claim must fail even if the rule here is classed as legislative.

Moreover, in the legislative-rule world, all of Plaintiffs' claims would fail because their entire pre-enforcement lawsuit is untimely. Plaintiffs' APA challenge is subject to a six-year statute of limitations. *Mendoza*, 754 F.3d at 1018; 28 U.S.C. § 2401(a). The clock begins to run when "the right to resort to federal court [was] perfected" by an agency action that "affected rights or altered the status quo" for Plaintiffs. *Impro Prods. v. Block*, 722 F.2d 845, 850-51 (D.C. Cir. 1983). Counsel is unaware of precedent suggesting that the timeliness analysis is altered by an agency's temporary non-enforcement of a policy, and such a principle would be inconsistent with courts' recognition of agencies' wide discretion in this context. *See, e.g.*, *Heckler*, 470 U.S. at 831-32. That is especially true where the non-enforcement happens decades after the policy is instituted, such that regulated entities are aware of the practical import of a pre-enforcement challenge during the limitations period.

Plaintiffs acknowledge, Pl. MSJ at 7, that Medicare Cost Report verification has been HRSA policy since 1994. The 1994 notice created the time-lag issue Plaintiffs complain of—a delay in the time between when a child site opens and when it can be registered for 340B pricing. *See id.* at 10. That was the moment the agency "altered the status quo" and affected Plaintiffs' rights. *Impro Prods.*, 722 F.2d at 851. But Plaintiffs offer no explanation as to why they could not

have brought a pre-enforcement challenge earlier to address the alleged delay. In sum, the time to bring such a challenge expired in 2000; Plaintiffs' lawsuit is over twenty years too late.

If Medicare Cost Report verification is a legislative rule, it does not matter that HRSA temporarily relaxed registration requirements in 2020 in light of the COVID-19 pandemic; decided to resume enforcement with the end of the public health emergency in May 2023; then issued a Federal Register notice in October 2023 confirming its adherence to the 1994 policy and providing a grace period for covered entities to come into compliance before HRSA takes enforcement action. None of that amounts to a notice-and-comment rulemaking to repeal the 1994 policy, and the 2023 notice would simply be a "renewal of an earlier decision" that "does not alter the status quo [and] does not restart the statute of limitations." *Mendoza*, 754 F.3d at 1018. None of HRSA's acts within the limitations period "significantly alter the stakes of judicial review" as compared to the 1994 notice, *All. for Hippocratic Med.*, 78 F.4th at 244 (quoting *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008)), or effectuate a "sea change" in the "basic regulatory scheme," *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016). Indeed, the 2023 notice made clear that HRSA was simply "remind[ing] stakeholders" of "its longstanding registration requirements" and noted that HRSA had allowed "various flexibilities" during the pandemic but was now returning to the status quo. A.R. at 19-21.

Plaintiffs assert that the temporary relaxation of Medicare Cost Report verification was a permanent (but short-lived) HRSA policy based on informal communications between HRSA and stakeholders during the pandemic. *See* Pl. MSJ at 12-13. But that theory is not viable in a world where Medicare Cost Report verification is a legislative rule. It cannot be right that HRSA repealed a legislative rule based on emails to certain interested parties, without notice-and-comment rulemaking. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

D.C. Circuit precedent recognizes that, in certain limited circumstances, an agency can "reopen" a longstanding policy for reconsideration, which can then make pre-enforcement APA challenges timely. *See Mendoza*, 754 F.3d at 1019 n.12. That did not happen here. Again, the hallmark of reopening is a formal process in which the agency provides notice that it is reevaluating the longstanding policy and invites public comment. *See, e.g.*, *ITServe All. v. Cissna*, 443 F. Supp. 3d 14, 32 (D.D.C. 2020). Here, by contrast, HRSA unilaterally posted a statement on its website concerning whether a program requirement was operational during the fluid and complex situation created by the COVID-19 pandemic. *See* A.R. at 53-56. HRSA then unilaterally reinstated Medicare Cost Report verification when the public health emergency ended. *See, e.g.*, A.R. at 135. Counsel is unaware of any case where a court has found "reopener" because an agency unilaterally and temporarily suspended a regulatory requirement due to an emergency, even if the agency informally communicated to regulated entities that the requirement would not be returning.

Even though Plaintiffs recognize that HRSA's registration waiver was occasioned by the COVID-19 public health emergency, Compl. ¶ 15, they assert that "HRSA did not present this position as a temporary policy," *id.* ¶ 16, or a "temporary COVID-19 measure," Pl. MSJ at 1. Not so: the waiver was described on a website entitled "COVID-19 Resources" that served to "keep 340B Program participants and stakeholders updated" on the "general flexibilities that covered entities should adhere to during this public health emergency." A.R. at 53-54. HRSA reiterated this point in a May 2023 email to Plaintiffs' counsel: "While HRSA allowed this flexibility during the COVID-19 [public health emergency], HRSA is returning to pre-COVID policy regarding registration of outpatient facilities" "[c]onsistent with HRSA's longstanding 1994 Guidelines[.]" *Id.* at 135. And in October 2023, HRSA issued a Federal Register notice to reiterate that the registration waiver had ended because it was "part of the government's efforts to respond" to the

public health emergency. *Id.* at 20. To ease the transition, HRSA offered a ninety-day grace period in which it would not enforce its "longstanding registration requirements." *Id.* at 21-22.

Notwithstanding the official statements of the agency's position, Plaintiffs point to a June 2020 news "exclusive" that an unnamed "HRSA spokesperson" said the "recent relaxation[]" of Medicare Cost Report registration was "in place regardless of the COVID-19 pandemic." Pl. MSJ at 13; Tom Mirga, *Exclusive: HRSA Confirms 340B Hospital Offsite Location and Telehealth Flexibilities are Permanent*, 340B Report (June 9, 2020); *see also* A.R. at 94-95 (underlying correspondence). The article itself emphasizes the tension with the posting on HRSA's website: "Many 340B stakeholders had expressed uncertainty about the permanence of" the "policy flexibilit[y]" because it was "published on HRSA's 340B COVID-19 resources page, not as FAQs on HRSA's separate 340B program FAQs page." *Id.*

Plaintiffs also point to a spring 2020 email chain between a HRSA contractor and a lawyer who represents 340B hospitals. Pl. MSJ at 13 (citing correspondence that can be found at A.R. at 183-89). But the chain actually discusses a different HRSA guidance concerning 42 U.S.C. § 256b(a)(5)(B). *See* Compl. ¶ 97; Pl. MSJ at 11 (recognizing distinct 1996 guidance). It starts with a request from the lawyer on behalf of a 340B hospital seeking "accelerated" registration of "a new child site that has been adversely affected by the coronavirus." A.R. at 188-89. The contractor's response says, "HRSA is unable to register a site not on the Medicare cost report" but "patients of the new site may still be 340B eligible to the extent that they are patients of the covered entity"; she then agrees with the lawyer that the "1996 patient definition guidance" "is applicable regardless of COVID-19." *Id.* at 187-88. The hospital's lawyer then sends a response that goes beyond what the contractor actually said, and the chain ends without any endorsement of the lawyer's confusion. *Id.* at 187. Subsequently, HRSA itself told stakeholders that it "has not

changed its policy," that it continues "to only register hospital outpatient facilities on [the System] that are listed as reimbursable on the hospital's Medicare cost report" and "[t]he 1994 guidance . . . is still in place." *Id.* at 90; *see also id.* at 104.

Finally, Plaintiffs note that a February 2023 public health emergency fact sheet for the entire Department did not specifically mention the 340B Program. Pl. MSJ at 13. This fact is insignificant: the document is obviously not a comprehensive account of the massive range of Departmental operations that were impacted by the COVID-19 public health emergency.

Based on these stray statements and tangential pieces of evidence, Plaintiffs attempt to portray the 2023 Federal Register notice as a new agency policy subject to challenge under the APA. No matter how one might interpret Plaintiffs' cherry-picked evidence, none of it can nullify the multiple official and formal agency pronouncements that made clear the waiver was temporary. *See United Student Aid Funds v. Devos*, 237 F. Supp. 3d 1, 7 (D.D.C. 2017) (recognizing "it may be" that an agency's "official interpretations must prevail over its more informal pronouncements"). Under Plaintiffs' view, agencies could be hamstrung by stray remarks—here, isolated remarks made during the press of the COVID-19 pandemic and contradicted by other contemporaneous remarks—that do not reflect the careful vetting that attends official issuances about agency policy. That is not the law. *See Vernal Enterps., Inc. v. FCC*, 355 F.3d 650, 660-61 (D.C. Cir. 2004).

In sum, even if Medicare Cost Report verification is a legislative rule, there is only one plausible view of events. HRSA relaxed its enforcement of registration requirements, including such verification, in 2020, then decided to return to its enforcement of those requirements in 2023. Agencies enjoy wide enforcement discretion, *Heckler*, 470 U.S. at 831-32, and the clock on pre-

enforcement challenges to HRSA's 1994 policy should not restart just because HRSA exercised that discretion for the COVID-19 public health emergency. Thus, Plaintiffs' lawsuit is untimely.

## VI.    Relief, if Any, Should Be Properly Limited.

Even if Plaintiffs prevail on one or more of their claims, the relief they seek is overbroad and vague. Plaintiffs ask the Court to "vacate HRSA's [2023] notice" and grant "declaratory relief" that "patients seen at child sites are patients of a covered entity for purposes of the 340B program as soon as the child sites qualify as part of the covered entity." Pl. MSJ at 45; Compl. at 45.

To start, most Plaintiffs have not come forward with evidence of standing to date. At this stage, allegations are not enough. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' reliance on the allegations without supporting evidence, *see* Pl. MSJ at 31-32, 40, should be disregarded. That leaves the declarations, which account for at most eight Plaintiffs (among 40-plus). *See* Pl. MSJ at 41; Albert Decl.; Lee Decl.; Gelejian Decl.

Even for the Plaintiffs mentioned in the declarations, it is not clear how many actually have standing. Plaintiffs Albany Medical Center Hospital, Columbia Memorial Hospital, and Glen Falls Hospital are part of Plaintiff Albany Med Health System. *See* Compl. ¶¶ 24-27; Albert Decl. ¶ 3. Plaintiffs Keck Medical Center of the University of Southern California and the University of Southern California Arcadia Hospital are part of Plaintiff Keck Medicine of the University of Southern California ("Keck Medicine"). *See* Compl. ¶¶ 58-60; Gelejian Decl. ¶ 4. Depending on the specifics of the relationships between the parent entities and their subsidiary hospitals, financial harm to those subsidiary hospitals may not be harm to the parent entity, or vice versa. *See Sec. Indus. & Fin. Mkts. Ass'n v. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 406-07 (D.D.C. 2014) (discussing "shareholder standing rule"). Next, to the extent these declarations assert past financial damages, *see* Pl. MSJ at 41, that is insufficient for prospective relief, *see Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438-39 (2017); *City of Los Angeles v. Lyons*,

461 U.S. 95, 111-13 (1983). Finally, the declarations for Plaintiffs City of Hope National Medical Center and Keck Medicine lack adequate detail about the timing and plans for hypothetical child sites—detail that should not be missing because this is information readily within their possession. *See, e.g.*, *Defs. of Wildlife*, 504 U.S. at 561 (declarations to support standing at summary judgment stage must contain "specific facts").

Next, it is axiomatic that relief should be limited to the parties properly before the Court. *See, e.g.*, *Califano v. Yamasaki*, 442 U. S. 682, 702 (1979); *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *United States v. Texas*, 599 U.S. 670, 693-94 (2023) (Gorsuch, J., concurring). APA suits are no different: vacatur of rules should not operate universally, but only with respect to particular parties.[11] *See Texas*, 599 U.S. at 695-704. Same for declaratory relief. *See* 28 U.S.C. § 2201(a) (the Declaratory Judgment Act permits courts to "declare the rights and other legal relations of any interested party"). In sum, insofar as the Court suspends the operation of HRSA's Medicare Cost Report approach, or issues related declaratory relief, such relief should run only to the Plaintiffs that have standing.[12]

Finally, the proposed declaration is vague and ambiguous. It does not adequately specify what it means for a child site to "qualify as part of" a parent hospital. That could still entail

---

[11]     With respect to the overbreadth of the proposed APA remedy, Defendants make this argument for the purpose of preservation. Defendants recognize that this Court has previously ruled that binding D.C. Circuit precedent holds that APA vacatur operates universally. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 202 (D.D.C. 2020) (citing *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).

[12]     Plaintiffs' motion focuses on "set aside" of the October 2023 notice. *See* Pl. MSJ at 2, 17, 40, 45. The main function of the 2023 notice was to provide hospitals with a grace period to come into compliance with HRSA's registration requirements. The Medicare Cost Report approach itself was instituted in 1994, and HRSA ended 340B registration flexibilities in May 2023. The requested relief is imprecise, and additional briefing on the appropriate remedy (if any) may be warranted if the Court were to reach this issue.

Medicare Cost Report verification and System registration, in which case the proposed declaration would not help Plaintiffs. Second, if the proposed declaration's reference to "patients" means anything other than HRSA's longstanding interpretation of the phrase "patient of the entity," 42 U.S.C. § 256b(a)(5)(B), Plaintiffs have not offered any argument on that issue. The declaration risks collateral damage to HRSA's administration of the 340B Program and may leave it vulnerable to abuse. *See, e.g.*, *Public Serv. Comm'n of Utah v. Wycoff*, 344 U.S. 237, 243-44 (1952). If the Court believes declaratory relief is warranted, Defendants respectfully ask for an opportunity to confer with Plaintiffs on a properly worded judgment that reflects the reasoning of the Court's decision.

*        *        *

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion.

Dated: March 8, 2024
      Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:       */s/ Stephen DeGenaro*
      STEPHEN DEGENARO
      D.C. Bar #1047116
      Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-7229
      Stephen.DeGenaro@usdoj.gov

*Attorneys for the United States of America*

Of Counsel:

ANANT KUMAR
Attorney
U.S. Dept. of Health & Human Services
26 Federal Plaza, Ste. 19-300
New York, NY 10278
(202) 597-1564
anant.kumar@hhs.gov

SAMUEL R. BAGENSTOS
General Counsel

SEAN KEVENEY
Deputy General Counsel
U.S. Dept. of Health & Human Services