**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALBANY MED HEALTH SYSTEM et al.,

*Plaintiffs*,

*v.*

HEALTH RESOURCES AND SERVICES
ADMINISTRATION et al.,

*Defendants*.

No. 1:23-cv-3252 (APM)

**COMBINED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

Emily J. Cook (*pro hac vice*)
  MCDERMOTT WILL & EMERY LLP
  *2049 Century Park E #3200*
  *Los Angeles, CA 90067*
  *(310) 277-4110*
  *ecook@mwe.com*

Steven J. Schnelle (*pro hac vice*)
  MCDERMOTT WILL & EMERY LLP
  *One Vanderbilt Avenue*
  *New York, NY 10017*
  *(212) 547-5403*
  *sschnelle@mwe.com*

Paul W. Hughes (D.C. Bar No. 997235)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
Charles Seidell (D.C. Bar No. 1670893)
  MCDERMOTT WILL & EMERY LLP
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*
  *phughes@mwe.com*

*Counsel for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

Glossary ................................................................................................................... ix

Introduction ............................................................................................................... 1

Argument .................................................................................................................... 4

   I.    HRSA failed to comply with notice and comment requirements for its
       2023 policy change. ....................................................................................... 4

       A.   The 2023 policy change was not a procedural rule. ............................... 4

       B.   HRSA cannot rely on the 1994 Guideline to justify its failure to
            comply with the APA. ........................................................................ 14

       C.   HRSA's statute of limitations argument lacks merit. ......................... 19

   II.   HRSA's Medicare cost report policy is *ultra vires* and contrary to law. .................... 20

       A.   HRSA's policy conflicts with the 340B Statute. .............................. 20

       B.   HRSA lacked authority to promulgate a legislative rule restricting
            the use of 340B drugs. ....................................................................... 27

   III.  HRSA's 2023 policy change was arbitrary and capricious. ........................... 30

       A.   The record demonstrates that HRSA never considered the
            substantial financial impacts of its policy change. ............................ 30

       B.   HRSA failed to consider the relevance of changes in Medicare
            regulations to its re-imposition of the Medicare cost report
            requirement. ....................................................................................... 33

       C.   HRSA's purported compliance concerns were inadequately
            explained and cannot justify its new policy. ...................................... 35

            1.   HRSA disregarded the reliance interests created by the 2020
                policy. ....................................................................................... 35

            2.   HRSA's prohibition is based on exaggerated compliance
                concerns that are already addressed by congressionally
                prescribed mechanisms. ........................................................... 36

            3.   HRSA completely failed to consider reasonable alternatives. ..................... 38

   IV.  Plaintiffs have adequately demonstrated standing. ....................................... 41

   V.   Plaintiffs request appropriate relief. .............................................................. 44

Conclusion ............................................................................................................... 44

# TABLE OF AUTHORITIES†

**Cases**

*Aetna Life Ins. Co. v. Cleveland Imaging,*
  2014 WL 12577612 (S.D. Tex. 2014) ...................................................................40

*\*AFL-CIO v. NLRB,*
  57 F.4th 1023 (D.C. Cir. 2023) ................................................................. *passim*

*Akron Gen. Med. Ctr. v. Azar,*
  836 F. App'x 13 (D.C. Cir. 2021) ......................................................................24

*Am. Bankers Ins. Grp., Inc. v. Bd. of Governors of the Fed. Reserve Sys.,*
  3 F. Supp. 2d 37 (D.D.C. 1998) ........................................................................27

*Am. Great Lakes Ports Ass'n v. Zukunft,*
  301 F. Supp. 3d 99 (D.D.C. 2018) .....................................................................44

*\*Am. Hosp. Ass'n v. Bowen,*
  834 F.2d 1037 (D.C. Cir. 1987) ..........................................................5, 10, 13, 14

*Am. Lib. Ass'n v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005) .....................................................................27, 28

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) ..........................................................................38

*Amalgamated Transit Union v. Skinner,*
  894 F.2d 1362 (D.C. Cir. 1990) ........................................................................28

*Amerijet Int'l, Inc. v. Pistole,*
  753 F.3d 1343 (D.C. Cir. 2014) ...................................................................17, 32

*Amor Fam. Broad. Grp. v. FCC,*
  918 F.2d 960 (D.C. Cir. 1990) ..........................................................................16

*Animal Legal Def. Fund. Inc. v. Glickman,*
  154 F.3d 426 (D.C. Cir. 1998) ..........................................................................43

*Arkansas v. Gresham,*
  142 S. Ct. 1665 (2022) .....................................................................................32

*Ashton v. U.S. Copyright Office,*
  310 F. Supp. 3d 149 (D.D.C. 2018) ...................................................................31

*Astra USA, Inc. v. Santa Clara County,*
  563 U.S. 110 (2011) .........................................................................................22

*Atlantic City Elec. Co. v. FERC,*
  295 F.3d 1 (D.C. Cir. 2002) ..............................................................................30

*Avenal Power Ctr., LLC v. EPA,*
  787 F. Supp. 2d 1 (D.D.C. 2011) .......................................................................23

---

†    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Ball, Ball & Brosamer, Inc. v. Reich*,
  24 F.3d 1447 (D.C. Cir. 1994) ...........................................................................20

*Bates v. United States*,
  522 U.S. 23 (1997) ...............................................................................................28

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ..........................................................4, 5, 8, 10

*Bloomberg L.P. v. SEC*,
  45 F.4th 462 (D.C. Cir. 2022) .............................................................................18

*Chamber of Commerce of the U.S. v. DOL*,
  174 F.3d 206 (D.C. Cir. 1999) ....................................................8, 10, 11, 12

*City of Brookings Mun. Tel. Co. v. F.C.C.*,
  822 F.2d 1153 (D.C. Cir. 1987) ..................................................................40, 41

*Consumer Energy Council of Am. v. FERC*,
  673 F.2d 425 (D.C. Cir. 1982) ...........................................................................18

*Continental Airlines, Inc. v. U.S. DOT*,
  856 F.2d 209 (D.C. Cir. 1988) ...........................................................................16

*Corbett v. TSA*,
  19 F.4th 478 (D.C. Cir. 2021) .............................................................................43

*CropLife Am. v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ...........................................................................18

*D.A.M. v. Barr*,
  486 F. Supp. 3d 404 (D.D.C. 2020) ..................................................................44

*DHS v. Regents of the University of California*,
  140 S. Ct. 1891 (2020) ...................................................................................3, 36

*United States ex rel. Edalati v. Sabharwal*,
  2023 WL 5334621 (D. Kan. 2023) ....................................................................40

*EPIC v. DHS*,
  653 F.3d 1 (D.C. Cir. 2011) ...................................................................... *passim*

*Ethyl Corp. v. EPA*,
  51 F.3d 1053 (D.C. Cir. 1995) ...........................................................................22

*ExxonMobil Gas Marketing Co. v. FERC*,
  297 F.3d 1071 (D.C. Cir. 2002) .........................................................................28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .....................................................................................20, 34

*Filazapovich v. Dep't of State*,
  560 F. Supp. 3d 203 (D.D.C. 2021) ..................................................................43

**Cases—continued**

*Genesis Health Care, Inc. v. Becerra,*
___ F. Supp. 3d. ___, 2023 WL 7549156 (D.S.C. 2023) ...........................................13, 26, 32

*Gomez v. Trump,*
485 F. Supp. 3d 145 (D.D.C. 2020) ......................................................................................44

*Gresham v. Azar,*
950 F.3d 93 (D.C. Cir. 2020) ...............................................................................................32

*Grossmont Hosp. Corp. v. Burwell,*
797 F.3d 1079 (D.C. Cir. 2015) ...........................................................................................24

*Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Ins. Corp.,*
589 F.2d 658 (D.C. Cir. 1978) .............................................................................................11

*Guilford College v. Wolf,*
2020 WL 586672 (M.D.N.C. 2020) ................................................................................17, 18

*Humane Society of the U.S. v. Zinke,*
865 F.3d 585 (D.C. Cir. 2017) .............................................................................................44

*Jama v. ICE,*
543 U.S. 335 (2005) ..............................................................................................................21

*James V. Hurson Assocs., Inc. v. Glickman,*
229 F.3d 277 (D.C. Cir. 2000) ..........................................................................................7, 8

*JEM Broadcasting Co., Inc. v. FCC,*
22 F.3d 320 (D.C. Cir. 1994) .......................................................................................7, 8, 12

*Kansas City v. HUD,*
923 F.3d 188 (D.C. Cir. 1991) .............................................................................................35

*Kessler v. FCC,*
326 F.2d 673, 678 (D.C. Cir. 1963) .....................................................................................25

*Lamoille Valley R.R. Co. v. ICC,*
711 F.2d 295 (D.C. Cir. 1983) .....................................................................................8, 9, 12

*Lawyers' Committee for 9/11 Inquiry, Inc. v. Wray,*
424 F. Supp. 3d 26 (D.D.C. 2020) .......................................................................................25

*Lujan v. Defenders of Wildlife,*
504 U.S. 551 (1992) .........................................................................................................41, 43

*Maine Lobstermen's Ass'n v. National Marine Fisheries Service,*
70 F.4th 582 (D.C. Cir. 2023) ......................................................................................41, 42, 43

*MCI Telecomms. Corp. v. AT&T,*
512 U.S. 218 (1994) ..............................................................................................................24

*MediNatura, Inc. v. FDA,*
496 F. Supp. 3d 416 (D.D.C. 2020) .....................................................................................36

## Cases—continued

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) .......................................................... *passim*

*Michigan v. EPA,*
    268 F.3d 1075 (D.C. Cir. 2001) .......................................................... 30

*Midtec Paper Corp. v. United States,*
    857 F.2d 1487 (D.C. Cir. 1988) .......................................................... 32

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................... 20, 32

*Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) .......................................................... 44

*Nat'l Senior Citizens Law Ctr., Inc. v. Legal Servs. Corp.,*
    581 F. Supp. 1362 (D.D.C. 1984) ........................................................ 18

*Nat'l Venture Capital Ass'n v. Duke,*
    291 F. Supp. 3d 5 (D.D.C. 2017) ........................................................ 43

*National Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ........................................................... 8

*Neb. Dep't of Health & Human Servs. v. HHS,*
    340 F. Supp. 2d 1 (D.D.C. 2004) ......................................................... 6

*Newspaper Ass'n of Am. v. Postal Regulatory Comm'n,*
    734 F.3d 1208 (D.C. Cir. 2013) .......................................................... 35

*NLRB v. SW General, Inc.,*
    580 U.S. 288 (2017) ......................................................................... 23

*NRDC v. EPA,*
    643 F.3d 311 (D.C. Cir. 2011) ............................................................ 6

*NRDC v. EPA,*
    822 F.2d 104 (D.C. Cir. 1987) ............................................................ 23

*Oakbrook Land Holdings, LLC v. Comm'r,*
    28 F.4th 700 (6th Cir. 2022) ............................................................... 18

*Oceana, Inc. v. Evans,*
    384 F. Supp. 2d 203 (D.D.C. 2005) ..................................................... 41

*Oceana, Inc. v. Ross,*
    290 F. Supp. 3d 73 (D.D.C. 2018) ....................................................... 36

*Original Honey Baked Ham Co. of Ga. v. Glickman,*
    172 F.3d 885 (D.C. Cir. 1999) ............................................................ 21

*NB ex rel. Peacock v. D.C.,*
    682 F.3d 77 (D.C. Cir. 2012) .............................................................. 42

**Cases—continued**

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015).....................................................................................35

*Pharm. Research & Mfrs. of Am. v. HHS*,
  138 F. Supp. 3d 31 (D.D.C. 2015)......................................................11, 26

\*Pharm. Rsch. & Mfrs. of Am. v. HHS*,
  43 F. Supp. 3d 28 (D.D.C. 2014)........................................................27, 29

*Planned Parenthood of Metro. Wash., D.C., Inc. v. Horner*,
  1988 WL 126240 (D.D.C. 1988)................................................................25

*Public Citizen v. Dep't of State*,
  276 F.3d 634 (D.C. Cir. 2002)...................................................................14

*Ramirez v. U.S. ICE*,
  471 F. Supp. 3d 88 (D.D.C. 2020)..............................................................40

*Ranger v. FCC*,
  294 F.2d 240 (D.C. Cir. 1961)..............................................................8, 14

*S. Cal. Edison Co. v. FERC*,
  415 F.3d 17 (D.C. Cir. 2005).....................................................................37

*Sea Robin Pipeline CO. v. FERC*,
  127 F.3d 365 (5th Cir. 1997)......................................................................28

*Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*,
  81 F.3d 179 (D.C. Cir. 1996).....................................................................22

*Silver v. IRS*,
  2019 WL 7168625 (D.D.C. 2019) ..............................................................41

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
  997 F.3d 1247 (D.C. Cir. 2021)..................................................................38

*State Nat'l Bank of Big Spring v. Lew*,
  795 F.3d 48 (D.C. Cir. 2015)......................................................................41

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979).....................................................................................23

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)...................................................................................42

*United States v. Gibson*,
  2022 WL 1693991 (S.D. Tex. 2022) ..........................................................39

*United States v. Mead Corp.*,
  533 U.S. 218, 227, 229 (2001)....................................................................28

*Vernal Enterprises, Inc. v. FCC*,
  355 F.3d 650 (D.C. Cir. 2004)....................................................................16

**Cases—continued**

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ......................................................................................27

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ......................................................................................43

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
   475 F.3d 319 (D.C. Cir. 2006) ....................................................................35

**Statutes**

5 U.S.C.
   § 551(4) ..........................................................................................................4
   § 553 ...............................................................................................................4
   § 553(b)(A) .....................................................................................................4
   § 706 ...............................................................................................................4

42 U.S.C.
   § 256b(a) .......................................................................................................25
   § 256b(a)(1) ..............................................................................................8, 22
   § 256b(a)(4) ...................................................................................................25
   § 256b(a)(5) ...................................................................................................34
   § 256b(a)(5)(A) ..............................................................................................36
   § 256b(a)(5)(B) ......................................................................21, 22, 26, 36
   § 256b(a)(5)(C) ......................................................................23, 29, 36, 38
   § 256b(a)(5)(C), (D) .....................................................................................23
   § 256b(a)(5)(D) ..............................................................................................29
   § 256b(a)(7)(A) ..............................................................................................22
   § 256b(a)(7)(B) ..............................................................................................22
   § 256b(a)(9) ...................................................................................................28
   § 256b(d)(2) ...................................................................................................29
   § 256b(d)(2)(B) ..............................................................................................36
   § 256b(d)(2)(B)(i) ..........................................................................................29
   § 256b(d)(2)(B)(ii) .........................................................................................29
   § 256b(d)(2)(B)(iv) ........................................................................................29
   § 256b(d)(2)(B)(v)(I)-(III) ............................................................................23

47 U.S.C.
   § 308 ...............................................................................................................25
   § 309 ...............................................................................................................25

**Other Authorities**

H.R. Rep. No. 102-384, pt. 2 (1992)...........................................................................11, 25, 26, 29

*Institutional paper claim form (CMS-1450)*, CMS.gov (Sept. 6, 2023) ........................................33

*Medicare Program Integrity Manual: Chapter 4 – Program Integrity* § 4.2.1,
    CMS (Oct. 26, 2023)...................................................................................................40

Office of Evaluations & Inspections, *Medicare Hospital Prospective Payment
    System: How DRG Rates are Calculated and Updated*, OIG (Aug. 2001) ............................33

Office of Public Affairs, *University of Miami to Pay $22 Million to Settle Claims
    Involving Medically Unnecessary Laboratory Tests and Fraudulent Billing
    Practices*, DOJ (May 10, 2021) .......................................................................................39

U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer
    Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs
    Improvement* (Sept. 23, 2011).........................................................................................26

**GLOSSARY**

APA:   Administrative Procedure Act

CMS:   Centers for Medicare & Medicaid Services

HHS:   U.S. Department of Health and Human Services

HRSA:  Health Resources and Services Administration

## INTRODUCTION

In 2020, the Health Resources and Services Administration (HRSA) issued a clear policy: Covered entities were permitted to use covered 340B drugs at offsite, outpatient facilities before those facilities appeared on Medicare cost reports—so long as the patients at those facilities were patients of the covered entity. HRSA explained that this approach was consistent with its longstanding interpretation of the word "patient," and on at least one occasion described that it was merely an explanation of how the program had always operated. AR104. When asked by stakeholders, the agency repeatedly confirmed that its policy was permanent and would extend beyond the end of the COVID-19 public health emergency. Nonetheless, when the emergency formally ended in May 2023, HRSA announced its intention to rescind its 2020 policy. Several months later, HRSA published a Notice in the Federal Register directing covered entities to immediately "cease" using 340B drugs at unregistered child sites or face audits and enforcement actions. AR22. As a result of HRSA's insistence that new child sites cannot register with the agency until they appear on a covered entity's Medicare cost report, facilities are locked out of using 340B drugs for a period of up to 17 months. This costs safety-net hospitals millions of dollars of discounts that Congress specifically provided.

HRSA's dramatic shift in policy—accomplished first through a haphazard series of emails to stakeholders, and then confirmed in the 2023 Notice—violates the APA in several ways.

*First*, HRSA did not attempt to comply with the APA's notice-and-comment requirements. It instead implausibly claims that the Notice was merely a procedural change targeted at the "paperwork" required for registration. HRSA Br. 16. But the APA's exception for rules of agency procedure must be narrowly construed lest—as HRSA tries here—agencies smuggle in substantive changes through ostensibly procedural framings. Procedural rules are those aimed at internal agency conduct or proceedings. When a rule alters the law, or when it imposes substantial burdens on regulated parties' rights or interests, the rule cannot be procedural. The Notice—which

mandates that unregistered child sites "cease" use of 340B drugs or be "out of compliance" (AR22)—does both. Before the Notice, a covered entity could use 340B drugs to treat its patients at unregistered child sites; after the Notice, it cannot. *Accord* HRSA Br. 8 ("[C]hild sites can no longer access 340B pricing immediately; rather, they must first register in the System (and as a precursor step, be listed on the parent hospital's Medicare Cost Report."). This change results in millions of dollars of lost savings per covered entity, per new child site. Important changes like this are precisely the kind that the D.C. Circuit has held time and again implicate the core policy objectives served by notice and comment. This is no less true when an agency flip-flops between substantive policies.

*Second*, the Notice is contrary to the text and purpose of the 340B statute. Congress provided covered entity hospitals and their patients a very important benefit—access to 340B drugs. Congress then specified a single limit on covered entities' use of 340B drugs—they may not administer or transfer such drugs to anyone other than patients of the covered entity. As HRSA now admits, child sites are integral components of a covered entity and their patients are patients of the covered entity long before the child sites appear on any Medicare cost report. By instructing covered entities to categorically cease use of 340B drugs for their patients at new child sites, HRSA improperly circumscribes the statutory benefit Congress intentionally provided covered entities and their patients. HRSA cannot rewrite the statute to foreclose the benefit that Congress granted.

Moreover, unlike many other agencies, Congress did not bless HRSA with a general grant of delegated authority to effectuate the 340B statute through legislative rulemaking. Instead, Congress specifically delineated the areas of the 340B program in which HRSA has plenary rulemaking authority, and its action here is outside HRSA's enumerated powers.

*Third*, the Notice is unreasoned:

- The agency was obligated to consider and address the substantial financial impacts of its policy change on covered entities, both because these costs were specifically

raised and because the financial wellbeing of covered entities is the overarching purpose of the 340B program. But HRSA failed to do so.

- HRSA's most basic obligation to explain its decisions was heightened where, as here, the agency's previous policy (and its reassurances of the policy's permanence) engendered serious reliance interests. While HRSA now casts doubt on those interests, they were known to the agency when it made its decision, and it was obligated to consider and address them. Yet it disregarded those interests wholesale.

- HRSA previously (correctly) held that its approach to the statutory term "hospital" should be consistent with the approach taken by the agencies administering the Medicare program. It applied this principle in its 1994 Guideline but abandoned it by the time of the Notice. HRSA was obligated to explain this departure. It did not.

- HRSA was obligated to consider and evaluate reasonable, less burdensome alternatives that would accomplish its policy aims. It never addressed clear alternatives.

- And HRSA based its new policy on conjured diversion fears derived from a survey showing only that, of a skewed sample of covered entities surveyed, the vast majority were complying with the policy in place at the time the survey was conducted.

In all, as we have explained, HRSA's flip-flop was baldly unreasoned—and thus unlawful.

A common thread runs through HRSA's attempts to shore up the Notice in its response brief: Almost none of its many arguments appears anywhere in the administrative record, including in the Notice itself. Yet in an APA challenge, the Court must evaluate the agency's contemporaneous explanation for its action and disregard *post hoc* arguments and rationalization from litigation counsel. *See, e.g.*, *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1914 (2020). Once counsel's newfound arguments are set aside, no meaningful reasoning remains.

Finally, Plaintiffs' standing is abundantly clear, both because they are the direct targets of HRSA's regulation and from the detailed declarations attached to Plaintiffs' motion for summary

judgment. There is nothing to HRSA's claim that relief should be limited to some subset of the parties—Plaintiffs need produce only *one* plaintiff with standing to bring this claim, yet Plaintiffs have demonstrated the standing of several.

## ARGUMENT

HRSA's recent action—reversing its 2020 policy—is unlawful several times over. It is a legislative rule, but adopted without the requisite notice and comment. It conflicts squarely with the statutory benefit conferred on covered entities and their patients to access 340B drugs. And it is arbitrary and capricious on multiple grounds. The Court should set the 2023 Notice aside.

## I.   HRSA FAILED TO COMPLY WITH NOTICE AND COMMENT REQUIREMENTS FOR ITS 2023 POLICY CHANGE.

Under the APA, legislative rules are void unless they are promulgated through the Act's notice-and-comment procedures. 5 U.S.C. §§ 553, 706; *see* Pl. Br. 17-21. HRSA does not deny that its 2023 Notice failed to undertake notice-and-comment procedures, nor does it contest that the Notice falls within the APA's broad definition of a "rule." 5 U.S.C. § 551(4); *see Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980). Instead, HRSA argues that it was entitled to avoid notice and comment, either because the Medicare cost report requirement was a procedural rule or because it was a legislative rule adopted in 1994. Neither argument withstands scrutiny. The Notice changed the status quo, dramatically altering the rights of regulated entities. Indeed, that much is apparent from the fact that the Notice includes a compliance safe harbor (AR22), underscoring its substantive effects. This quintessentially substantive rule required notice and comment.

### A.   The 2023 policy change was not a procedural rule.

The APA excepts a limited category of "rules of agency organization, procedure, or prac-tice" from its general notice-and-comment requirements. 5 U.S.C. § 553(b)(A). Courts in this Cir-cuit have used the general label "procedural rules" for "rules falling under this exemption." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). Procedural rules are "primarily directed

toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Id.* (quoting *Batterton*, 648 F.2d at 702 n.34) (alteration in original). "At bottom, the exception" is for "internal house-keeping measures." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1035 (D.C. Cir. 2023) (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987)). And, due to the crucial policy objectives served by the notice-and-comment process, "the exception for procedural rules 'must be narrowly construed.'" *EPIC v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011); *accord Bowen*, 834 F.2d at 1044 ("Congress intended the exceptions to § 553's notice and comment requirements to be narrow ones.").

**1.**  To start, it is important to identify HRSA's actions. In 1994, HRSA concluded that 340B pricing should be available only at facilities that are "integral component[s]" of covered entity hospitals. AR14. The agency chose presence on a covered entity's Medicare cost report as its benchmark for "integral" status, reasoning that "[o]nly outpatient facilities which are an integral component of the [covered entity] will be included on the . . . Medicare cost report, and only those facilities will be eligible for . . . discount pricing." *Id.* HRSA thus took the position that drugs could be used at child sites *only* once they were registered after appearing on a Medicare cost report. *Id.*

HRSA changed its policy in 2020 during the COVID-19 public health emergency. Under the 2020 policy, a child site must still be "listed as reimbursable on the hospital's most recently filed Medicare cost report and ha[ve] associated outpatient costs and charges" in order "to register for the 340B program and be listed" in OPAIS. AR55. Nonetheless, HRSA clarified that "patients of the [child] site may still be 340B eligible to the extent that they are patients of the covered entity." *Id.* Thus, HRSA explained that it "ha[d] not changed its policy" for *registration*, but *had* implemented a new policy that "patients of [a] new site may still be 340B eligible" even before the child site appears on a Medicare cost report. AR90. The upshot of this change was that covered entities could begin using 340B drugs at child sites as soon as they met Medicare's provider-based criteria, without having to wait for registration or for the Medicare cost report.

In the Notice challenged here, HRSA explained that "ending" its 2020 policy "[was] appropriate at this time." AR20. Before the Notice, a covered entity could permissibly use 340B drugs at child sites even before registration; after the Notice, such a facility is "out of compliance and must stop using 340B drugs as soon as practically possible." AR22. The policy change was only underscored by the new safe harbor created by the Notice. HRSA specified that it will allow "off-site outpatient facilities that are not yet listed as a reimbursable facility on the hospital's most recently filed Medicare Cost Report . . . to continue to use 340B drugs" so long as the facility opened prior to publication of the Notice and the child site notifies HRSA by email within 90 days with basic identifying information. *Id*. Otherwise, the use of 340B drugs at those facilities is now prohibited, and covered entities must "cease" use of drugs immediately. *Id.* HRSA's decision to require registration—and continued insistence on basing registration on appearance on a Medicare cost report—results in substantial delays before covered entities can use 340B drugs to treat their patients at new child sites.

**2.** The Notice thus fundamentally altered where and when covered entities can use 340B drugs. AR-22; HRSA Br. 8. And "[g]iven that the [Notice] changed the law," the question of its status as "a legislative rule that required notice and comment [] is easy." *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011). "A policy" like this "that adds a requirement not found in the relevant statute" is the quintessential example of "a substantive rule." *Neb. Dep't of Health & Human Servs. v. HHS*, 340 F. Supp. 2d 1, 18 (D.D.C. 2004). While Plaintiffs made all these points in their opening brief (at 17-20), HRSA has no convincing response.

Instead, HRSA attempts to sidestep the substantive implications of the Notice by reframing the issue at far too high a level of generality—claiming that the Medicare cost report requirement "simply addresses the paperwork that is needed to assure HRSA that a child site should be registered." HRSA Br. 16. But courts routinely reject this tactic. In *EPIC*, for example, the TSA had implemented a new, more invasive type of scanner to which airline passengers were required to

submit prior to boarding their flights. *EPIC*, 653 F.3d at 3-5. TSA argued that the new policy was simply an internal choice about how to conduct airline screenings, and that any impacts on passengers were incidental. The D.C. Circuit rejected this gambit. "Of course, stated at a high enough level of generality, the new policy imposes no new substantive obligations upon airline passengers." *Id.* at 6. "But this overly abstract account of the change . . . elides the . . . interests at the heart of the petitioners' concern" with the challenged policy. *Id.*

Just as the court of appeals rejected TSA's attempt to abstract away the problems with its regulation, so too should this Court reject HRSA's. The Notice was not aimed at the "paperwork" HRSA requires for its applications—it was expressly directed at the undeniably substantive questions of *where* and *when* covered entity hospitals can use 340B drugs. AR20-22. That is why HRSA explained that it would "continue to allow" some child sites "to continue to use 340B drugs," including those opened prior to the issuance of the Notice and those in-between appearance on a Medicare cost report and registration with HRSA. AR22. The Notice provided a safe harbor *because* it is a substantive change. But HRSA declared that all other covered entities are "out of compliance and must stop using 340B drugs at these unregistered sites." AR22. HRSA attempts to gloss over Plaintiffs' very real concerns about the impacts of these acknowledged changes on covered entities, "elid[ing]" their concerns. *EPIC*, 653 F.3d at 6. But the stated goals and clear effects of the Notice make apparent that "the change substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.*

**3.** HRSA next seeks to analogize the Notice to a category of rules that merely alter "the manner in which [regulated] parties present themselves or their viewpoints to the agency." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (quoting *JEM Broadcasting Co., Inc. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994)). In *JEM Broadcasting*, for example, the D.C. Circuit held that an FCC regulation changing the agency's timeline for amending applications in administrative proceedings was procedural and thus exempt from notice and comment.

22 F.3d at 326-327. That regulation fell "comfortably within the realm of the 'procedural'" only because it "did not change the *substantive standards*" for parties regulated by the FCC. *Id.* at 327. The same is true of cases establishing deadlines or submission windows for applications. *See, e.g.*, *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961) ("No substantive rights were actually involved by the regulation itself."); *Lamoille Valley R.R. Co. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983) (explaining that the rule lacks "definite substantive consequences"). And the Court echoed this holding in *James V. Hurson*, explaining that the agency's decision to eliminate face-to-face review "did not alter the substantive criteria" relevant to the regulatory decision at issue. 229 F.3d at 281.

HRSA's Notice, of course, looks nothing like these prototypical examples of agency authority to regulate its *internal* procedures. Each of the examples cited above could fairly be described as directed to the "procedures" employed by the agency—they all govern the time and manner of agency proceedings. The analogy breaks down, however, for "agency action that purports to impose legally binding obligations or prohibitions on regulated parties" or "sets forth legally binding requirements for a private party to obtain a permit or license" like the Notice does here. *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-252 (D.C. Cir. 2014).

Under the 340B statute, covered entities have a substantive right to access discounts on covered outpatient drugs. 42 U.S.C. § 256b(a)(1). Where and when they can use these drugs is of critical importance to the regulatory regime—that question can make a difference in 340B savings of millions of dollars at each integrated, offsite, outpatient facility. *See infra*, pp. 41-43. And the Notice directly modifies where and when 340B drugs can be used. AR20-22 (directing that unregistered child sites must "cease" using discounted drugs). "Procedural rules 'do not themselves alter the rights or interests of parties.'" *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 707); *accord Chamber of Commerce of the U.S. v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999) ("[W]hether a rule has the force of law often will bear upon its proper classification as substantive or procedural."). But the Notice clearly does.

Courts have consistently rejected agencies' similar attempts to wrap substantive changes in procedural paper. In *AFL-CIO*, for example, the D.C. Circuit rejected the NLRB's claims that a rule delaying certification of election results was procedural. 57 F.4th at 1039-1040. In doing so, the Court distinguished between rules altering "the 'timetable for *asserting* substantive rights' before an agency" and those changing "the timetable for exercising a substantive right itself." *Id.* at 1040. (quoting *Lamoille*, 711 F.2d at 328). Rules in the former category are "primarily directed toward regulating the manner in which parties present their views or otherwise submit requests to the agency;" rules in the latter concern "their exercise of substantive rights or interests outside of any agency-facing proceeding." *Id.*

In sum, the D.C. Circuit explained, even when a rule "involves some form of 'timing' change," the rule cannot be procedural when it "suspend[s] a party's entitlement to a substantive right or interest" in the interim. *Id.* That is precisely what the Notice does here: It precludes covered entities' "entitlement to a substantive right"—the right to use 340B discounted drugs to treat its patients at facilities that HRSA acknowledges are part of covered entity hospitals. AR22. The Notice is therefore not a simple procedural rule.

HRSA's reliance on *AFL-CIO* is therefore entirely misplaced. True, the Court there held that the NLRB's change to the presumptive timing of union election eligibility disputes was a procedural rule not subject to notice-and-comment requirements. 57 F.4th at 1044. But key to the Court's analysis on this point was the rule's change to a *presumption*—"the provision sets only the sequence Regional Directors 'normally' should follow." *Id.* Because the change was limited to this presumption, the rule "neither prevents parties from agreeing" to take a different approach nor prevents officials "from deciding over objection to defer decision." *Id.* It was on this basis the D.C. Circuit determined that the record did "not bear out the contention that the parties' substantive rights or interests are affected." *Id.* The same cannot be said of the Notice's requirement that covered entities "cease" use of 340B drugs at child sites that have not yet appeared on a Medicare cost

report or find themselves "out of compliance" and subject to HRSA enforcement actions. AR22. Procedural rules "do not . . . foreclose alternate courses of action or conclusively affect rights of private parties"—unlike the facially mandatory Notice. *Batterton*, 648 F.2d at 702. HRSA cannot analogize the binding Notice to a nonbinding regulatory presumption when the key question is whether a rule imposes "obligations" on regulated entities. *EPIC*, 653 F.3d at 6.

HRSA conspicuously omits from its brief any discussion of the *other* four regulatory changes the D.C. Circuit considered in *AFL-CIO*—three of which were held to fall outside of the APA's exception for procedural rules. This is likely because the contrast clearly demonstrates that the Notice's requirements are substantive rather than procedural. Like the non-procedural change in the deadline for employers to provide a voter list (from two days to five), the Notice was substantive because it "directly addresses" covered entities' right to use and access 340B drugs and is "neither facially nor materially directed at 'internal house-keeping.'" *AFL-CIO*, 57 F.4th at 1036 (quoting *Bowen*, 834 F.2d at 1045). The Notice specifies what covered entities can and cannot do, irrespective of any ties to agency internal processes. *Id.* at 1037. Similarly, like the NLRB's rule delaying certification of election results until after requests for review are resolved, the Notice creates a delay that shifts the parties' substantive burdens during the pre-approval period. *Id.* at 1039. It "suspend[s]" covered entities' entitlement, with a "direct impact on" the entity's "legal duty," which "distinguishes the provisions" from internal, procedural rules. *Id.* at 1040.

The D.C. Circuit's analysis of the NLRB's election-observers policy is particularly instructive. The Board argued that its policy of permitting election observers was a "privilege" or "courtesy" rather than a substantive right. *Id.* at 1041. The Court rejected any notion that its inquiry turned on the agency's characterization of the right or interest at issue. *Id.* The procedural-versus-substantive inquiry "is functional, not formal," which is why courts "examine how the rule affects not only the 'rights' of aggrieved parties, but their 'interests' as well." *Chamber of Commerce*, 174 F.3d at 212. The Notice here imposed a substantive burden on regulated parties by "alter[ing] the

standards imposed" for where and when they can use 340B drugs—an interest at the heart of the 340B program. *AFL-CIO*, 57 F.4th at 1042 (quoting *Mendoza*, 754 F.3d at 1024) (alteration in original). Like HRSA here, the Board in *AFL-CIO* argued that its rule was inward-oriented and that external effects were merely incidental. But HRSA's "role in supervising" the 340B program "does not convert every provision regarding" the program "into a rule of agency procedure." *Id.* The Notice is not the "'necessary consequence of,'—or even arguably related to—a decision about the duties of [agency] staff." *Id.* at 1043 (quoting *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Ins. Corp.*, 589 F.2d 658, 665 (D.C. Cir. 1978)). Instead, it is a regulation of covered entities' conduct, and unquestionably affects their substantive rights and interests.

**4.** In the face of *AFL-CIO* and these other recent cases from this Circuit, HRSA's other arguments do not hold water.

*First*, HRSA argues that the Notice is procedural because the relevant "substantive judgment" was made beforehand in the 1994 Guideline. HRSA Br. 16. For one, this is incorrect—as explained above and in Plaintiffs' opening brief, the relevant regulatory question is whether covered entities may provide 340B drugs to their patients when these patients are seen at an integrated, outpatient facility that has not yet appeared on a Medicare cost report. HRSA cannot avoid Plaintiffs' argument by framing the rule at an abstract level in an attempt to portray it as procedural. *EPIC*, 653 F.3d at 4-5. But even under its own framing, HRSA's argument fails. Regardless of whether the Notice affects substantive *rights*—again, it does—it surely affects Plaintiffs' *interests*. *Chamber of Commerce*, 174 F.3d at 212. Plaintiffs are a group of 340B covered entities that rely on discounts from the program to keep the lights on and provide critical services to millions of underserved Americans. They each utilize offsite, outpatient facilities to provide enhanced, convenient care for their patients—exactly what Congress intended for the 340B program. *Pharm. Research & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 52 (D.D.C. 2015) ("*PhRMA II*") (quoting H.R. Rep. No. 102-384, pt. 2, at 12 (1992)).

11

It thus is of no moment how the agency has "characterized its policy." *AFL-CIO*, 57 F.4th at 1041. The inquiry is "functional, not formal." *Chamber of Commerce*, 174 F.3d at 212. As HRSA recognizes (at 18 n.5), the D.C. Circuit has recently held that:

> Where a rule imposes "substantive burden[s]," *Bowen*, 834 F.2d at 1052, "encodes a substantive value judgment," *Pub. Citizen*, 276 F.3d at 640 (quoting *Bowen*, 834 F.2d at 1047), "trenches on substantial private rights [or] interests," *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 708), or otherwise "alter[s] the rights or interests of parties," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Glickman*, 229 F.3d at 280), it is not procedural for purposes of the section 553 exemption.

*AFL-CIO*, 57 F.4th at 1034-1035. HRSA implies that this binding language from the Court of Appeals is inconsistent with other, unspecified D.C. Circuit and Supreme Court precedent.[1] But the Court has long held that the relevant question is whether "the change substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rule-making." *EPIC*, 653 F.3d at 6. The Notice contains HRSA's substantive value judgment as to where and when 340B drugs can be used by covered entities. HRSA certainly thought the issue warranted notice and comment in 1994, the first time it addressed the regulatory question at issue. And for the reasons Plaintiffs have thoroughly described, HRSA's policy results in millions of dollars in lost savings per covered entity, per child site. Given that the 340B program was designed to help keep covered entities in business "in the face of the prescription drug price increases that followed the Medicaid Drug Rebate Program and that continue to this day," there can be little

---

[1]    In concurrence, Judge Rao expressed the opinion that "a substantive rule encodes a value judgment about primary conduct whereas a procedural rule governs secondary conduct." *AFL-CIO*, 57 F.4th at 1051 (Rao, J., concurring). For that proposition, she analogized to Supreme Court cases analyzing the application of judicial rules and cited to a dissent by Judge Silberman in a prior APA case. But in the most relevant precedential case she cited, the D.C. Circuit explained that the Court's task is "to identify which substantive effects are 'sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'" *JEM Broadcasting*, 22 F.3d at 327 (quoting *Lamoille Valley*, 711 F.2d at 328)). And in any event, the Notice fails even the primary conduct test: by demanding that covered entities cease the use of 340B drugs at unregistered child sites, HRSA has directly regulated the primary conduct of covered entities.

doubt that the Notice's effects are sufficiently substantive, grave, and direct to warrant notice-and-comment rulemaking. *Genesis Health Care, Inc. v. Becerra*, ___ F. Supp. 3d. ___, 2023 WL 7549156, at *14 (D.S.C. 2023).

In response to this clear case law, HRSA attempts (at 18-19) to minimize the burdens imposed by the rule. The NLRB took the same approach in *AFL-CIO*. 57 F.4th at 1039. But the D.C. Circuit held that the existence of countervailing considerations that might lessen the impact "does not negate the fact that the new provisions . . . shift the parties' substantive burdens during the" relevant period. *Id.* The same is true here. AR20-22. And in any event, Plaintiffs have provided evidence that the Notice is causing millions of dollars of ongoing harm for child sites already in existence. *See, e.g.*, Albert Decl. ¶¶ 14-15. "The record, then, does not bear out [HRSA's] contention." *AFL-CIO*, 57 F.4th at 1044.

*Second*, HRSA argues that "mere delay" in access to 340B discounts at child sites cannot "transform a procedural rule into a substantive one." HRSA Br. 19-20. But in *AFL-CIO* the Court considered several regulatory provisions and for some *did* conclude that delay rendered the burden sufficiently substantive to require notice and comment. *Compare* 57 F.4th at 1044-1045 (holding provision procedural where delay in when challenges can be presented to the Board has no effect on the regulated entities' rights in the interim) *with id.* at 1040 (holding change substantive where the delay affected regulated entities' substantive rights). The key distinction is whether the delay "suspend[s] a party's entitlement to a substantive right or interest." *Id.* The Notice does just that— it delays eligibility to register, and restricts covered entities' ability to use 340B drugs in the meantime. AR22.

HRSA concludes its argument with a bevy of cases it claims confirms its position, each of which is far afield from the Notice at issue here. *Bowen* concerned a regulation that "essentially establish[ed] a frequency and focus" for agency audits, urging enforcement agents "to concentrate their limited resources on particular areas." 834 F.2d at 1050. But despite HRSA's misleading

quotation, the Court in *Bowen* held the rule to be procedural only after concluding that it "imposes no new burdens on hospitals" because it did not alter the "standard of review." *Id.* at 1051. This is nothing like the Notice, which changed what covered entities are allowed to do—a classically substantive regulation.

HRSA's other cases are even less relevant. *Public Citizen* and *Ranger* both dealt with traditional internal timing rules. *Public Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (upholding agency regulation restricting FOIA request cutoff dates); *Ranger*, 294 F.2d at 243-244 (upholding cut-off for applications). They each were internal-facing rules describing how the agency would handle its internal affairs. HRSA draws from these cases that, "[i]f a rule is procedural even where it effectively blocks a party from accessing the benefit of a regulatory regime," then the effects of the Notice do not transform it from procedural to substantive. HRSA Br. 19-20. HRSA incorrectly assumes that the Notice is procedural to begin with, and then uses that assumption to prove the Notice's procedural nature. The circularity of this argument is its chief flaw. There is little doubt that a rule containing express restrictions on private conduct unrelated to internal agency proceedings is a classic legislative rule. HRSA's failure to comply with notice and comment is thus fatal to the Notice.[2]

### B.    HRSA cannot rely on the 1994 Guideline to justify its failure to comply with the APA.

Unable to escape the significant and substantive changes wrought by its change in policy, HRSA's fallback argument is that the Notice did not require notice-and-comment rulemaking because the agency sought and responded to comments when promulgating the 1994 Guideline. HRSA Br. 36-42. In doing so, HRSA disregards the intervening change: Use of 340B drugs at unregistered child sites went from prohibited, to permitted, back to prohibited. An agency's policy

---

[2]    As Plaintiffs explained in their opening brief, the Notice cannot be defended as an interpretive rule, either. Plaintiffs' Br. 19-20. HRSA now expressly waives any defense of the Notice as an interpretive rule. HRSA Br. 17 n.4.

change is not excused from notice-and-comment requirements just because the agency is flip-flop-ping as opposed to charting a new course.

**1.** In its brief, HRSA attempts to disregard its 2020 policy. Disputing our claim that the 2020 action constituted a "permanent . . . HRSA policy" (HRSA Br. 38-41), HRSA claims its 2020 policy was merely a temporary stopgap. *Id.* But the administrative record proves otherwise.

To begin, it bears emphasis that the *only* relevant, contemporaneous portion of the admin-istrative record HRSA relies on is the fact that the 2020 policy guidance was located on HRSA's COVID-19 Resources page. HRSA Br. 39 (citing AR53-54). But while this site noted that the agency would create "flexibilities" for use during the PHE, the new child site policy was not one of them. AR53-54. Instead, HRSA explained in the FAQs that, while it was *not* allowing child sites to register in OPAIS prior to the issuance of the Medicare cost report, "patients of the new site may still be 340B eligible to the extent that they are patients of the covered entity." AR55. The agency later clarified that the policy was posted to "highlight some of the 340B Program practices that are available to covered entities during this challenging time"—not that it was a COVID-specific flexibility. AR104. HRSA did not identify this policy as a "waiver" (as the agency's law-yers now call it) or otherwise indicate that it was temporary, nonbinding, or unofficial.

Almost immediately after HRSA posted the guidance, regulated parties and key stakehold-ers expressed uncertainty about the agency's intent. Tom Mirga, a journalist, reached out several times in April 2020 to ask whether HRSA was allowing child sites to register in OPAIS before they appeared on the Medicare cost report. AR73-77. HRSA responded that "regardless of the COVID-19 pandemic," child sites "must be listed on the hospital's most recently filed [Medicare cost report] . . . in order to be listed" in OPAIS. AR76. When the same journalist asked about the use of 340B drugs at child sites, HRSA explained that *unlike* for registration, where it "ha[d] not changed its policy," patients of a new child site "may still be 340B eligible to the extent that they are patients of the covered entity." AR90. When the journalist asked (less than a week later) whether the policy was in place "only during the COVID-19 public health emergency," or whether

"it is intended to continue in effect after the public health emergency ends," a Public Affairs Specialist in HRSA's Office of Communications straightforwardly answered that the policy was "in place regardless of the COVID-19 pandemic." AR94-95. Similarly, the Vice President of 340B Compliance at Apexus (HRSA's designated Technical Assistance Contractor to 340B covered entities) confirmed that the policy "is applicable regardless of COVID-19." AR187.[3]

HRSA complains that all these comments were merely "stray statements" that cannot bind the agency. HRSA Br. 41. But it points to nothing in the administrative record to indicate that these statements from HRSA officials and contractors—whose duties entail communicating the agency's position to stakeholders and the press—are in any way inconsistent with HRSA's policy at the time.[4] Instead, HRSA relies on statements made long after it adopted the 2020 policy, particularly focusing on characterizations it made when it rescinded that policy in 2023. HRSA Br. 39-40. The Court should "give more weight" to HRSA's contemporaneous explanations of its policy "than to the agency's current view." *Continental Airlines, Inc. v. U.S. DOT*, 856 F.2d 209, 217 (D.C. Cir. 1988). However much HRSA might wish its recission of the 2020 policy was merely a "clarif[ication]" of its earlier statements (AR126), that change was a fundamental reversal of policy. HRSA gave no indication that the policy was temporary or a waiver, and indeed confirmed otherwise to those who asked. There is simply no evidence that HRSA intended the policy to be

---

[3]    HRSA inexplicably claims that this correspondence was *not* related to the 2020 policy at issue here. HRSA Br. 40. But Mr. Oehsen specifically asked Dr. Richardson to confirm whether the "advice highlighted in yellow is applicable only during the COVID-19 public health emergency." AR187. The highlighted yellow text is visible on AR187: "patients of the new site may still be 340B eligible to the extent they are patients of the covered entity." And Dr. Richardson was explicit that "the highlighted advice in yellow is applicable regardless of COVID-19." *Id.* There is no ambiguity here.

[4]    This case is thus nothing like *Vernal Enterprises, Inc. v. FCC*, in which the D.C. Circuit held that an agency is not bound by "the actions of its staff if the agency has not endorsed those actions" and the agency has otherwise "acted consistently." 355 F.3d 650, 660 (D.C. Cir. 2004). The D.C. Circuit's cases about "internal inconsistency at a subordinate level" do not imply that official agency policies and interpretations can never be delivered by a subordinate. *Amor Fam. Broad. Grp. v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1990).

anything but permanent until the moment HRSA announced its recission of the policy.

**2.**   HRSA also rejects the relevance of the 2020 policy by implying that, if the "Medicare Cost Report verification is a legislative rule," then its own 2020 policy was unlawful for departing from that rule without notice and comment. HRSA Br. 38.[5]

To start with, it is not entirely clear that the 2020 policy *was* a deviation from the 1994 Guideline. In June 2020, a Senior Advisor in HRSA's Office of Pharmacy Affairs clarified on behalf of Rear Admiral Pedley that the new guidance was "not a change in policy," but "a clarification on how the Program has been operating." AR104. If this were true, then the 2020 guidance would not be subject to the notice-and-comment requirement to begin with. *Mendoza*, 754 F.3d at 1021. But the Notice expressly and intentionally departs from the policy expressed in the 2020 guidance, stating that the agency intends to "end[]" the use of 340B drugs at unregistered child sites and directing covered entities "to cease purchasing 340B drugs for use at those facilities" or "be subject to audit and compliance action." AR20, 22. If the 2020 guidance is illustrative of the policy under the 1994 Guideline, and if the 1994 Guideline is legislative (as HRSA argues), then there can be no doubt that notice and comment is required to adopt the new policy in the 2023 Notice.

In any event, for present purposes, the question is decisively *not* whether the agency acted properly with its 2020 policy. An agency cannot escape a challenge to its current policy by arguing that its own past policy was unlawful. In a nearly identical situation, the government argued that its most recent policy change need not undergo notice and comment because the previous policy had not. *Guilford College v. Wolf*, 2020 WL 586672, at *7 (M.D.N.C. 2020). The court disagreed: "[E]ven if the prior policy should have been issued through the notice-and-comment process," an

---

[5]   HRSA does not claim that concerns about the legitimacy of the 2020 policy were actually a reason for its recission. Nor could it—any legal concerns are wholly absent from the Notice and from the administrative record. Such an argument would be a "post hoc rationalization" rather than the "agency's contemporaneous explanation for its actions." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1351 (D.C. Cir. 2014).

"agency's first mistake is not a basis for making a second." *Id.* An agency cannot "immunize[]" its policy changes from the APA's procedural requirements "by virtue of the fact that the prior policy went unchallenged." *Id.*

The *Guilford College* holding is correct. Were it otherwise, nothing would constrain an agency that flip-flops between admittedly substantive policies while each time casting procedural doubt on the most recent policy announcement. Indeed, the D.C. Circuit has expressly rejected this argument when advanced by other agencies. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) ("The Commission's argument that notice and comment requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of [Section] 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."). Instead, the APA requires agencies to use notice-and-comment rulemaking "*whenever*" they enact substantive regulatory changes, regardless of the state of play beforehand. *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022) (quoting *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 710 (6th Cir. 2022)). The statute does not contain a "two wrongs make a right" exception.

**3.** With the 2020 policy in mind, HRSA's attempt to portray the Notice as one that simply "remind[s] parties of existing statutory or regulatory duties" rings hollow. *Mendoza*, 754 F.3d at 1021; *see* HRSA Br. 36. Though HRSA so framed the Notice, "[it] is self-evident that an agency cannot determine the characterization of an announcement merely by labelling it in a given way." *Nat'l Senior Citizens Law Ctr., Inc. v. Legal Servs. Corp.*, 581 F. Supp. 1362, 1369 n.6 (D.D.C. 1984); *accord CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) ("[T]he agency's characterization of its own action is not controlling."). The Notice expressly "end[ed]" the 2020 policy (AR20), demanded that covered entities cease and desist previously permitted conduct (AR22), and threatened enforcement actions (*id.*). It even, as a matter of policy, provided a new safe harbor. AR22. It is similar to the policy at issue in *Mendoza*—it "do[es] more than clarify or remind parties

of preexisting duties" by "imposing specific duties on [entities] seeking certification" from the agency. *Mendoza*, 754 F.3d at 1022. Notice and comment were thus plainly required.

### C. HRSA's statute of limitations argument lacks merit.

HRSA's contention (at 37-39) regarding the APA's six-year statute of limitations has no merit. In attempting to reframe the complaint as a challenge to the 1994 Guidelines, HRSA implausibly claims that the Notice is simply a "renewal of an earlier decision" which "does not alter the status quo." *Id.* at 38 (quoting *Mendoza*, 754 F.3d at 1018). But *Mendoza* and the related cases use "renewal" to mean something like "continued application" of an existing policy—the holding is simply that an agency's continuous decision to maintain its *current* rules does not subject the rules to continuous APA challenges. *Id.* Those cases say nothing about the result when an agency *revives* a policy that it previously abandoned. *See* pages 5-6, *supra*.

It may be true that "[n]one of HRSA's acts within the limitations period" effects a substantive change *as compared to the 1994 [Guideline]*."[6] HRSA Br. 38. But the 1994 Guideline is not the relevant baseline for Plaintiffs' challenge to the Notice—the proper comparator is the immediately preceding policy, which defines the "status quo." *Mendoza*, 754 F.3d at 1018. Here, that is the 2020 policy, which the agency is not at liberty to disregard.[7]

HRSA's contrary argument does not withstand scrutiny. At bottom, HRSA contends that whenever an agency resurrects a policy that had previously been adopted through notice-and-comment rulemaking, the statute of limitations should be measured from the first implementation of the old policy. Some agencies, of course, have changed their position on any given regulatory issue

---

[6]   Even this is unclear—the administrative record indicates that HRSA understood the 2020 policy to be "a clarification of how the Program has been operating" and thus consistent with the 1994 Guideline. AR104. Given that the Notice expressly abrogated the 2020 policy, there is substantial reason to doubt that the Notice and the 1994 Guideline are wholly compatible.

[7]   HRSA briefly argues (at 39) that it never formally "reopen[ed]" its policy for reconsideration. This is irrelevant. As Plaintiffs explained (at 42-45), the Notice is a final agency action subject to challenge under the APA. Notably, HRSA does not argue otherwise. Plaintiffs challenged that action—which changed the agency's policy on an important regulatory issue—within days.

several times over the decades—as they are permitted to do. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). But when an agency *does* change its policy, it must provide a reasoned explanation for doing so. *Fox Television*, 556 U.S. at 514-515. This requirement would be eviscerated if an agency were allowed to freely switch between any of its prior policies that are more than six years old without any potential for an APA challenge. But that is the precise consequence of HRSA's faulty reasoning—any challenge to the new policy would be outside the statute of limitations measured from when the policy was first adopted. That result is flatly wrong.

Measured from the proper date—October 27, 2023—Plaintiffs' complaint was undoubtably timely. It was filed just four days later. ECF 1.

## II. HRSA'S MEDICARE COST REPORT POLICY IS *ULTRA VIRES* AND CONTRARY TO LAW.

Nor could HRSA have enacted its new policy even if it had followed the proper procedures. HRSA's new policy is inconsistent with the clear statutory language and manifest legislative purpose. In the 340B sphere, HRSA lacks legislative rulemaking authority outside certain narrow, specified areas. Because "[a]n agency can neither adopt regulations contrary to statute, nor exercise powers not delegated to it by Congress," HRSA's Notice must be vacated. *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (D.C. Cir. 1994).

### A. HRSA's policy conflicts with the 340B Statute.

The 340B Statute unambiguously entitles 340B hospitals to access discounted prices when they provide drugs to their patients at offsite, hospital outpatient facilities. Child sites are by definition integral components of an eligible "hospital," and are therefore themselves eligible for the program. And a provider-based child site's patients are "patients of a covered entity"—that is, patients of the parent hospital—and are thus eligible to receive 340B drugs under the statute. Make no mistake: HRSA *agrees* with this characterization. "The parties agree that an off-site clinic that is integrated with the parent hospital is statutorily eligible for 340B pricing, and the clinic can

20

benefit from the Program by providing 340B drugs to eligible patients." HRSA Br. 21.

Given this concession, one might imagine that this case would be over. HRSA accepts that child sites are integrated components of covered entity hospitals and that patients of those child sites are patients of the covered entity long before they appear on a Medicare cost report. The only statutory limitation on a covered entity's use of 340B drugs is the prohibition on "resell[ing] or otherwise transfer[ring] the [340B] drug to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B). This provision does two important things.

*First*, it establishes that a person who *is* "a patient of the [covered] entity" *is* entitled to 340B program drugs. Thus, per the plain statutory terms, participating hospitals may use 340B drugs for patients who qualify within the meaning of the statute—and HRSA has no right to adopt additional qualifying criteria.

*Second*, and related, Congress defined the conduct it sought to prohibit—and "[a] statute listing the things it does cover exempts, by omission, the things it does not list." *Original Honey Baked Ham Co. of Ga. v. Glickman*, 172 F.3d 885, 887 (D.C. Cir. 1999). By precluding the use of 340B drugs for a covered entity's patients because those patients are seen at a facility not yet registered in OPAIS (because it has not appeared on a Medicare cost report), HRSA thus excludes some patients of the covered entity from the permissible recipients of 340B drugs. In doing so, the Notice exceeds HRSA's statutory authority. *Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply."). This basic statutory interpretation should end the inquiry. *See* Pl. Br. 22-27.

**1.** HRSA insists to the contrary that, despite the 340B statute's clear language, it nonetheless must "know that the facts out in the world" support "the parties' shared construction of the statute." HRSA Br. 21. In HRSA's telling, it can condition the benefits to covered entities provided by the 340B statute on submission of the agency's preferred form of evidence—regardless of the burdens that decision imposes on covered entities. To paint this picture, though, HRSA is forced to contort the 340B program beyond recognition.

The 340B statute functions by conditioning drug manufacturers' participation in Medicare and Medicaid on agreements that the manufacturers will provide discounted drugs to safety-net hospitals. It requires the Secretary to "enter into an agreement with each manufacturer" (42 U.S.C. § 256b(a)(1)) which requires the manufacturer to "offer discounted drugs to covered entities." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115 (2011). The statute provides a detailed definition of the "covered entities" that are entitled to these discounts. 42 U.S.C. § 256b(a)(4). And it restricts what covered entities can do with these drugs. *Id.* § 256b(a)(5)(B).

But nowhere does the statute permit HRSA to transform this single statutory prohibition into an application process for child sites before which *acknowledged* covered entities cannot use 340B drugs to treat people who HRSA *admits* are their "patients" within the meaning of the 340B Statute. Nor does the general fact that HRSA has been entrusted with enforcement of the diversion and duplicate discount prohibitions create such authority. Of course, at the end of the day, HRSA "has the authority to make the factual determination of whether" a violation has occurred. *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1059 (D.C. Cir. 1995). "But this does not mean that the Agency can apply criteria beyond those prescribed in the statute in enforcing the . . . provision[s]." *Id.* The admission that child sites are part of covered entity hospitals and that patients seen there are patients of the covered entity irrespective of registration status is fatal to HRSA's Notice. "[I]t should be clear that an agency is not free to add extra licensing procedures . . . merely because the agency has general authority to regulate in a particular area." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 186 (D.C. Cir. 1996).

Indeed, in other parts of the 340B statute Congress *did* grant HRSA the authority it seeks to arrogate here. A separate provision, for example, directs the Secretary to "develop and implement a process for the certification of" two specific types of covered entities not relevant here. 42 U.S.C. § 256b(a)(7)(A). With respect to those types of entities, Congress even specified the types of information that must be submitted as part of the to-be-developed certification process. *Id.* § 256b(a)(7)(B). Congress notably did *not* extend this certification process to include *all* covered

entities (and their child sites)—strongly suggesting an intended limitation on the scope of HRSA's authority to develop a program-wide application process. *See NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (explaining that under the *expressio unius* canon, "expressing one item of [an] associated group or series excludes another left unmentioned"). And the clarity with which Congress gave the Secretary this authority demonstrates that the agency knew *how* to clearly delegate such authority and did so when that was its intended result. Courts have long recognized that "[t]he fact that Congress has vested some agencies with [a particular] power demonstrates that when Congress wanted to extend that power, 'it knew how to do so and did so expressly.'" *NRDC v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987) (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 21 (1979)). If that is true across agencies with different organic statutes enacted at different times by different Congresses, it is even more so within the confines of a single statute.

**2.** The inconsistency between the statute and HRSA's pre-registration ban on the use of 340B drugs at child sites is especially clear given Congress's specification of the enforcement mechanisms it actually directed HRSA to use. The 340B Statute specifies that covered entities must submit to audits by manufacturers and HRSA and provides "[a]dditional sanction[s] for non-compliance" that can be imposed should the audit uncover a violation. 42 U.S.C. § 256b(a)(5)(C), (D). It imposes an additional monetary penalty for knowing and intentional violations "in the form of interest on sums for which the covered entity is found liable," empowers the Secretary to "remov[e] the covered entity" from the 340B program in the case of an "egregious" violation, and instructs the Secretary to refer matters to "the appropriate Federal authorities" in appropriate cases. *Id.* § 256b(d)(2)(B)(v)(I)-(III).[8]

---

[8]  HRSA complains that it can "only audit a fraction of covered entities in the Program." HRSA Br. 10 n.2. But "[a]n act of Congress . . . cannot be overridden by a regulatory process created for the convenience of an Administrator." *Avenal Power Ctr., LLC v. EPA*, 787 F. Supp. 2d 1, 4 (D.D.C. 2011). And in any event, that is likely why Congress also permitted *manufacturers*—which are generally well-resourced and have economic incentives to do so—to conduct audits of covered entities as well. 42 U.S.C. § 256b(a)(5)(C).

Despite these prescribed enforcement mechanisms, HRSA claims that it *must* be able to "verif[y] information related to covered entity sites." HRSA Br. 23. But nowhere does HRSA explain why the statutory obligation to verify information of covered entities comes along with the ability to restrict the use of 340B drugs by covered entities for treatment of their own patients until that information is verified. HRSA may not employ its verification and enforcement responsibilities to restrict the statutory right Congress conferred on covered entities. To be clear, Plaintiffs do not contest HRSA's authority to require covered entities to register with HRSA, including to register their child sites—but HRSA may not transform this registration requirement into a separate, substantive requirement sharply limiting the use of 340B drugs.[9] Congress balanced the interests of covered entities and manufacturers; HRSA, accordingly, is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994).

**3.** HRSA attempts to salvage the Notice's ban on pre-registration use of drugs at provider-based child sites by analogy to other "[g]overment healthcare programs" which "require all manner of evidence and adherence to submission procedures." HRSA Br. 22. But all the examples HRSA cites are cases in which a regulated party seeks a benefit (such as reimbursement) *from the agency*. *See, e.g.*, *Akron Gen. Med. Ctr. v. Azar*, 836 F. App'x 13 (D.C. Cir. 2021) (reimbursement from the Provider Reimbursement Review Board); *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079 (D.C. Cir. 2015) (same). The same is true of benefits received after "applications" to the Department of Education or Veterans Affairs. It makes perfect sense, of course, that when a regulated party seeks payment or another benefit directly from an agency, the agency may create procedures

---

[9]    HRSA "briefly stumble[s] across this realization" (HRSA Br. 21-22) when it notes that Plaintiffs' position would apply to all new child sites. Of course this is what Plaintiffs argue—covered entities can use 340B drugs for any of their outpatients, regardless of the registration status of the facility where they are administered. This does not mean that the drugs are used merely "on say-so." HRSA Br. 23. Instead, HRSA and manufacturers possess a variety of statutorily created enforcement mechanisms to seek relief if covered entities abuse the program.

for processing such requests and need not provide the benefit until it does so.

That analogy breaks down, though, where the regulated entities are not seeking *anything* from the agency—instead, the agency can at most require "applications" as part of its record-keeping and enforcement functions. That is the case for HRSA and the 340B program. Congress created a system in which covered entities are entitled to discounted prices on covered drugs as soon as the HHS Secretary enters into a contract with a drug manufacturer. Covered entities receive those discounts from the *manufacturer*, not from HRSA. 42 U.S.C. § 256b(a); H.R. Rep. No. 102-384, pt. 2, at 16 (providing example discount mechanisms including "a point-of-purchase discount" or "manufacturer rebate"). In fact, HRSA does not provide any benefit to covered entities *at all* beyond entering into the manufacturer agreements and overseeing the system—it certainly does not provide payment, even if discounts are unfairly denied.

This distinction disposes of the few cases to which HRSA gestures. In *Kessler v. FCC*, the Court considered a freeze on applications for most classes of radio stations. 326 F.2d 673, 678 (D.C. Cir. 1963). But then (as now), the Communications Act expressly created an application process and made a benefit contingent on the FCC's evaluation of those applications. *Id.* at 684; 47 U.S.C. §§ 308, 309. It was thus Congress's decision to condition eligibility on an application, not the agency's. HRSA's reliance on *Planned Parenthood of Metro. Wash., D.C., Inc. v. Horner* is even less comprehensible. 1988 WL 126240 (D.D.C. 1988). There, the court *rejected* an OPM rule that would "transform" "*procedural* mechanisms governing" the program into "*substantive* criteria that must be applied to determine eligibility." *Id.* at *3. Of course, that is exactly what HRSA is trying to do here; its attempt should be rejected for the same reasons.

At bottom, HRSA's argument boils down to the idea that agencies "create procedures to establish eligibility" all the time. HRSA Br. 22. But Congress, not HRSA, has defined the eligibility criteria for the 340B program. 42 U.S.C. § 256b(a)(4). And HRSA lacks the authority to create substantive eligibility requirements beyond those Congress has chosen. *Lawyers' Committee for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 31 (D.D.C. 2020).

**4.** Finally, it bears emphasis that HRSA's restriction on the use of 340B drugs is directly contrary to Congress' purposes. *See* Pl. Br. 27-29. For its part, HRSA acknowledges that "the overarching goal of the 340B program is to allow safety-net providers to 'stretch scarce federal resources.'" HRSA Br. 24. But restricting access to 340B discounts at child sites until they are registered, and conditioning that registration on an event that results in more than a year of delay, "reduce[s] the level of services and the number of individuals that [covered entity] hospitals and clinics are able to provide" care for—exactly what Congress sought to avoid. H.R. Rep. No. 102-384, pt. 2, at 11; *see* Lee Decl. ¶ 9; Gelejian Decl. ¶ 11; Albert Decl. ¶¶ 17-18.

Child sites in particular are emblematic of the expanded care that Congress sought to incentivize with the 340B program. As the Government Accountability Office has recently found, many "covered entities" benefitting from the 340B program use their revenue "to serve more patients and to provide services that they might not have otherwise provided, including additional service locations." U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17 (Sept. 23, 2011). Plaintiffs have explained that their child sites allow them to offer additional and enhanced care in a manner that is convenient for their patients. *See generally* Lee Decl.; Gelejian Decl.; Albert Decl. Child sites are thus core to covered entities' attempts to "reach[] more eligible patients and provid[e] more comprehensive service"—the "general stated purpose for the 340B program." *PhRMA II*, 138 F. Supp. 3d at 52.

When Congress passed the 340B statute, it made its intentions unmistakably clear. A committee report accompanying the enactment of the 340B statute states that HRSA is not authorized "to limit in any way the volume of purchases that can be made [by covered entities] at the price reduction." H.R. Rep. No. 102–384, pt. 2, at 16. That is exactly what HRSA has now done. And HRSA has made no attempt "to reconcile its restrictive [policy] . . . with the purpose of the 340B statute." *Genesis Health Care*, 2023 WL 7549156, at *13. Indeed, HRSA offers *no* interpretation of Section 256b(a)(5)(B) that would allow it to carve out "patient[s] of the entity" who are eligible

to receive 340B drugs. HRSA's own vision of preferred policy cannot stand as an obstacle to realization of Congress's carefully articulated statutory scheme. *Am. Bankers Ins. Grp., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 3 F. Supp. 2d 37, 40 (D.D.C. 1998).[10]

**B.    HRSA lacked authority to promulgate a legislative rule restricting the use of 340B drugs.**

Not only is this rule inconsistent with the text of the 340B Statute, but HRSA lacks statutory authority to implement it in the first place. *See* Pl. Br. 20-21.

**1.** "It is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by Congress." *Am. Lib. Ass'n v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005). To be sure, agencies typically enjoy limited authority to adopt procedural rules governing their internal conduct and proceedings. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 542-543 (1978). But that inherent authority does not extend to agency rules that affect the substantive rights of regulated parties, like the Notice here. *Supra* pp. 6-14.

And when it comes to legislative rules, another court in this district has held that "HHS has not been granted broad rulemaking authority to carry out all the provisions of the 340B program." *Pharm. Rsch. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 42 (D.D.C. 2014) ("*PhRMA I*"). "Instead, Congress has limited HHS's rulemaking authority to creating a system for resolving disputes between covered entities and manufacturers—not to engaging in prophylactic non-adjudicatory rulemaking regarding the 340B program altogether." *Id.* at 42-43. This conclusion flows from the specific and narrow delegations of rulemaking authority which Congress *did* include in the statute. Where "Congress includes particular language in one section of a statute but omits it in another

---

[10]    HRSA expresses (at 24-25) apparent concern with hypothetical retaliatory measures by drug manufacturers dissatisfied with the 340B program. These manufacturers are as much bound by Congress's enactments as HRSA and 340B covered entities—they are not free to ignore the statute just because they are "not eager to give the mandated discounts." Instead, Congress created an administrative dispute resolution process and further provided manufacturers auditing power to address this very concern.

section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29-30 (1997).

Plaintiffs made this point in their opening brief, but HRSA offers no real response. Pl. Br. 21. The agency cites generally *United States v. Mead Corp.*, where the Supreme Court held that where Congress grants an agency "responsibility to implement a particular provision," the grant serves as "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." 533 U.S. 218, 227, 229 (2001). But *Mead* fails to address these circumstances, where Congress has given HRSA authority that is precisely delineated, rather than general. *Am. Library Assoc. v. FCC*, 406 F.3d at 708 (rejecting FCC's argument that "it possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area"); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1371 (D.C. Cir. 1990) (similar).

Nor, of course, can HRSA locate its authority for the Notice in its purported regulatory necessity. As explained in detail in Plaintiffs' opening brief, HRSA disregarded a variety of less restrictive mechanisms to accomplish its regulatory ends. Pl. Br. 38-40. And even absent these alternatives, the "[n]eed for regulation cannot alone create authority to regulate"—rather, "it is *statutory authorization* alone that" does so. *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002) (alterations and emphasis in original) (quoting *Sea Robin Pipeline CO. v. FERC*, 127 F.3d 365, 371 (5th Cir. 1997)).

**2.** In the absence of any general rulemaking authority over the contours of the 340B program, HRSA is forced to dramatically overread various statutory provisions in a hunt for a grant of specific, relevant authority. The best it can muster is a set of provisions which, at most, require the Secretary to keep track of "the identities of covered entities." 42 U.S.C. § 256b(a)(9). True, Congress tasked the Secretary with developing procedures to "require covered entities to regularly update . . . the information on" HRSA's website, and to "verify the accuracy of information

regarding covered entities that is listed on the website. 42 U.S.C. § 256b(d)(2)(B)(i), (ii). And the Secretary certainly has authority to create "a single, universal, and standardized identification system" for covered entities. *Id.* § 256b(d)(2)(B)(iv). But HRSA's policy goes far beyond these limited statutory grants of authority by *restricting access* at new child sites until the sites are registered in OPAIS—a result Congress neither authorized nor desired. AR22; 340B Health Amicus Br. 5.

To be clear, Plaintiffs do not contest HRSA's authority to establish OPAIS, or even to require covered entities to register their child sites and regularly update the database to ensure its accuracy. Nor do they dispute that HRSA could, theoretically, condition *registration* of a child site on appearance on a Medicare cost report, so long as registration is not a prerequisite for the use of 340B drugs to treat patients at that site. The problem arises when HRSA does each of these things and, through regulatory alchemy, converts them into a substantive restriction on where and when covered entities can permissibly use 340B drugs. HRSA certainly identifies no statutory provision that would allow it to impose such a restriction, either in its brief or in the Notice.

The reason, of course, is that Congress did not intend to grant HRSA such power. Congress carefully delineated the sphere in which HRSA enjoys legislative rulemaking authority. *PhRMA I*, 43 F. Supp. 3d at 42. It employed express language directing the Secretary to "promulgate regulations" within this sphere—but did not do so with respect to the Secretary's obligation to keep track of covered entities. Nor did Congress grant HRSA broad authority to build an enforcement regime to prevent duplicate discounts and diversion. Instead, Congress specified the tools at the Secretary's disposal—audits and fines—allowing for no expansion. *See* 42 U.S.C. § 256b(a)(5)(C), (a)(5)(D), (d)(2). None of this suggests that Congress envisioned HRSA restricting the use of 340B drugs to ensure compliance.

On the contrary, Congress was clear that HRSA *cannot* "limit in any way the volume of purchases that can be made [by covered entities] at the price reduction." H.R. Rep. No. 102-384, pt. 2, at 16. But that is precisely what HRSA did in the notice, directing covered entities to "cease

purchasing 340B drugs for use at" unregistered child sites and "stop using 340B drugs at these unregistered sites." AR22. "In the absence of statutory authorization for its act, [HRSA]'s 'action is plainly contrary to law and cannot stand.'" *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)).

### III.    HRSA'S 2023 POLICY CHANGE WAS ARBITRARY AND CAPRICIOUS.

As Plaintiffs explained in great detail, HRSA's Notice was arbitrary and capricious, on top of being substantively unlawful, outside the scope of HRSA's authority, and procedurally invalid. Pl. Br. 29-40. HRSA devotes the bulk of its brief to a defense of the Notice's reasoning. But its arguments cannot resuscitate an unreasoned and unreasonable rule—especially since they appear for the first time in litigation filings, rather than in the administrative record.

#### A.    The record demonstrates that HRSA never considered the substantial financial impacts of its policy change.

As Plaintiffs have described, the policy change embedded in HRSA's notice has an enormous financial impact on the nation's crucial safety-net hospitals. Plaintiffs have opened numerous child sites that qualified as provider-based the instant they opened and plan to open more that will do the same. Compl. ¶¶ 158-170; *see* Lee Decl. ¶ 6; Gelejian Decl. ¶¶ 4, 6-7. The delays mean that covered entities must purchase drugs at full price from manufacturers for use at each new child site, despite the fact that HRSA recognized the patients seen there as patients of the covered entity. The difference between HRSA's policy during the public health emergency and the policy under the Notice is on the order of millions of dollars per child site. Albert Decl. ¶ 17 ($7 million); Gelejian Decl. ¶ 10 (millions of dollars); Lee Decl. ¶¶ 5-9 ($10 million between two facilities).

HRSA has strikingly little to say about the enormous costs of its policy change, either in its brief (at 26-27) or in the Notice. It first responds that the delays and lost savings caused by the Notice were *also* a flaw of the 1994 Guideline. Perhaps. But, as this Court held, agencies have a "duty under the APA to provide a reasoned decision on *every* important aspect of the problem."

*Ashton v. U.S. Copyright Office*, 310 F. Supp. 3d 149, 158 (D.D.C. 2018) (emphasis added). In adopting *this* policy—even if it resurrects the 1994 Guideline (*but see* p. 17, *supra*)—HRSA was obligated to engage in reasoned decision-making. Plaintiffs have put forth uncontested declarations in which Plaintiffs attest to the costs of the Notice. HRSA seems skeptical (at 26) of these costs, but it cannot wish them away.

And there can be no doubt that HRSA was aware of this problem at the time it was considering revising its policy. The administrative record undeniably demonstrates that numerous parties brought the issue to the agency's attention. 340B Health, for example, submitted a letter to HRSA's Administrator just a few days after HRSA informally announced its plans to end the 2020 policy in which it noted "significant financial impact[s]" to a hospital from a "17-month delay before the hospital can use 340B in the new clinic." AR141-142. Mercy Hospital Jefferson sent a message to HRSA just one day later explaining that it "stands to lose 5.4 – 8.1 million in savings before" a new location "will be on the cost report of Mercy Hospital Jefferson and able to be registered." AR144. Just the next day, Ascencion Illinois Hospital sent a letter to Administrator Johnson warning that HRSA's "new policy would cause immense harm to many 340B hospitals, which already are facing exceptionally low operating margins." AR151. Cox Health sent a nearly identical message the same day (AR153-154), as did Hilo Medical Center (AR155-156), the CEO of the Kimber Boothe Group, LLC (AR159-160), Memorial Hospital Belleville (AR161-162), St. Charles Health System (AR165), and Adventist Health (AR166-168). A representative of UF Health Jacksonville explained that "it could be up to 21 months before [new child sites] are eligible for 340B pricing" under HRSA's new policy. AR157. And Memorial Hospital Gulfport's Director of Outpatient Pharmacy Services specifically noted that "[t]he financial impact will be substantial." AR170-173.

There is no question, then, that HRSA was alerted to the potential impacts of its new policy long before it formally published the Notice which gave it effect. And the economic impact of the new policy is certainly a significant aspect—if not *the most* significant aspect—of the problem

HRSA was considering. In *Gresham v. Azar*, for example, the D.C. Circuit had no trouble in concluding that "loss of coverage for beneficiaries [was] an important aspect" of the regulatory issue "because coverage is a principal objective of Medicaid and because commenters raised concerns about the loss of coverage." 950 F.3d 93, 102 (D.C. Cir. 2020), *vacated as moot by Arkansas v. Gresham*, 142 S. Ct. 1665 (Mem) (2022). The same is true here. HRSA *agrees* that "the overarching goal of the 340B program is to allow safety-net providers to 'stretch scarce Federal resources.'" HRSA Br. 24. Numerous parties raised this precise concern to the agency months before it published the Notice. HRSA's action is thus "arbitrary and capricious" if it has "entirely failed to consider [this] important aspect of the problem." *State Farm*, 463 U.S. at 43.

Nonetheless, the two paragraphs of HRSA's response to this point contain only a *single* citation to the administrative record, and none at all to anything published since the 1990s. HRSA Br. 26-27. Its sole claim (without any support) is that the claimed burdens were "not supported by the record." *Id* at 27. Ironically, though, this argument itself appears nowhere in the record—not in the administrative record, and not in the Notice itself. Under "well-established law," the Court evaluates "an agency's contemporaneous explanation for its actions and not" counsel's *post hoc* rationalizations. *Amerijet*, 753 F.3d at 1351. HRSA is unable to point to a single sentence in the administrative record demonstrating that it gave a moment's consideration to a crucial issue at the heart of the 340B statute that was flagged for the agency by regulated parties. Such a failure makes the Notice the epitome of unreasoned, arbitrary and capricious action.[11]

---

[11]   It bears repeating that the Notice is also arbitrary and capricious for the independent reason that HRSA has not made "any attempt . . . to reconcile its restrictive definition . . . with the purpose of the 340B statute." *Genesis Healthcare*, 2023 WL 7549156 at *13. As in *Genesis*, HRSA's failure to grapple with the statutory objective is fatal. The APA requires it to "provide a reasoned analysis that is not manifestly contrary to the purposes of the legislation it administers." *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1500 (D.C. Cir. 1988). HRSA failed to do so and offers no response in its brief.

**B.    HRSA failed to consider the relevance of changes in Medicare regulations to its re-imposition of the Medicare cost report requirement.**

**1.** As Plaintiffs explained in detail (at 33-35), in the 1994 Guideline HRSA considered one of its first major regulatory issues in implementing the fledgling 340B program. In analyzing the 340B statute, the agency noted that Congress referred frequently throughout to various Medicare statutes, including for the definition of some covered entities. AR14. HRSA concluded that it ought "to define [hospital] in a manner consistent with [CMS] policy guidelines." *Id*. It therefore chose "to utilize existing Medicare rules to determine eligibility for PHS discount pricing." *Id.* While at the time CMS's predecessor agency relied heavily on cost reports for Medicare reimbursement, those reports have become far less relevant as CMS has shifted to a prospective reimbursement model for Medicare. Office of Evaluations & Inspections, *Medicare Hospital Prospective Payment System: How DRG Rates are Calculated and Updated*, OIG 2 (Aug. 2001), perma.cc/JT3M-XSA3. Under CMS's modern regulations, the Medicare cost report is not the primary driver of reimbursement—instead, providers submit interim bills under pain of federal prosecution or regulatory enforcement actions should they falsely certify their eligibility. *See Institutional paper claim form (CMS-1450)*, CMS.gov (Sept. 6, 2023), perma.cc/Y953-QHT4. Whatever sense it might have made for HRSA to use cost reports as the sole basis of its system in 1994, changes in CMS regulations have long since abandoned any such approach for Medicare.

**2.** By refusing to recognize that child sites are part of covered entity hospitals prior to their appearance on a Medicare cost report, HRSA has therefore abandoned its previous finding that "hospital" should be "defined . . . in a manner consistent" with CMS's rules and guidelines. AR14. Stakeholders identified this issue for the agency long before it published the Notice. *See* AR142 ("[L]imiting 340B in this way conflicts with Medicare law, as provider-based facilities that have not year appeared on a cost report are still treated as part of the hospital for purposes of reimbursement and are included as part of the government's survey and certification reviews."). While HRSA now attempts a detailed justification for this departure (at 27-30), once again, *none* of its

33

explanation is drawn from the administrative record. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515. Neither the agency's awareness of the change nor its explanation can be supplied purely through *post hoc* rationalizations. But that is all HRSA offers here. This alone is reason enough to find the rule arbitrary and capricious.

Nor can HRSA simply disregard its prior statement. HRSA devotes, for example, several pages to detailing the differences between Medicare and the 340B program. HRSA Br. 27-28. This is simply irrelevant. Neither HRSA nor Plaintiffs have ever claimed the two programs should be identically administered—HRSA concluded only that because the 340B statute relies on the Medicare statute for the definition of some covered entities, it is important that HRSA's interpretation of "hospital" be harmonious with CMS's parallel approach. AR14. In 1994, the Guideline accomplished this goal; in 2023, HRSA neither considered the intervening regulatory changes in the Medicare space nor concluded that a consistent interpretation of "hospital" is no longer required. Nobody is suggesting "[p]recise consistency with Medicare practice." HRSA Br. 29. HRSA previously recognized the importance of *some* level of consistency, and HRSA has now departed from that finding *sub silentio*.

Finally, HRSA briefly suggests that it "is not precisely true" that "CMS treats a facility as provider based as soon as it opens." HRSA 29. Instead, as HRSA rightly notes, CMS "tells hospitals to proceed at their own peril and simply defers any definitive determination to subsequent audits." *Id.* This is, of course, precisely what HRSA allowed as to the 340B program under the 2020 policy—covered entities could use 340B drugs at unregistered child sites, under pain of enforcement if the recipients of those drugs were not patients of the entity after all. And it is completely consistent with Congress's specified enforcement regime of audits and post-audit penalties. *See* 42 U.S.C. § 256b(a)(5). But HRSA rejected this approach out of hand, without bothering to explain why an approach that works for Medicare cannot work for it—in direct contravention of

its earlier statements on the question. That failure to consider and reasonably explain its rejection of this alternative (at the time, not through counsel after being sued) is arbitrary and capricious.

### C.    HRSA's purported compliance concerns were inadequately explained and cannot justify its new policy.

The most basic requirement of reasoned decisionmaking is that agency decisions "must be adequately explained." *Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1215 (D.C. Cir. 2013). As HRSA scrambles to meet this burden in its brief, it disregards a crucial corollary: "Arbitrary and capricious review 'demands evidence of reasoned decision-making at the agency level; agency rationales developed for the first time during litigation do not serve as adequate substitutes.'" *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (quoting *Kansas City v. HUD*, 923 F.3d 188, 192 (D.C. Cir. 1991)). Thus, even if HRSA's various rebuttals were at all convincing—and they are not—they fail for the simple reason that they are *post hoc* rationalizations utterly unsupported by the administrative record.

### *1.    HRSA disregarded the reliance interests created by the 2020 policy.*

HRSA's failure to contemporaneously justify its decision is jarring given the considerable reliance interests engendered by the 2020 policy and HRSA's repeated assurances that its policy would remain in place "regardless of . . . COVID-19." AR94; *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification . . . when [the agency's] prior policy has engendered serious reliance interests that must be taken into account."). As Plaintiffs explained, covered entities relied on HRSA's assurances, investing resources to plan and prepare new child sites. Albert Decl. ¶¶ 5-10; Gelejian Decl. ¶¶ 6-7; *accord* 340B Health Amicus Br. 15-17. HRSA's skepticism about these reliance interests is difficult to understand—numerous regulated entities raised their reliance as a reason HRSA should *not* rescind the 2020 policy. AR141-142 (letter from 340B Health); AR144-145 (letter from Mercy Health Jefferson); AR151 (letter from Ascension Illinois); AR155-156 (letter from Hilo Medical Center); AR159-160 (letter from Kimber Boothe Group); AR165 (letter from St. Charles Health System);

AR166-168 (letter from Adventist Health); AR170 (letter from Memorial Hospital Gulfport).

HRSA does not offer any contradictory evidence to suggest that these reliance interests were "overstate[d]." HRSA Br. 30. Nor would that absolve the agency of the burden of a reasoned explanation in any event. "When an agency changes policy, it must consider any alleged reliance interests, even if it ultimately finds that the asserted reliance interests are weak or outweighed by other factors." *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 456 (D.D.C. 2020); *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1914-1915 (2020) (consideration of reliance interests must be undertaken contemporaneously by the agency). HRSA's only argument that it considered reliance interests is that "the statements are in the administrative record." HRSA Br. 31. But "the mere mention of a document in the agency's decision or the record does not always mean, *ipso facto*, that the agency considered the document." *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 79 (D.D.C. 2018). And HRSA cannot even show that much—it is unable to identify a single instance in the administrative record where agency even *pointed* to comments alleging reliance interests. "[C]onsidering the alleged reliance interests and whether they were reasonable 'was the agency's job,' and 'the agency failed to do it.'" *MediNatura*, 496 F. Supp. 3d at 456 (quoting *Regents*, 140 S. Ct. at 1914). The agency's action is therefore arbitrary and capricious.

**2.    HRSA's prohibition is based on exaggerated compliance concerns that are already addressed by congressionally prescribed mechanisms.**

When Congress created (and expanded) the 340B program, it entrusted HRSA with a variety of mechanisms through which to ensure covered entity compliance with the prohibitions on diversion and duplicate discounts. 42 U.S.C. § 256b(a)(5)(A), (B), (C); *id.* § 256b(d)(2)(B). While HRSA argues that the 2020 policy "added risk and complexity to [its] ability to effectively oversee ongoing compliance in the 340B program" (AR20), it did not provide—and still has not provided—any indication that permitting the use of 340B drugs at child sites before they appear on a Medicare cost report actually *has* led to any noncompliance.

In attempting to justify its decision, HRSA points to portions of the administrative record

it claims show that "hospitals were not listing purported child sites on their Medicare Cost Reports and registering them in the System." HRSA 31. For support, it cites an April 2023 compliance analysis in which the agency surveyed covered entities to ascertain their practices at the time. What HRSA neglects, however, is that this survey was conducted while the 2020 policy *allowing* the use of 340B drugs at unregistered child sites was *still in place*. HRSA's concern, it seems, is that covered entities were following HRSA's policies as they existed at the time. But "agencies may not keep regulations in place and then disregard them in order to disapprove [of] actions taken by regulated entities to conform with those regulations." *S. Cal. Edison Co. v. FERC*, 415 F.3d 17, 23 (D.C. Cir. 2005). "Doing so is perhaps the essence of 'arbitrary and capricious.'" *Id.*

Nor did HRSA's audits identify any actual noncompliance with the 340B statute. Instead, the agency's findings were simply that child sites were using 340B drugs at unregistered child sites—which HRSA allowed at the time—and some small subset of those were, at most, taking longer than appropriate to register those child sites in OPAIS. AR302-311. None of the audit findings or analysis indicate that any diversion or duplicate discounting actually occurred. At bottom, HRSA's concern is that it "did not know whether those purported child sites" were appropriately using 340B drugs (HRSA Br. 9), and it is "common sense that if several unidentified covered-entity sites are using 340B discount drugs, increased diversion and duplicate discounting are likely downstream consequences" (*id.* 32). First, that assertion is far from intuitive, and seems untrue—HRSA's audit *did not* turn up a single instance of actual diversion or duplicate discounting. And the mere *risk* of noncompliance is not *actual* noncompliance; Congress has banned only the latter.

In any event, the administrative record shows that HRSA's existing compliance mechanisms—audits and penalties—are more than sufficient to detect, prevent, and remedy misconduct. HRSA was easily able to discover which covered entities were utilizing 340B drugs at unregistered child sites that had not yet appeared on a Medicare Cost Report. If registration of a new child site does not occur, or if the child site does not appear on the covered entity's cost report, it is simple

for HRSA to ascertain as much by cross-referencing documents in its possession. And the strength of these mechanisms is only bolstered by Congress's empowerment of manufacturers—the entities with money on the line—to audit covered entities and bring claims against them for violations. 42 U.S.C. § 256b(a)(5)(C). Given that the administrative record demonstrates no statutory noncompliance and that HRSA has shown that it can easily detect noncompliance if it occurs, HRSA has never provided a compelling explanation for why a total ban on pre-registration use of 340B drugs at new child sites is remotely warranted.

### 3. *HRSA completely failed to consider reasonable alternatives.*

Finally, "[a]n agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). This is true notwithstanding the existence of the 1994 Guideline. Again, HRSA claims without justification that it need not fully justify its choices because it was re-adopting an abandoned policy. HRSA Br. 33. But again, the APA does not contain an exception for flip-flopping—especially since alternative, less burdensome solutions may have arisen in the decades since HRSA originally adopted the Medicare cost report requirement.[12]

In the Notice, HRSA categorically prohibited the use of 340B drugs at unregistered child sites until those child sites appeared on a covered entity's Medicare cost report and were registered in OPAIS. AR22. HRSA's post-promulgation reasoning fails to explain why a less burdensome alternative could not serve the agency's goal. But more importantly, nothing in the administrative record shows that HRSA considered *any* of the myriad, obvious, reasonable alternatives.

---

[12]    Thus, as explained repeatedly, the "relevant decision" was HRSA's 2023 change to its policy. HRSA Br. 33. Under the 2020 policy, covered entities could use 340B drugs at unregistered child sites so long as those sites were provider based (and thus the patients seen there were patients of the covered entity). After the Notice, they cannot. It is this decision—to abandon the 2020 policy—that Plaintiffs challenge, not whatever policy was adopted in 1994.

**a.** To begin, HRSA expresses doubt that any evidence besides the Medicare cost report could adequately demonstrate that a child site is an integral component of a covered entity hospital. HRSA Br. 34-35. It criticizes the provider-based attestations as "optional" and "not consistently used." HRSA Br. 35. But this is no reason to reject them when they *are* used—especially since they can be submitted well in advance of the Medicare cost report. And HRSA criticizes both interim bills and attestations for failing to "definitively establish provider-based status," arguing that they only reflect "the hospital's determination that it is willing to risk" later enforcement actions. *Id.* 34-35.

HRSA somewhat strangely suggests that the federal government would not prosecute or seek civil relief against a hospital that improperly billed Medicare as provider based. Counterexamples are not difficult to find. The United States, for example, prosecuted Earnest Gibson IV for Medicare fraud, rejecting his defense that the relevant clinic was part of the main hospital campus because it complied with Medicare's provider-based regulations. *See United States v. Gibson*, 2022 WL 1693991, at *3-*4 (S.D. Tex. 2022). And in 2021, the Department of Justice announced a $22 million settlement involving claims, among others, that a hospital "knowingly engaged in improper billing relating to its Hospital Facilities." Office of Public Affairs, *University of Miami to Pay $22 Million to Settle Claims Involving Medically Unnecessary Laboratory Tests and Fraudulent Billing Practices*, DOJ (May 10, 2021), perma.cc/9XVF-5LU9. The billing practices in question involved a clinic allegedly "bill[ing] as a provider-based facility despite never submitting a Form CMS 855 or complying with the provider-based billing requirements in 42 C.F.R. § 413.65." Complaint, *United States ex rel. Lord v. University of Miami*, No. 13-cv-22500, at ¶ 122 (S.D. Fla. July 12, 2013); *see id.* ¶ 124 (the clinic "failed to comply with several conditions for billing as a provider-based facility.").

Even when the Department of Justice declines to intervene, covered entities can still face enormous civil liability for Medicare billing practices. In another recent case, a district court in the District of Kansas granted summary judgment to plaintiffs in a False Claims Act case because "no

reasonable jury could find that" the clinic in question "satisfied the requirements for provider-based status." *United States ex rel. Edalati v. Sabharwal*, 2023 WL 5334621, at *10 (D. Kan. 2023). And in 2014, a district court awarded an insurer more than $8 million after finding that clinics failed to meet Medicare's provider-based requirements. *Aetna Life Ins. Co. v. Cleveland Imaging*, 2014 WL 12577612, at *2 (S.D. Tex. 2014). At minimum, HRSA should have *considered* whether the threat of liability for a false certification of provider-based status is sufficient to ensure that covered entities only claim it when appropriate.

In any event, all this overlooks the obvious fact that every complaint HRSA has about alternative sources of proof of provider-based status *applies equally to the Medicare cost report*. Just like an attestation or an interim bill, the Medicare Cost Report is a document prepared by a hospital, containing the hospital's claimed charges based on the hospital's own assessment of the relationship between its component facilities. Just like a bill or attestation, it is submitted to Medicare on pain of a variety of criminal and civil penalties should any of the constituent claims be false. *See Medicare Program Integrity Manual: Chapter 4 – Program Integrity* § 4.2.1, CMS (Oct. 26, 2023), perma.cc/V4TN-VSJM (describing "[e]xamples of cost report fraud"). It is no more or less definitive than, for example, a bill submitted to Medicare claiming an increased rate due to provider-based status. Both are the hospital's characterization of the facility, and both can result in civil and criminal sanctions should that characterization be inaccurate. The only difference is that reliance on the cost report results in more than a year of delay, whereas other forms of equivalent evidence are submitted far sooner. HRSA completely fails to identify any distinction.

**b.** All that aside, it is critical to note that absolutely none of the reasons HRSA now gives for rejecting these alternatives appears anywhere in the administrative record. HRSA was not allowed to entirely disregard "obvious alternatives," especially those which would fully satisfy the agency's purpose while imposing fewer burdens on regulated entities. *Ramirez v. U.S. ICE*, 471 F. Supp. 3d 88, 178 (D.D.C. 2020) (quoting *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). While HRSA certainly did not need to consider every possible

alternative, it was required at least to "choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goal of the action." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 241 (D.D.C. 2005). It did not do so, and HRSA does not argue otherwise. Nor is there any doubt that the alternatives the parties have discussed are reasonable and obvious—especially in light of HRSA's original determination that it should look to CMS regulations in this sphere. AR14. But when an agency fails to consider or address any alternatives *at all*, this Court has "uniformly" found the action arbitrary and capricious. *City of Brookings*, 822 F.2d at 1169. Just so here.

## IV.  PLAINTIFFS HAVE ADEQUATELY DEMONSTRATED STANDING.

Plaintiffs have demonstrated standing: Their claim to standing is obvious and supported by several declarations. HRSA's arguments otherwise are foreclosed by D.C. Circuit precedent.

**A.** First, as explained in Plaintiffs' opening brief (at 40-42), Plaintiffs have demonstrated standing. Each Plaintiff has opened offsite, outpatient facilities in the past, currently operates such facilities, and plans to open more in the future. Pl. Br. 40. Plaintiffs "are the 'object of the action'" challenged here, and so their "standing to challenge" it "is self-evident." *Maine Lobstermen's Ass'n v. National Marine Fisheries Service*, 70 F.4th 582, 592 (D.C. Cir. 2023) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 551, 561 (1992)). There is "ordinarily little question" that such a plaintiff has standing to challenge a regulation that assertedly causes a direct regulatory impact. *Lujan*, 504 U.S. at 561-562; *see State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015). This Court applied this principle to conclude that plaintiffs challenging IRS tax regulations had standing to do so at the summary judgment stage. *See Silver v. IRS*, 2019 WL 7168625 (D.D.C. 2019).

More concretely, Plaintiffs' standing here is amply supported by the declarations attached to their motion for summary judgment. Several plaintiffs here declared, in detail, that they have historically opened and operated child sites in order to better serve their patient populations and

they plan to do so again in the future. Albert Decl. ¶¶ 9, 16; Gelejian Decl. ¶¶ 3, 7; Lee Decl. ¶¶ 5-6. An executive from Albany Med Health System explained, for example, that it opened a new oncology site on December 19, 2023, which is subject to HRSA's new policy. Albert Decl. ¶ 14. The ongoing delay in 340B eligibility caused by HRSA's change in policy will result in approximately $6.3 million in lost savings. *Id.* Keck Medicine is in a nearly identical situation, facing millions in lost savings. Gelejian Decl. ¶¶ 7-10. City of Hope National Medical Center explained that HRSA's policy will cost approximately $10 million between two child sites it is currently in the process of opening in Southern California. Lee Decl. ¶¶ 5-8. And Albany Medical Center Hospital has cancelled at least one project in direct response to the economic changes caused by HRSA's policy change. Albert Decl. ¶ 17. The policy injures both Plaintiffs and the patients in their community, who are denied additional and enhanced services. Albert Decl. ¶ 18; Gelejian Decl. ¶ 11; Lee Decl. ¶ 9.

HRSA does not contest that Plaintiffs' identified harms are traceable to HRSA's policy, or that they are likely to be redressed by judicial relief. Nor could it. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see also Maine Lobstermen*, 70 F.4th at 592 ("The harm is caused by the defendant [agency], which promulgated the rule, and . . . it may be redressed by the court; should the [plaintiffs] prevail, we may vacate or remand the rule, giving them relief from enforcement, or at least a chance on remand to pursue their case against the rule free of the [agency]'s alleged legal errors.").

Instead, HRSA quibbles with the content and adequacy of the declarations themselves. It notes, for example (at 42-43), that the declarations contain some allegations of past harm which, HRSA claims, is insufficient for prospective relief. But past harm can serve as evidence to support claims of ongoing or imminent injury. *NB ex rel. Peacock v. D.C.*, 682 F.3d 77, 84 (D.C. Cir. 2012). And regardless, HRSA disregards that the declarations *also* specify the substantial, ongoing injuries that Plaintiffs are currently suffering as a direct result of HRSA's policy change. *See, e.g.*,

Albert Decl. ¶¶ 14, 16 (describing facilities *currently* unable to access 340B drugs because of HRSA's Notice); Lee Decl. ¶¶ 5-7 (describing injuries that *will* accrue as a result of HRSA's policy at two yet-to-open facilities); Gelejian Decl. ¶¶ 7-11 (describing losses and delays in opening due to HRSA's policy at child sites that will open in the next several years). HRSA's policy currently restricts access to drugs at Plaintiffs' child sites and will cost Plaintiffs millions of dollars over the next few years—undeniably a "concrete, particularized pocketbook injury" that gives Plaintiffs "a stake in the outcome of the suit." *Maine Lobstermen*, 70 F.4th at 592.

**B.** HRSA's only real response to the evidence Plaintiffs marshalled is to complain (at 42-43) that "it is not clear" how the injuries are distributed because the declarations do not include detailed organizational charts and account breakdowns explaining the structures of the various entities involved. And it argues, based on this uncertainty, that *some* plaintiffs probably lack standing and that relief should be limited to the parties whose standing has been demonstrated. Neither part of HRSA's argument can withstand scrutiny.

First, it is beyond cavil that "[i]n a suit brought by multiple parties, only a single plaintiff must possess standing for a case to proceed." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 12 (D.D.C. 2017); *Mendoza*, 754 F.3d at 1010 ("To establish jurisdiction, the court need only find one plaintiff who has standing."); *Animal Legal Def. Fund. Inc. v. Glickman*, 154 F.3d 426, 429 (D.C. Cir. 1998); *accord, e.g.*, *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 224 (D.D.C. 2021) (Mehta, J.). Plaintiffs' standing as regulated parties is self-evident—as "directly regulated part[ies]," they "plainly ha[ve] standing to pursue [their] claims in this case." *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021). But even more, the plaintiffs who declared their injuries in support of Plaintiffs' motion have *easily* cleared the hurdle to show that this dispute is "appropriately resolved through the judicial process." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Second, HRSA's argument that relief here should be available only to a subset of plaintiffs,

or restricted only to the plaintiffs in this suit, is—as HRSA itself concedes—foreclosed by binding D.C. Circuit precedent. As this Court recently observed, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated—*not that their application to the individual petitioners is proscribed.*" *Gomez v. Trump*, 485 F. Supp. 3d 145, 202 (D.D.C. 2020) (Mehta, J.) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *Humane Society of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017). Indeed, HRSA acknowledges that it cannot succeed on this argument. HRSA Br. at 43 n.11.

To be clear, if there is *any* doubt on this score, Plaintiffs respectfully request leave to file additional declarations should the Court determine them necessary. But given that HRSA's argument is foreclosed by binding precedent, Plaintiffs submit that the multiple, independent declarations they have filed are sufficient to demonstrate standing in this action.

## V.    PLAINTIFFS REQUEST APPROPRIATE RELIEF.

HRSA's complaint that the relief requested is "imprecise" or "vague" (at 43 & n.12) lacks merit. Plaintiffs have made abundantly clear what action must be set aside—HRSA's most recent flip-flop in which it reimposed the previously abandoned Medicare cost report requirement for 340B pricing eligibility at child sites. Because the Notice was final agency action which marked the consummation of HRSA's decisionmaking—a conclusion HRSA does not resist—it should be set aside if found unlawful. The result of vacatur would be a return to HRSA's last, unchallenged policy. *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103 (D.D.C. 2018) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect."); *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415-416 (D.D.C. 2020) (holding that vacatur under the APA "restore[s] the prior regulatory status quo; the invalid rule [is] eliminated and replaced by any preexisting rule it had superseded"). Plaintiffs seek nothing more.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs, deny HRSA's cross-motion for

summary judgment, vacate HRSA's Notice, and award Plaintiffs declaratory relief as described in

the Complaint.

Dated: March 29, 2024

Respectfully submitted,

*/s/ Paul W. Hughes*

Emily J. Cook (*pro hac vice*)
   McDermott Will & Emery LLP
   *2049 Century Park E #3200*
   *Los Angeles, CA 90067*
   *(310) 277-4110*
   *ecook@mwe.com*

Steven J. Schnelle (*pro hac vice*)
   McDermott Will & Emery LLP
   *One Vanderbilt Avenue*
   *New York, NY 10017*
   *(212) 547-5403*
   *sschnelle@mwe.com*

Paul W. Hughes (D.C. Bar No. 997235)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
Charles Seidell (D.C. Bar No. 1670893)
   McDermott Will & Emery LLP
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*
   *phughes@mwe.com*

*Counsel for Plaintiffs*