UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALBANY MED HEALTH SYSTEM, et al.,

      Plaintiffs,

      v.

HEALTH RESOURCES AND SERVICES
ADMINISTRATION, et al.,

      Defendants.

Civil Action No. 23-3252 (APM)

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................. 3

    I.     Plaintiffs' Account of HRSA's Past Actions Is Self-Contradictory. ..................... 3

    II.    Plaintiffs Fail to Explain How Their Lawsuit Is Timely. ....................................... 6

    III.   Plaintiffs' Notice-and-Comment Claim Fails. ....................................................... 8

         A.    If the Rule Is Legislative, HRSA Satisfied Notice and Comment in 1994. 8

         B.    Medicare Cost Report Verification Is a Procedural Rule. ......................... 9

    IV.   Medicare Cost Report Verification Is Consistent with the 340B Statute. ............ 16

    V.    Medicare Cost Report Verification Is Not Arbitrary and Capricious. ................. 18

         A.    HRSA Did Not Unreasonably Fail to Consider the Impact on Hospitals. 20

         B.    There Is No Change In Position With Respect to Medicare. ..................... 22

         C.    The 2023 Notice Is Not Otherwise Inadequately Reasoned. .................... 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*AFL-CIO v. NLRB,*
   57 F.4th 1023 (D.C. Cir. 2023) ................................................................. 10, 14, 15

*Am. Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) ........................................................................ 10

*Biden v. Texas,*
   597 U.S. 785 (2022) .......................................................................................... 8

*Bloomberg L.P. v. SEC,*
   45 F.4th 462 (D.C. Cir. 2022) ............................................................................ 9

*Brock v. Cathedral Bluffs Shale Oil Co.,*
   796 F.2d 533 (D.C. Cir. 1986) ........................................................................... 7

*Chamber of Commerce v. DOL,*
   174 F.3d 206 (D.C. Cir. 1999) .................................................................... 10, 14

*Consumer Energy Council of Am. v. FERC,*
   673 F.2d 425 (D.C. Cir. 1982) ........................................................................... 9

*Da Costa v. Immig. Investor Prog. Office,*
   80 F.4th 330 (D.C. Cir. 2023) .......................................................................... 19

*Daneshvarkarshkooli v. Blinken,*
   2024 WL 1254075 (D.D.C. March 25, 2024) ..................................................... 19

*Elec. Privacy Inf. Ctr. v. DHS,*
   653 F.3d 1 (D.C. Cir. 2011) ...................................................................... passim

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................ 23

*Guilford College v. Wolf,*
   2020 WL 586672 (M.D.N.C. Feb. 6, 2020) ....................................................... 8

*James V. Hurson Assocs., Inc. v. Glickman,*
   229 F.3d 277 (D.C. Cir. 2000) ........................................................................ 10

*JEM Broad. Co., Inc. v. FCC,*
   22 F.3d 320 (D.C. Cir. 1994) .................................................................... 13, 16

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
   336 F.3d 1094 (D.C. Cir. 2003) ...................................................................... 19

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.,*
   158 F.3d 135 (D.C. Cir. 1998) .......................................................................... 7

*Nat'l Mining Ass'n v McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) ........................................................................ 13

*Natural Resource Def. Council v. EPA,*
   559 F.3d 561 (D.C. Cir. 2009) .......................................................................... 7

*Pub. Citizen v. Dep't of State,*
   276 F.3d 634 (2002) ................................................................................... 9, 10

*Rural Cellular Ass'n v. FCC,*
   588 F.3d 1095 (D.C. Cir. 2019) ...................................................................... 22

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) ................................................................. 24
*U.S. Army Corps. of Eng'rs. v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) ................................................................................. 13
*Van Hollen, Jr. v. FEC*,
   811 F.3d 486 (D.C. Cir. 2016) ......................................................... 20, 24
*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ................................................................................. 18

Statutes

5 U.S.C. § 706(1) ........................................................................................ 19
28 U.S.C. § 2401(a) ...................................................................................... 8
42 U.S.C. § 256b(a)(4) ............................................................................ 1, 2
42 U.S.C. § 256b(a)(5)(B) ....................................................................... 4, 5
42 U.S.C. § 256b(a)(9) ............................................................................... 16

Regulations

42 C.F.R. § 413.24 ...................................................................................... 25
42 C.F.R. § 413.65 ...................................................................................... 24

Defendants the Department of Health and Human Services (the "Department"), its Secretary, its Health Resources and Services Administration ("HRSA"), and its Administrator respectfully submit this reply in further support of their cross-motion for summary judgment (ECF No. 21, "Defs. Mot.").[1]

Plaintiffs' position rests on this alarming contention: "[N]owhere does HRSA explain why the statutory obligation to verify information of covered entities comes along with the ability to restrict the use of 340B drugs by covered entities" "until that information is verified." Pl. Opp'n to Defs. Mot. (ECF No. 23, "Pl. Resp.") at 24. Plaintiffs want to be able to use 340B drugs at questionable sites without anyone knowing beforehand, perhaps ever, that the sites are actually eligible under 42 U.S.C. § 256b(a)(4). Plaintiffs read the statute as forbidding HRSA from conditioning discount access on registration (regardless of the method, including "an attestation or an interim bill," *id.* at 40) because ex post enforcement alone is the only permissible way to administer the Program, *id.* at 23, 29.

Yet requiring the Program to sever verification from entities' access to 340B discounts and restricting the Program only to after-the-fact integrity and oversight measures, would be inconsistent with the text, structure, and purpose of the 340B statute. To accept Plaintiffs' assertion—that even in the normal course and outside a declared public health emergency, Congress wanted providers to access 340B discounts without of any verification of their eligibility—would functionally undermine HRSA's responsibility to oversee the fundamental rules that make it possible for this Program, which affects thousands of healthcare providers, to operate smoothly and in compliance with statutory requirements. As section 256b(a)(4) shows, it

---

[1]    Unless otherwise noted, defined terms used herein are intended to have the same meaning as those used in Defendants Motion.

is not the Program's purpose to provide valuable 340B discounts to all providers. Defendants' position is not "regulatory alchemy," Pl. Resp. at 29, it is common sense backed up by the statute.

The need for registration is not an academic issue. Child sites can be located miles from the hospital and have a different name. Plaintiff Albany Med (DSH330013) has a child site listed as Clifton Park Neurology Clinic (DSH33013AM) that is twenty miles away from the parent hospital. *See* Office of Pharmacy Affairs Information System, available at https://340bopais. hrsa.gov/SearchLanding.    Without verification and registration, HRSA, manufacturers, wholesalers, and State Medicaid agencies cannot see that the latter site derives 340B eligibility from the former. So "manufacturers" and "distributors" cannot "facilitat[e] the ordering, purchasing, and delivery" of 340B drugs to a "covered entity site" if that "site" is not "identified" on HRSA's "system." 42 U.S.C. § 256b(d)(2)(B)(iv). Nor is Plaintiffs' reasoning limited to child sites. HRSA requiring parent hospitals (or any covered entity) to register before accessing 340B discounts would be forbidden "regulatory alchemy." This cannot be right. For example, hospitals' baseline Program eligibility often turns on a disproportionate share adjustment percentage, *see id.* 42 U.S.C. § 256b(a)(4)(L)–(O), that can change over time and must be verified.

Plaintiffs are forced to take this extreme position because of a pervasive conceptual error. They mix up HRSA's procedures for ascertaining eligibility under sections 256b(a)(9) and (d)(2)(B) with the substantive standards established by Congress in section 256b(a)(4). Plaintiffs use that conflation to argue that Medicare Cost Report verification is nonprocedural, and contrary to the statute, because it denies eligible entities 340B savings for some period. Pl. Resp. at 6, 20-21. And they argue, based on the premise that a given site is inherently a valid participant, that HRSA's practice is contrary to the purpose of the 340B statute. *Id.* at 26, 29, 32 n.11. But because no one knows that a site is eligible prior to verification, Plaintiffs' arguments collapse.

At most, Plaintiffs are left with arbitrary-and-capricious arguments about other ways to verify eligibility and the adequacy of HRSA's explanation in the 2023 notice. Plaintiffs are trying to bootstrap the 2023 notice, which was meant to establish a transition plan for hospitals' benefit after the end of an emergency waiver, into a full reevaluation of a policy that HRSA has had since 1994. Their criticisms of the notice fail: they are based on mistaken factual premises and an erroneous account of the record, and they imply a standard of review that is far more stringent than the deferential standard that actually applies.

All that said, the Court should not address the merits because the lawsuit is untimely. Plaintiffs' position that an email from agency staff was enough to repeal HRSA's longstanding policy would create administrative chaos across agencies. Plaintiffs' treatment of the statute-of-limitations issue is wrong, so the suit must be dismissed at the threshold. Finally, and importantly, Defendants do not concede the issues of standing and appropriate relief. *See* Defs. Mot. at 42-44; Pl. MSJ at 41-44. Rather, they stand on the points made in their opening brief.

## ARGUMENT

### I.    Plaintiffs' Account of HRSA's Past Actions Is Self-Contradictory.

Plaintiffs' opposition largely repeats their prior filings with no real answer to Defendants' argument that access to 340B discounts cannot be self-fulfilling or automatic. But there is one new wrinkle: Plaintiffs now muddle HRSA's 1996 patient-definition guidance and its 1994 registration policy. *See* Pl. Resp. at 1-2, 5, 15, 29, 34, 38 n.12. This confusion leads to an inaccurate read of the record and infects much of the brief.

Plaintiffs initially claimed that HRSA deviated from past policy in 2020, then returned to it in 2023: "In 1994, HRSA took the position that patients seen at a child site of a covered entity are patients of the covered entity, and are thus eligible for 340B drugs, only if the child site appears on the most recently filed Medicare cost report for a covered entity," Compl. ¶ 11. "In 2020

. . . HRSA changed course." *Id.* ¶ 15. "Nonetheless, just before the Public Health Emergency was scheduled to end [in May 2023], HRSA suddenly announced . . . a return to its earlier [1994] policy." *Id.* ¶ 17. Now, Plaintiffs say that "it is not entirely clear that the 2020 policy *was* a deviation from the 1994 Guideline," Pl. Resp. at 17 (emphasis in original); "[T]he administrative record indicates that HRSA understood the 2020 policy to be . . . consistent with the 1994 Guideline," *id.* at 19 n.6. Plaintiffs' contradictory accounts seem to drain this lawsuit of practical effect. *See* Pl. Resp. at 44 (requesting a return to HRSA's pandemic practice, which might be the same as its policy both before and after).

Plaintiffs' confusion seems to originate in a failure to distinguish between (i) 340B patient eligibility and (ii) 340B covered-entity registration. Both affect an off-site clinic's access to discount pricing when providing 340B drugs to an individual, but they are separate concepts. If the clinic is unregistered, HRSA does not know whether an individual treated there is a "patient of [a covered] entity," 42 U.S.C. § 256b(a)(5)(B), because it does not know if the clinic is part of a covered entity. But even if a clinic is registered, an individual who receives 340B drugs there does not automatically fall within HRSA's interpretation of "patient of the entity." For example, if an individual went to a child site simply to fill a prescription, with no other connection to the provider, that person would not be an eligible patient, even if the site itself was part of a covered entity. *See* A.R. at 18 (it is insufficient that "the only health care service . . . is the dispensing of a drug").

Keeping the two concepts distinct makes HRSA's 2020 FAQ more comprehensible. First, HRSA explained that, to register child sites in the 340B Program via the Office of Pharmacy Affairs Information System (the "System"), such sites must be listed on the hospital's latest filed Medicare Cost Report (consistent with HRSA's pre-pandemic practice). *See* A.R. at 55. Next, HRSA explained that, even without registration, covered-entity hospitals could access 340B

pricing for drugs used at their child sites for the covered entity's qualified patients. *Id*. This is the waiver: prior to the pandemic, covered entities could not use 340B drugs at off-site clinics that were not validated through registration in HRSA's System. And since May 2023, the same is true. This is what Plaintiffs characterize as the "pre-registration ban on the use of 340B drugs at child sites," Pl. Resp. at 23, and it is this policy—not patient eligibility—that is at issue in this case.

The 2020 FAQ came with caveats. First, HRSA expected that hospitals would register off-site clinics as soon as practicable. That would provide assurance, albeit after-the-fact, that hospitals were using 340B drugs only at sites with derived eligibility. *See* Defs. Mot. at 7. Second, HRSA emphasized that an individual receiving the 340B drugs from the child site must still qualify as a "patient of" the covered entity to remain compliant with section 256b(a)(5)(B). A.R. at 55. Finally, the covered entity had to maintain documentation to demonstrate compliance with 340B requirements, including "auditable records" for each individual "dispensed a 340B drug." *Id.* at 56.

Against this backdrop, Plaintiffs' reading of the record is clearly wrong. Plaintiffs point to a June 2020 email to argue that the FAQ was posted to "'highlight some of the 340B Program practices that are available to covered entities during this challenging time'—not that it was a COVID-specific flexibility." Pl. Resp. at 15 (quoting A.R. at 104). The email's reference to a "challenging time" means the COVID-19 public health emergency. Indeed, the email responds to a question about information that "OPA posted to its COVID-19 page"; it was a "clarification on how the Program has been operating" during the COVID-19 pandemic. *Contra* Pl. Resp. at 19 n.6. Plaintiffs minimize the fact that the 2020 FAQ was "on HRSA's COVID-19 Resources page" with the *ipse dixit* that the FAQ was "not one of" the "flexibilities" "for use during the" public health emergency. Pl. Resp. at 15. That assertion is refuted by the website itself. *See* A.R. at 55 ("Below are some frequently asked questions (FAQs) related to COVID-19."). In addition, Defendants'

- 5 -

description of the Apexus email is not "inexplicabl[e] as Plaintiffs contend. *See* Pl. Resp. at 16, n.3. The email's discussion of HRSA's patient-definition guidance, *see* Def. Mot. at 40, does not support Plaintiffs' contention that the separate registration waiver was a new permanent policy.

Although HRSA did not explicitly say "public-health emergency waiver" in its 2020 FAQ, the record shows it was intended as and operated as such. *See, e.g.*, A.R. at 20. Plaintiffs are left to rely on a single email to argue that HRSA's waiver was actually a new permanent policy. *See* Pl. Resp. at 15-16 (citing A.R. at 94-95). Plaintiffs admit that email was preceded just a week earlier by an email to the same party that stated HRSA was not changing its registration policy. *Id.* at 15 (citing A.R. at 90). The earlier email states the 1994 policy is "still in place" even though HRSA has "stated to hospitals" that during the pandemic their child sites can give 340B drugs to individuals "to the extent they are patients of the covered entity." A.R. at 90. As between Plaintiffs' chosen email and HRSA's 2020 website posting—the most "relevant, contemporaneous portion of the administrative record," Pl. Resp. at 15—the latter definitively shows that HRSA's 2020 action was a temporary COVID-19 measure.

## II.    <u>Plaintiffs Fail to Explain How Their Lawsuit Is Timely.</u>

Armed with an accurate account of the HRSA's actions, the Court can easily dispose of this case on statute-of-limitations grounds. Medicare Cost Report verification was established in 1994, and without a repeal or reopener of the 1994 notice, Plaintiffs' challenge *must* be untimely. Plaintiffs are wrong that HRSA's pandemic practice constituted an "immediately preceding policy" (as opposed to temporary nonenforcement of the purportedly legislative 1994 rule) such that the date of accrual here is October 27, 2023. Plaintiffs are also wrong that the reopener doctrine is "irrelevant" because the 2023 notice is final agency action. *See* Pl. Resp. at 19-20, n.7.

To start, there is no way to construe Plaintiffs' evidence—a single email contradicted by other formal public statements—as establishing that the 1994 notice was repealed and replaced

with a new, intervening legislative rule before HRSA returned to its pre-pandemic practice in 2023. *See* Defs. Mot. at 38-42. Defendants' pointing out the lack of a notice-and-comment rulemaking in 2020 is not a contention that "two wrongs make a right" as Plaintiffs contend. *See* Pl. Resp. at 18. Rather, nothing HRSA did during the pandemic could reasonably be construed as intending or effectuating a repeal or replacement of Medicare Cost Report verification, assuming it is a legislative rule. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986).

Next, the decision in *Alaska v. Department of Agriculture*, 772 F.3d 899 (D.C. Cir. 2014), shows that without a repeal—or without reopener, which Plaintiffs disclaim—Plaintiffs' lawsuit is untimely.  In that case, Alaska brought a 2011 challenge to a rule the Forest Service issued in 2001. The court held the lawsuit was timely only because "the Forest Service repealed the [rule] in 2005" before it was reinstated in 2006. *Id.* at 900. Otherwise, the court suggested the challenge would be untimely because the cause of action would have accrued in 2001. *See id.* Here, without a repeal or reopener, Plaintiffs' facial challenge accrued when HRSA adopted Medicare Cost Report verification in 1994. Thus, Plaintiffs' challenge is untimely.

Finally, if the Court assumes (without deciding) that Medicare Cost Report verification is a legislative rule, and finds there is no intervening repeal, then the reopener doctrine is the applicable framework. Plaintiffs do not attempt to establish reopener. Instead, they argue in passing that the reopener doctrine is "irrelevant" because the 2023 notice is "final agency action." Pl. Resp. at 19 n.7. But courts apply the reopener doctrine in situations where the later-in-time agency action is final. *See, e.g.*, *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135 (D.C. Cir. 1998). Otherwise, the doctrine would be useless: a plaintiff would prevail on reopener, then lose for lack of final agency action. The Supreme Court has explained that the

reopener doctrine is "inapposite to the question of final agency action" and is instead an "exception to statutory limits on the time for seeking review of an agency decision." *Biden v. Texas*, 597 U.S. 785, 809 n.8 (2022) (quotes omitted).

The question to be answered is whether the later-in-time agency action is when a challenge "first accrue[d]," 28 U.S.C. § 2401(a), not whether the action is final. Finality is necessary but not sufficient. And here, Plaintiffs challenge Medicare Cost Report verification, so their challenge "first accrued" in 1994. The 2023 notice may also be non-final—it simply restates obligations that come from the 1994 notice—but untimeliness is a separate hurdle that allows this Court to dismiss the case without getting into thorny questions of finality.

## III.    Plaintiffs' Notice-and-Comment Claim Fails.

If the Court reaches the merits, Plaintiffs' notice-and-comment claim fails regardless of whether Medicare Cost Report verification is classed as a legislative or procedural rule.

### A.    If the Rule Is Legislative, HRSA Satisfied Notice and Comment in 1994.

If Medicare Cost Report verification is a legislative rule, then, as explained above, it traces back to the 1994 notice, which was preceded by notice and comment. Defendants do not ignore an "intervening change" as Plaintiffs allege. *See* Pl. Resp. at 14. Rather, Defendants have explained why the temporary, emergency non-enforcement of HRSA's so-called "pre-registration ban" was not a replacement of a legislative rule. *See supra* at 5-7; Defs. Mot. at 38-42. And Defendants are not arguing that one email from agency staff, A.R. at 94, was intended as a repeal but was procedurally defective; Defendants argue that there could be no repeal at all.

None of Plaintiffs' case law, Pl. Resp. at 17-18, undermines Defendants' position. They chiefly rely on a non-controlling, out-of-circuit decision, *Guilford College v. Wolf*, Civ. A. No. 18-0891, 2020 WL 586672 (M.D.N.C. Feb. 6, 2020). In that case, the defendant argued that the current iteration of a rule was interpretative, not legislative, because prior iterations of the rule

had never undergone notice and comment. *Id.* at *7. That is the opposite of here: Defendants assume the rule is legislative and argue it did undergo notice and comment. Meanwhile, *Consumer Energy* supports Defendants: revocation of a rule did not moot a lawsuit because there was not notice and comment for the revocation. *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 445-48, n.79 (D.C. Cir. 1982). If HRSA issued a legislative rule in 1994, it did so pursuant to notice and comment, and nothing in 2020 revoked that rule. Finally, *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022), simply stands for the proposition that agencies must use notice-and-comment rulemaking to establish legislative rules. Defendants agree—and as explained, the same is true for when agencies repeal and replace legislative rules, which did not happen here.

### B.    Medicare Cost Report Verification Is a Procedural Rule.

Medicare Cost Report verification falls within the APA's procedural-rule exception. Plaintiffs' contrary argument largely rests on a misreading of precedent.

Plaintiffs' overarching argument is that Medicare Cost Report verification is legislative because it impacts when a covered-entity site may access 340B discount pricing. Pl. Resp. at 6-8, 12-13. But the D.C. Circuit has made clear that access to a benefit being delayed while covered entities comply with registration requirements does not automatically make the rule legislative. *See* Defs. Mot. at 18-20. Indeed, Plaintiffs' cited authority emphasizes this point. *See Elec. Privacy Inf. Ctr. ("EPIC") v. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) ("a rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule under § 553(b)(3)(A)") (citing *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640-41 (2002)). Beyond their incorrect accusation of "circularity," Pl. Resp. at 14, Plaintiffs have no meaningful answer. Their discussion ignores that several D.C. Circuit decisions deal with procedural rules that very much "altered where and when," Pl. Resp. at 6, a person could access the benefits of a regulatory regime.

- 9 -

In a similar vein, Plaintiffs attempt to distinguish between impact on "rights" versus "interests." Pl. Resp. at 10-11. Their overbroad reading of precedent would destroy the procedural-rule exception. Any litigant challenging an agency rule has "interests" that are adversely impacted by the rule. *See, e.g.*, *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280-81 (D.C. Cir. 2000). The court in *Chamber of Commerce v. Department of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999), focused on "interests" not as a watered-down version of "rights," but rather as reason to reject an argument that a rule operated by "leverage" rather than as a direct mandatory obligation. *See id.* That aspect of *Chamber of Commerce* is not relevant here, however.

Plaintiffs' approach would mean any perceived negative impact would be sufficient to determine that an action constitutes a nonprocedural rule. That contradicts a basic understanding of administrative procedures as well as the controlling authority. The proper approach is a nonmechanical ("functional, not formal") weighing of (1) whether the rule "encodes a substantive value judgment"; and (2) whether the rule occasions such a significant change that notice and comment is "needed to safeguard the policies underlying the APA." *E.g.*, *EPIC*, 653 F.3d at 5-6; *Pub. Citizen,* 276 F.3d at 640; *Chamber of Com.*, 174 F.3d at 212; *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987).

Applying the correct approach favors Defendants. As explained in Defendants' opening brief, Defs. Mot. at 16, Medicare Cost Report verification is a "house-keeping measure[]" for how hospitals register their sites in an agency database that tracks 340B-participating covered entities. *AFL-CIO v. Nat'l Lab. Rels. Bd.*, 57 F.4th 1023, 1035 (D.C. Cir. 2023) (quoting *Bowen*, 834 F.2d at 1045). It is separate from the "substantive value judgment" of whether an off-site clinic that is integrated with a covered-entity hospital could ever be considered eligible under § 256b(a)(4). Moreover, the policy goals animating the APA do not necessitate notice-and-comment for the 2023

notice because it simply marked a return to enforcement of HRSA's standard, pre-pandemic registration requirements, which Plaintiffs had abided by since 1994.

None of Plaintiffs' specific arguments show otherwise. First, Plaintiffs argue that the 2023 notice changes the substantive eligibility standards for covered entities under § 256b(a)(4). *See, e.g.*, Pl. Resp. at 6-7. They are wrong.  It is important to recognize that the 1994 notice first addressed the substantive issue (whether an off-site clinic can ever claim derived eligibility) and then the procedural issue (how HRSA will ascertain integration). *See* A.R. at 14. Moreover, even if that dual function were somehow problematic (it is not), there is no similar duality in the 2023 notice. Indeed, Plaintiffs do not contend that HRSA ever abandoned the position that a site needs to be integrated with a 340B-eligible hospital to enjoy derived eligibility.

In the instances when Plaintiffs accurately characterize the dispute here, the rule is self-evidently procedural: "HRSA's decision to require registration—and continued insistence on basing registration on appearance on a Medicare cost report—results in" a purported delay before a site can access 340B discounts. Pl. Resp. at 6. And as explained throughout Defendants' briefing, it makes no sense, in non-emergency circumstances, to disaggregate entities' access to 340B discounts from the necessary step of Program registration. It is incorrect that the 2023 notice "precludes covered entities' 'entitlement to a substantive right'—the right to use 340B discounted drugs to treat its patients at facilities that HRSA acknowledges are part of covered entity hospitals," Pl. Resp. at 9—because prior to registration, HRSA has not "acknowledged" that a particular site is "part of" an eligible covered entity (as opposed to acknowledging in the abstract that a site would fall within (a)(4) if it is shown to be integrated).

Second, Defendants have not framed the issue at "too high a level of generality," Pl. Resp. at 6: Medicare Cost Report verification is exactly the mechanism by which HRSA can determine

that a given off-site clinic enjoys derived 340B eligibility and is thus eligible for 340B discounts. *EPIC* does not undermine Defendants' position. In *EPIC*, the Transportation Security Administration implemented a rule that changed default airport screening from magnetometers to advanced imaging technology. 653 F.3d at 2-3. The HRSA tried to avoid notice-and-comment rulemaking for this path-breaking change because "[t]he requirement that a passenger pass through a security checkpoint is hardly novel." *Id.* at 6. The court found this blanket invocation of "procedure" to be wanting: "it is clear that by producing an image of the unclothed passenger, an AIT scanner intrudes upon his or her personal privacy in a way a magnetometer does not." *Id.* It was the significance and novelty of the rule that motivated the *EPIC* decision: "regardless whether this is a new substantive burden, the change substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* (quotes and cite omitted); *see also id.* ("few if any regulatory procedures impose directly and significantly upon so many members of the public"). Here, by contrast, the 2023 notice simply confirms HRSA's resumption of a non-emergency regime that has existed since 1994—and does so for a specified class of statutorily-defined entities.

Third, Plaintiffs incorrectly declare that Medicare Cost Report verification is not part of HRSA's "*internal* procedures." Pl. Resp. at 8 (emphasis in original). Not so. The rule is about what information the agency needs to ascertain that a site is 340B eligible and then listed on an agency database. Many of the cited procedural-rule cases involve the submission of information from an external party; one paradigmatic description of a procedural rule is that it concerns "the manner in which the parties present themselves or their viewpoints to the agency." *EPIC*, 653 F.3d at 5. Under similar reasoning, Medicare Cost Report verification is related to "the duties of agency

staff," and governs the "time and manner of agency proceedings."  Plaintiffs' argument to the contrary (Pl. Resp. at 8, 11) is incorrect.

Fourth, Plaintiffs return to their argument that a rule cannot be procedural if it is mandatory and make much of the 2023 notice's "compliance safe harbor." *See, e.g.*, Pl. Resp. at 4, 8, 10. But Defendants' authority amply establishes that agencies can require compliance with procedural rules. *See, e.g.*, *JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320, 322 (D.C. Cir. 1994) (procedural rule that provided that incomplete applications would be summarily rejected with no opportunity to cure). The presence of a "safe harbor"—to the extent that is even an accurate characterization—is best understood as an indication of finality, not of whether a rule is non-procedural. *See Army Corps. of Eng'rs. v. Hawkes Co., Inc.*, 578 U.S. 590, 598-99 (2016). If regulated entities could disregard procedural rules without consequence, it is unclear what use they would serve.

Plaintiffs' treatment of *National Mining*, Pl. Resp. at 8, is similarly wrong. The court referenced "binding obligations or prohibitions" in its finality analysis and in the context of distinguishing legislative rules from general statements of policy. *See Nat'l Mining Ass'n v McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014). The procedural-rule analysis is earlier in the decision and addresses a different agency issuance. Indeed, the court would have never reached the procedural-rule analysis for that different document if it was non-binding, and non-final, in the same way as the issuance that the court declined to review. *Compare id.* at 250, *with id.* at 253. Also, Plaintiffs' use of *National Mining* here contradicts their later concession that HRSA may "require 'applications' as part of its recordkeeping and enforcement functions." Pl. Resp. at 25.

Fifth, Plaintiffs repeatedly assert that verification costs hospitals millions of dollars without accounting for the massive scale of hospital revenues, i.e., they present the numerator without the denominator. For example, the Program is $53 billion as of 2022, with over 80% attributable to

340B hospitals. *See* 2022 340B Covered Entity Purchases, *available at* https://www.hrsa.gov/opa/updates/2022-340b-covered-entity-purchases (last visited Apr. 19, 2024). Without addressing the denominator here, Plaintiffs do not provide an adequate basis for this Court to evaluate the substantiality of the purported lost-savings problem. *See EPIC*, 653 F.3d at 5 ("[T]he distinction between substantive and procedural rules" "depend[s] upon whether the substantive effect is sufficiently grave so that notice and comment are needed[.]") (quotes omitted). The problem may be relatively minor for most, if not all, providers.

Sixth, Plaintiffs' effort to coopt *AFL-CIO*, Pl. Resp. at 9-13, fails. Start with the court's analysis of the dispute-resolution timing provision in the National Labor Relations Board's ("Board") 2019 rule. 57 F.4th at 1043-45. Plaintiffs argue that the key distinction was that the rule was a "presumption," Pl. Resp. at 9, but that cannot be the right: a "presumption" still dictates the default course of proceedings—and still adversely impacts a person's interests, *see* 57 F.4th at 1043—so under Plaintiffs' reasoning, it is not clear why the presumptive (rather than certain) effect of a rule would be dispositive. For example, the rule at issue in *EPIC* was also presumptive. 653 F.3d at 3 ("No passenger is ever required to submit to an AIT scan."). Same with *Chamber of Commerce*. *See* 174 F.3d at 208. Even *AFL-CIO* found a rule was substantive although it, too, was presumptive. 57 F.4th at 1041. Instead, it was important to the court's analysis that the 2019 dispute-resolution provision returned to the Board's pre-2014 practice. 57 F.4th at 1044-45. That circumstance bears on whether notice-and-comment is needed to safeguard the policies underlying the APA, and that aspect of *AFL-CIO* favors Defendants.

The court's analysis of the Board's 2019 election-scheduling provision, *see* 57 F.4th at 1045-46, similarly favors Defendants. The court held the provision to be procedural even though it doubled the delay time in when a union election could be scheduled. *Id.* at 1045. That is, it

delayed when a regulated party could "assert" "substantive rights." *Id.* (cleaned up). Notably, the court reasoned that the rights or benefits of union representation did not attach until the election determined there would be a union. *Id.* at 1046. So, too, here.  Plaintiffs are wrong that verification should be construed as denying eligible covered-entity sites the benefits of the Program, because no one knows they are eligible until verification. And once again, the *AFL-CIO* court focused on the fact that the Board's 2019 provision marked a return to the pre-2014 regime. *Id.* So, too, here. In 2023, HRSA simply resumed its standard pre-pandemic registration practices. Finally, the provision was aimed at allowing the orderly resolution of union-employer disputes to facilitate clean elections and remove questions of union-representation down the road. *Id.* So too here. HRSA requires verification on the front end to facilitate the orderly functioning of the Program by weeding out sites with unknown eligibility.

The *AFL-CIO* court's analysis of other provisions in the Board's 2019 rule further supports Defendants. The voter-list timing provision was nonprocedural because "it primarily facilitates the transmission of information between parties, not from a party to the [agency]" and therefore "directly addresses the union's ability to contact employees on equal terms with the employer." *Id.* at 1036. Not so here: Medicare Cost Report verification is about the information that hospitals submit to HRSA. The delayed-certification provision was nonprocedural because it denied the benefits of unionization even after a pro-union vote, in contrast to the 2014 rule. *Id.* at 1038-39; *see also id.* at 1046 (election-scheduling provision was distinguishable from delayed-certification provision because "[o]nly the latter directly alters an employer's legal duty and its employees' associated substantive right during a certain period post-election"). Here, the point of verification is to check whether a site has derived eligibility; moreover, outside emergency circumstances, HRSA has always required Medicare Cost Report verification before a purported child site can

access 340B discount pricing. Finally, the election-observer provision was nonprocedural because it restricted parties' choice of "non-Board observers" even though the Board had "long" recognized such choice "as an important interest." *Id.* at 1042; *see also id.* (the provision departed from "the Board's precedent"). HRSA has not "long" recognized the value of allowing sites to access 340B pricing before validating eligibility. Quite the contrary.

In the end, a "narrowly construed" procedural-rule exception, Pl. Resp. at 1, does not mean one that is never applied, and the D.C. Circuit has emphasized that arguments of negative impact simpliciter should not be allowed to "obliterate[]" "the distinction that Congress demanded," *JEM Broad. Co.*, 22 F.3d at 326. A proper reading of precedent shows it is on Defendants' side.

## IV.    Medicare Cost Report Verification Is Consistent with the 340B Statute.

Section II of Plaintiffs' response rests on two fundamental errors. First, Plaintiffs assert that verification, regardless of method, may never precede covered entities' access to 340B discounts. *See, e.g.*, Pl. Resp. at 24. As explained throughout Defendants' briefing, that position is untenable. *See, e.g.*, *supra* at 1-2; Defs. Mot. at 21-24.

Second, Plaintiffs conflate HRSA's patient-eligibility guidance and HRSA's separate registration practices. They endeavor to portray HRSA's actions in 2020 and 2023 as lifting then reimposing a substantive restriction on which individuals may be considered "patients of" a covered entity.  *See* Pl. Resp. at 21-24. As explained *supra* at 4-5, that characterization is incorrect. During the pandemic, HRSA never relaxed the statutory requirement that 340B drugs may only be provided to a "patient of" a covered entity. *See, e.g.*, A.R. at 55-56. It simply allowed, in response to the emergent circumstances of the pandemic, covered entities to access 340B pricing at off-site clinics prior to those sites being validated as integrated child sites and registered in the Program.

Without Plaintiffs' obfuscation, it is easy to see how HRSA's policy fits within the 340B statute. HRSA's policy is a "pre-registration ban" in the sense that, prior to registration, neither

HRSA nor Program stakeholders know that a given clinic has derived 340B eligibility. HRSA cannot "identify" that "site" as part of a covered entity, 42 U.S.C. § 256b(a)(9), (d)(2)(B), so the clinic is a stranger to the Program. Nor has HRSA "verif[ied]" the site as an eligible 340B participant, as required by section 256b(d)(2)(B)(ii). Even Plaintiffs concede that HRSA can "require 'applications' as part of its record-keeping and enforcement functions." Pl. Resp. at 25. That concession is fatal to their position: providing information from a Medicare Cost Report is how a hospital "applies" to include an off-site clinic in the Program. Plaintiffs' precedent, *id.* at 22, is inapposite, as HRSA uses verification to ascertain whether a purported child site is part of a "covered entity," not to add substantive criteria to what constitutes a "covered entity" under (a)(4).

Also, Plaintiffs attack Defendants' assertion that "agencies 'create procedures to establish eligibility' all the time." Pl. Resp. at 25 (quoting Defs. Mot. at 22). Plaintiffs take this language out of context. In context, "establish" clearly means "ascertain" or "validate," not the creation of substantive criteria to augment section 256b(a)(4). Putting aside the explicit textual hooks in the statute, Plaintiffs do not explain how it is practically possible for an agency to administer a program that provides a benefit to a defined set of entities without an agency mechanism for identifying the set. Plaintiffs argue that Defendants' examples, Pl. Resp. at 24-25 (citing Defs. Mot. at 22), deal with programs that involve the expenditure of federal government funds. That is a distinction without a difference. Indeed, it is arguably worse for the government to play fast and loose with others' (drugmakers') "money on the line." Pl. Resp. at 38. And the agreements that manufacturers execute to enter the 340B Program, *see* Pl. Resp. at 25, only obligate them to provide discount prices to providers who qualify as covered entities under § 256b(a)(4). Manufacturers cannot satisfy that obligation (nor can HRSA hold them to it) without knowing which provider sites are, indeed, "covered entities."

Plaintiffs' reliance on section 256b(a)(7), Pl. Resp. at 22-23, is misplaced. Whatever additional "certification" and "recertification" process may attach to specific types of entities whose eligibility may turn on the volume of discount purchases (*see* 256b(a)(7)(B), (E)), subsections 256b(a)(9) and (d)(2)(B) are separate and are not limited to particular covered-entity types. The need for verification stems from the basic structure of the 340B Program, where all participating providers must fall within a specific provision of section 256b(a)(4), and sometimes do so based on criteria that are not immediately ascertainable, such as the hospital's disproportionate share adjustment percentage. *See* Defs. Mot. at 23. Indeed, subsection 256b(a)(7) does not speak to the dispute here—whether access to 340B discounts must precede a child site's validation—so it is unclear how it advances Plaintiffs' position. And Plaintiffs contradict themselves a few pages later. *Compare* Pl. Resp. at 23 (there can be no "program-wide application process"), *with id.* at 25 (conceding that HRSA can "require 'applications'").

Just as HRSA's registration process is consistent with the 340B statute, it falls within the agency's delegated authority. Plaintiffs argue that "Congress has given HRSA authority that is precisely delineated, rather than general." Pl. Resp. at 28. But Defendants' argument is that sections 256b(a)(9) and (d)(2)(B) are specific delegations of authority to establish a covered-entity registration regime. HRSA has merely executed the statutory terms in those provisions with real-world processes. Plaintiffs wave away the possibility of "inherent authority." *See* Pl. Resp. at 27 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519 (1978)). But an agency cannot administer a program that provides a benefit to defined entities without identifying those entities. Either way, Plaintiffs' "*ultra vires*" claim (Pl. Resp. at 28-30) is meritless.

## V.    <u>Medicare Cost Report Verification Is Not Arbitrary and Capricious.</u>

Shorn of its deceptive statutory-interpretation wool, Plaintiffs' argument amounts to the contention that HRSA's use of Medicare Cost Report verification is unreasonable because it results

in a delay in when a child site that will ultimately be found to be 340B eligible can actually access 340B pricing. *See, e.g.*, Pl. MSJ at 32. Even here, much of Plaintiffs' attack on the substantive reasonableness of HRSA's policy is premised on a conceptual sleight-of-hand that confuses the burden of verification for a restriction on substantive eligibility.

In addition, case law on what it means for agency action to be "unreasonably delayed," 5 U.S.C. § 706(1), lays to rest any doubt that HRSA's approach is reasonable. Verification processes can take years depending on the regulatory regime and available resources—and people are denied benefits in the meantime. *See generally Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099-1102 (D.C. Cir. 2003); *Da Costa v. Immig. Investor Prog. Off.*, 80 F.4th 330, 340-46 (D.C. Cir. 2023). If the easily administered approach of Medicare Cost Report verification is vacated, HRSA (needing something more rigorous than optional self-attestations or interim bills) may have to evaluate child-site registrations using site visits, record review, and more. Registration delay could easily span years instead of months: HRSA's Office of Pharmacy Affairs has less than ten staff members whose duties include, but certainly are not limited to, covered-entity registrations; HRSA currently conducts 200 audits a year for all aspects of covered-entity participation in the Program; there are over 14,000 covered entities and over 800 drug manufacturers participating in the Program; there are over 33,000 participating outpatient facilities associated with 340B hospitals; and in the first quarter of 2024 alone there were over 1,600 hospital child-site registrations. If there were no verification rule to serve as a target for suit, and a hospital sued for unreasonable delay after two years of waiting for its child site to gain access to the Program (the maximum alleged delay here), it would face a steep uphill climb. *See, e.g.*, *Daneshvarkarshkooli v. Blinken*, Civ. A. No. 23-1225 (RJL), 2024 WL 1254075, at *4 (D.D.C.

Mar. 25, 2024) (processing delays of five years not unreasonable). In sum, HRSA's approach is a reasonable way to validate child sites, consistent with statutory mandates and resource constraints.

Plaintiffs not only attack the substantive reasonableness of HRSA's chosen procedures, but also the adequacy of HRSA's explanation. Plaintiffs want this Court to vacate and remand the notice so that HRSA can even more plainly state: "The agency does not believe the costs articulated by hospitals justify turning the 340B Program into an unchecked free-for-all." That is not actually a plea for reasoned decisionmaking as HRSA already said it rejects the contention that "undue burden" arises from its "reverting back to its original program guidelines." A.R. at 22; *see also id.* at 21 ("The burden of registration and including a facility in the next filed Medicare Cost Report" is not sufficient reason for HRSA to not "enforce its longstanding registration requirements.").

HRSA's explanation in the 2023 notice is sufficient. *See Van Hollen, Jr. v. FEC*, 811 F.3d 486, 496-99 (D.C. Cir. 2016). As the D.C. Circuit explained in *Van Hollen*, the applicable standard is "not particularly demanding" and asks only whether the agency's explanation allows a court to "reasonably discern the agency's analytical path." *Id.* at 497. That "analytical path" is obvious here, and none of Plaintiffs' sub-arguments meet the "heavy burden" of showing that an "agency action is not a product of reasoned decisionmaking." *Id.* at 495 (cleaned up).

### A.    HRSA Did Not Unreasonably Fail to Consider the Impact on Hospitals.

Defendants' opening brief explained why it was not arbitrary and capricious for HRSA to resume its standard registration practices notwithstanding any purported financial impact on hospitals. The language from the 2023 notice quoted above—that the "burden of registration" does not warrant abandoning HRSA's longstanding practice, A.R. 21-22—refutes Plaintiffs' argument that HRSA did not "give a moment's consideration" to costs for hospitals. *See* Pl. Resp. at 32. Notably, Plaintiffs abandon their original contention, Pl. MSJ at 33, that HRSA ignored the time-lapse between a site's opening, its listing on a Medicare Cost Report, and its registration in the

Program. That is because the notice makes clear Plaintiffs were wrong: "In that time period between the audits and May 11, 2023, hospitals should have been able to register offsite, outpatient facilities on [the Office of Pharmacy Affairs Information System]" so "it was unclear whether the unregistered sites would ever be eligible and an integral part of a 340B hospital." A.R. at 21. Defendants' argument is supported with quotes from the 2023 notice; it is not a post-hoc rationalization as Plaintiffs suggest. *See* Pl. Resp. at 32.

Nor do Plaintiffs dispute that these purported costs have been present as long as HRSA has used Medicare Cost Report verification. Instead, Plaintiffs assert that HRSA was "was obligated to engage in reasoned decision-making" "even if [the 2023 notice] resurrects the 1994 Guideline." Pl. Resp. at 30-31. No one disputes that "reasoned decision-making" is needed. The dispute is over what it entails. The requirement for reasoned decisionmaking is context specific, Defs. Mot. at 25-26, and here, HRSA was ending an emergency waiver of a policy that has existed since 1994. That context clearly bears on the reasonableness of its decision and what explanation is required.

Plaintiffs do not directly respond to this point, but instead argue that HRSA was "aware of" hospital's concerns based on letters sent after HRSA told stakeholders that the waiver would end at the end of the public health emergency. Pl. Resp. at 31. Indeed, that is why HRSA issued the 2023 notice: to confirm the waiver had ended and establish a transition process that gave hospitals ample lead time to return to compliance with HRSA's standard, pre-pandemic practices. A.R. at 21. Plaintiffs' argument just underscores the reasonableness of HRSA's action.

In their Opposition (Pl. Resp. at 32), Plaintiffs misunderstand Defendants' contention that their burden argument is not supported by the record. To repeat, prior to validation as an integrated off-site clinic, no one knows if a particular site is eligible for the 340B Program. There are no "lost [340B] savings" if it is not. When HRSA reviewed its experience during the pandemic, it found

that hospitals were not registering sites on the System regardless of having enough time to list them on their Medicare Cost Reports. *See* Defs. Mot. at 26. Thus, HRSA reasonably determined that any "lost [340B] savings" caused by delays in Medicare Cost Report verification was not dispositive: hospitals' exploitation of the absence of pre-access verification raised the substantial concern that ineligible sites were accessing 340B discounts. A.R. at 21. Under the governing statute, it was clearly reasonable for HRSA to refuse to dispense with verification altogether for the sake of hospital profits, so Plaintiffs' burden argument collapses into its argument about alternative verification methods.

Insofar as Plaintiffs take issue with HRSA's application of its past experience to inform future predictions of hospital behavior, "[t]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2019). It was reasonable for HRSA to make a policy choice about the proper balance between 340B Program integrity and timely access to discounts for eligible child sites based on HRSA's experience with hospitals in the years immediately preceding the 2023 notice.

**B.     There Is No Change In Position With Respect to Medicare.**

Defendants' opening brief explained how HRSA's 340B practice has retained the same level of "some . . . consistency," Pl. Resp. at 34, with Medicare practices since 1994. *See* Defs. Mot. at 27-28. Plaintiffs' broad assertion that cost reports "have become far less relevant," *id.* at 33, is non-responsive to the fact that the same divergence has always existed between the 340B Program and Medicare when it comes to child sites' financial benefit. This is not an impermissible post-hoc rationalization: the point is that HRSA need not "display awareness" of a change that did not impact the 340B Program. Plaintiffs' argument that HRSA's notice needed a more fulsome analysis of a different program, Medicare, is especially misguided given the context here—HRSA was not writing on a blank slate but instead was winding down an emergency measure.

Plaintiffs also argue that it would be more consistent with Medicare for HRSA to rely on ex post enforcement. Pl. Resp. at 34-35. It is not a failure of reasoned decisionmaking for HRSA to believe that, for the distinct 340B Program, relying on audits of a fraction of covered entities is not a responsible substitute for ex ante verification of sites' 340B eligibility. Plaintiffs cannot wave away this point as a post hoc rationalization: precedent is clear that an agency need only consider "responsible" and "viable" alternatives. *See* Defs. Mot. at 35. Ex post enforcement alone, using audits of a small portion of hospital covered entities, is not a "responsible" or "viable" alternative.

## C.    The 2023 Notice Is Not Otherwise Inadequately Reasoned.

Plaintiffs now agree that the relevant reliance interests here, if any, are those engendered by HRSA's "repeated assurances" that the waiver was permanent. Pl. Resp. at 35. "Repeated" is an overstatement: Plaintiffs identify one relevant email. *Supra* at 5-6. And HRSA did consider such interests: "As some covered entities believed the waiver would continue indefinitely . . . HRSA is providing a transition period[.]" A.R. at 21-22. Indeed, the 2023 notice's main practical function was to account for reliance interests; HRSA had announced the waiver's end months earlier and was resuming a practice that hospitals (including Plaintiffs) had complied with for 26 years prior to the pandemic. Plaintiffs cite to letters, Pl. Resp. at 35-36, that all point to sites falling within the 2023 notice's transition plan. As such, Plaintiff's point about "mere mention of a document," Pl. Resp. at 36, has no merit, since HRSA expressly acted on stakeholders' concerns.

Next, Plaintiffs complain that HRSA did not identify specific instances of diversion or duplicate discounting and did not explain why ex post compliance mechanisms are insufficient. Pl. Resp. at 36-38. These points do not make the notice arbitrary and capricious. HRSA reasoned that it is difficult to ascertain Program compliance and protect Program integrity when it is unclear whether certain sites are even eligible participants, A.R. at 20-21, which is not "far from intuitive." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) ("[T]hat complete

immunity . . . will lead to a substantial increase in fleeting expletives seems to us an exercise in logic."); *Van Hollen*, 811 F.3d at 497-98; *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("An agency need not suffer the flood before building the levee."). And Plaintiffs are wrong that HRSA faulted hospitals for acts consistent with the waiver.  As HRSA explained, hospitals never took steps to register sites even though they should have.  *See* Defs. Mot. at 7-9.

On the second point, Defendants have already explained that ex post enforcement alone is not a viable alternative, so HRSA did not need to explicitly consider it. It is hard to believe Congress mandated a regime with a flagrant "risk of noncompliance," Pl. Resp. at 37 (emphasis omitted), because no one checks if a site falls within section 256b(a)(4) before the site accesses 340B discounts. And again, Plaintiffs ignore the context of the notice: it resumed a practice that HRSA used for twenty-six years notwithstanding additional enforcement mechanisms.

Finally, Plaintiffs argue that HRSA failed to consider "alternative, less burdensome solutions" and accuse Defendants of more post hoc rationalizations. *See* Pl. Resp. at 38-41. It is not a post hoc rationalization to say that a purported alternative does not "meet the goal of the action" such that it need not be a part of an agency's reasoned decisionmaking. *See* Defs. Mot. at 34-35; *see also Van Hollen*, 811 F.3d at 499 (a "partially mitigating alternative" is not a "viable" alternative that needs to be considered) (cleaned up). Agencies need not analyze irresponsible alternatives to avoid forfeiting litigation arguments.

Defendants explained, Defs. Mot. at 33-36, why Plaintiffs' proposals did not need to be analyzed for the 2023 notice to pass muster. Plaintiffs try to resuscitate their proposal to use provider-based attestations by arguing that HRSA should rely on them only when hospitals choose to submit them. Pl. Resp. at 39. That still results in a system that conditions 340B access on a voluntary Medicare process, thereby impinging on the policy balance struck in 42 C.F.R. § 413.65.

And reasoned decisionmaking does not require HRSA to explain why it does not want a multitiered system tailored to the interests of any particular hospital, regardless of resource costs—particularly because the statute mandates a "standardized" system, 42 U.S.C. § 256b(d)(2)(B)(iv).

Plaintiffs add that hospitals can lie on Medicare Cost Reports, too. Pl. Resp. at 40. A painstaking analysis of how hospitals commit fraud should not be a requirement for reasoned decisionmaking here. And Medicare Cost Reports are clearly more reliable and robust than a provider's bill. *See* Defs. Mot. at 35. The Court should reject Plaintiffs' implication that hospitals do not apply a host of internal controls to ensure the truth and accuracy of their Medicare Cost Reports, not to mention the oversight exercised by Medicare Administrative Contractors. *See generally* 42 C.F.R. § 413.24 (requiring direct certification from "the provider's administrator or chief financial officer"); *Medicare Fin. Mgmt. Man.*, CMS Pub. No. 100-06, Ch. 8 (describing review processes that contractors apply to cost reports).

Again, the 2023 notice was meant to wind down an emergency measure and help hospitals with a transition plan. In context, the absence of express refutation of Plaintiffs' posited alternatives—just like Plaintiffs' heightened requirements for a more explicit rejection of their lost-savings argument or a deep analysis of Medicare reimbursement practices—does not make the notice arbitrary and capricious.

## CONCLUSION

For these reasons, and those in Defendants' opening brief, the Court should grant Defendants' cross-motion.

*/s/ Stephen DeGenaro*, Assistant United States Attorney (full signature block to follow)

Dated: April 19, 2024
      Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:          */s/ Stephen DeGenaro*
    STEPHEN DEGENARO
    D.C. Bar #1047116
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-7229
    Stephen.DeGenaro@usdoj.gov

*Attorneys for the United States of America*

Of Counsel:

ANANT KUMAR
Attorney
U.S. Dept. of Health & Human Services
26 Federal Plaza, Ste. 19-300
New York, NY 10278
(202) 597-1564
anant.kumar@hhs.gov

SAMUEL R. BAGENSTOS
General Counsel

SEAN KEVENEY
Deputy General Counsel
U.S. Dept. of Health & Human Services